## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MERISANT WORLDWIDE, INC., <u>et al.</u>,[1] | Case No. 09-10059 (PJW) |
| | Jointly Administered |
| Debtors. | |

| | |
|---|---|
| MERISANT US, INC. | |
| Plaintiff, | |
| v. | |
| HEARTLAND SWEETENERS, LLC, | Adv. Pro. No. 09-_____ |
| Defendant. | |

## COMPLAINT

Merisant US, Inc. ("Merisant"), together with its affiliated debtor corporations (collectively, the "Debtors"), debtors and debtors-in-possession in the above-captioned bankruptcy matter, by and through their attorneys, for their Complaint against Heartland Sweeteners, LLC ("Heartland"), state as follows:

## NATURE OF THE ACTION

1.      This case concerns Heartland's efforts to interfere with Merisant's business, customers and potential customers. Heartland's continuing misconduct arises from two agreements between the parties concerning the distribution and manufacture of artificial sweeteners: the Distribution Agreement dated July 12, 2007 ("Distribution Agreement") and the Toll Manufacturing Agreement dated February 17, 2006 ("Toll Manufacturing

---

[1] The Debtors are: Merisant Worldwide, Inc., (Tax ID No. XX-XXX9000), Merisant Company (Tax ID No. XX-XXX8321), Merisant Foreign Holdings I, Inc. (Tax ID No. XX-XXX6579), Merisant US, Inc. (Tax ID No. XX-XXX7233), Whole Earth Sweetener Company LLC (Tax ID No. XX-XXX3024), and Whole Earth Foreign Holdings LLC (Tax ID No. XX-XXX3024). The mailing address for all of the Debtors is 33 North Dearborn, Suite

Agreement"). Copies of these agreements are attached hereto as Exhibits A and B, respectively.[2]

2.     The Distribution Agreement sets forth the terms under which Merisant was to be Heartland's exclusive distributor of branded and private label tabletop sweeteners in distribution channels in the United States and Mexico. (Ex. A § 2.1(a).)

3.     One of these channels was the Retail Channel, which ████████████ ████████████████████████████████████████████████████████████████ ██████████ [3] ██████████ The Retail Channel was central to the parties' arrangement and to Merisant's portfolio strategy, pursuant to which Merisant would offer its customers a complete line, or "portfolio" of low-calorie sweeteners—*i.e.*, sweeteners utilizing aspartame, saccharine, and sucralose as the main sweetening ingredient—labeled as both premium brands and store brands.

4.     Before the parties executed the Distribution Agreement, Heartland had secured an exclusive supply of sucralose for use in tabletop sweetener applications in the United States that Merisant independently verified did not infringe on third-party patent rights, and Heartland had entered into contracts to supply store brand sucralose tabletop sweetener products to customers representing a large portion of the Retail Channel in the United States. While

---

200, Chicago, Illinois 60602.

[2] In light of Heartland's pending motion to file these documents under seal, Merisant has filed Exs. A and B under seal. Out of an abundance of caution, Merisant is also filing the related Option Agreement under seal as Ex. C pending a ruling on Heartland's motion to file the Distribution Agreement and Toll Manufacturing Agreement under seal. Merisant does not believe the Option Agreement contains confidential agreement and also opposes filing that agreement under seal. In its motion to file under seal, Heartland does identify the provisions discussed herein as containing confidential pricing, vendor or customer information.

[3] Merisant opposes Heartland's pending motion to file the Distribution Agreement and Toll Manufacturing Agreements under seal. As set forth in Merisant's opposition papers, this motion is meritless as those agreements themselves are not confidential, and Heartland does not come close to satisfying its burden. However, pending a decision on that motion, Merisant has redacted the relevant language from those agreements from this Complaint, and has filed a redacted, public version of the Complaint, as well as a non-redacted version filed under seal. The Complaint generally discusses the agreements and the parties' business relationship pursuant thereto. Heartland

Merisant could offer its customers a suite of premium, value and store brand tabletop products sweetened with aspartame and saccharin, customers also wanted a store brand sweetened with sucralose, which is the artificial sweetener in Splenda®. The Distribution Agreement with Heartland completed the portfolio and allowed Merisant to try to reestablish itself as the leader in tabletop sweeteners. It also provided Heartland the opportunity to expand into the Foodservice Channel, which was the other distribution channel subject to the Distribution Agreement. When the Distribution Agreement was signed, Heartland offered sucralose products primarily to retail vendors and not to customers in the Foodservice Channel (*i.e.,* restaurants, bakeries and other businesses at which prepared food or beverages are sold). The opportunity to add Merisant's foodservice customers and capabilities to its revenue base was advantageous to Heartland.

5. Heartland's owner, Ted Gelov ("Gelov"), has been in the business of buying and selling companies. Heartland considered Merisant a potential purchaser. Merisant believed that, through the Distribution Agreement, Merisant might add substantial value to Heartland's business, and Merisant wanted the ability to capture that value. Accordingly, on the very same day that the Distribution Agreement was executed, the parties executed an Option Agreement. A copy of this agreement is attached hereto as Exhibit C. The Option Agreement granted Merisant an option to acquire all of Heartland's equity interests or assets and business until the earlier of the termination of the Distribution Agreement, or three years after the date of the Option Agreement. (Ex. C at 1.) The Option Agreement gave Merisant an 18-month period of exclusivity during which Heartland could not solicit any third party buyers ("no-shop provision"). (*Id.* § 3.1(a).)

---

cannot object to these statements, as it provided similar background in its motion for relief from the stay.

6.     While the stage was set for a mutually beneficial relationship, Heartland delayed transitioning its retail customers to Merisant as required by the Distribution Agreement. Instead, Heartland appeared more interested in maintaining control of those customers while it actively pursued Merisant's foodservice customers and capabilities and explored a sale of the company. If Heartland was not going to be purchased by Merisant, then Heartland would not want its valuable retail customers working with a potential competitor in the sweetener industry (and the company that was actually manufacturing and distributing its products), Merisant. The problem for Heartland was that it had agreed with Merisant to do exactly that.

7.     Although the Distribution Agreement became effective immediately upon its execution in July 2007, Heartland spun excuse after excuse as to why it could not transition its retail business to Merisant as required under the agreement. In various communications, Heartland sought to convince Merisant that it intended to honor its agreement. After a full year of excuses, Heartland finally revealed the truth to Merisant in July 2008: It would *never* transition its retail customers to Merisant as required by the Distribution Agreement. Given Heartland's repudiation of the Distribution Agreement, Merisant rescinded the agreement on July 29, 2008.

8.     Following Merisant's rescission of the Distribution Agreement, correspondence between the parties' counsel was exchanged in the summer of 2008, in which Heartland agreed that a rescission of the Distribution Agreement was the best option. Aside from that correspondence, no further action was taken prior to Merisant's bankruptcy filing on January 9, 2009. To be clear, Heartland made absolutely no attempt to comply with the Distribution Agreement after Merisant's rescission, and subsequently acted in accordance with

4

the rescission. Indeed, the parties wrapped up all ongoing business under the Distribution Agreement in September 2008.

9.     Notwithstanding that Heartland *never* transitioned its retail customers as required by the Distribution Agreement, Heartland now belatedly wants to hold *Merisant* to the portions of the agreement that are beneficial to its own business, most importantly, a covenant not to compete. This was the very issue that Heartland led Merisant to believe had been settled last August. But Heartland's timing was no coincidence. Once the no-shop provision in the Option Agreement expired in January 2009, and Heartland was free to solicit other buyers for its company, Heartland became determined to keep Merisant from competing in the sucralose market. Clearly, if Heartland could keep Merisant out of the sucralose market, then Heartland would presumably be worth more for its sale purposes.

10.     On May 27, 2009, Heartland filed a proof of claim relating to the Distribution Agreement, and threatened to sue Merisant to stop it from pursuing customers that it has every legal right to pursue.[4] The Distribution Agreement, however, is null and void and has no force or effect following Merisant's rescission of that agreement on July 29, 2008. Once an agreement is rescinded, it no longer exists and there is nothing to enforce. Because the ability to do business with any potential retail customer is an important part of Merisant's post-reorganization business plan, Merisant seeks a declaration that it rightfully rescinded the Distribution Agreement and has no further obligations under that agreement.

11.     Even if Merisant had not effectively rescinded the Distribution Agreement, which it did, any claims by Heartland to enforce that agreement would be barred by Heartland's failure to timely assert its position that Merisant was breaching that agreement.

---

[4] Heartland filed proofs of claim (numbers 117 and 118) (the "Heartland POCs") against Merisant Worldwide, Inc. on May 27, 2009. The Debtors reserve all of their rights with respect to the Heartland POCs, and nothing herein

Heartland cannot offer any reasonable explanation for delaying the initiation of suit against Heartland for almost a year after it was undeniably aware that Merisant rescinded the agreement on July 29, 2008. Heartland did not dispute any actions taken by Merisant from that time through February 2009. Instead, Heartland led Merisant to believe that the parties had agreed to rescission in August 2008. Heartland wanted to have it both ways: It wanted to keep the option of pursuing a non-compete claim open, knowing that with that claim came the burden of the exclusivity period of the Option Agreement. Once that exclusivity period expired and Heartland was free to shop the company, Heartland desired to keep Merisant out of the sucralose marketplace, thereby driving up the value of its own company. In the meantime, Merisant had every legal right to compete with Heartland because the Distribution Agreement, including the non-compete provision, no longer existed. Because Heartland prejudiced Merisant by unreasonably delaying a potential initiation of a lawsuit for almost a year while it watched Merisant carry on its business, any potential claims by Heartland must be barred by Heartland's failure to timely assert the alleged breach.

12. Seeking to enforce the Distribution Agreement that it expressly repudiated is not Heartland's only effort to curtail Merisant's proper business activities. Heartland filed another proof of claim on May 27, 2009, accusing Merisant of violating the non-competition provisions of the parties' Toll Manufacturing Agreement, pursuant to which Merisant agreed to produce certain sucralose-based tabletop sweetener products for Heartland.[5]

13. On June 8, 2009, Heartland moved to lift the automatic stay to send a notice of default under the Toll Manufacturing Agreement to Merisant (the "Motion"). In the

---

shall be deemed a waiver of such rights or an agreement as to the validity or accuracy of the Heartland POCs.
[5] See *supra*, footnote 4.

067998.1001

Motion, Heartland asserts that Merisant is violating, among other things, the non-competition provision of that agreement.

14. The Toll Manufacturing Agreement expressly provides that either party may terminate the agreement without cause, which Merisant did by sending a 60-day termination notice to Heartland on April 29, 2009. Following termination, the non-competition provision remains in effect ██████████████████████████████ (Ex. B § 8.4.) Of this there is no dispute.

15. The plain and unambiguous language of that provision states that the only customers Merisant is prevented from soliciting are those customers expressly listed in an attached schedule to the Toll Manufacturing Agreement to whom Heartland actually provided commercial levels of the product to such customers within two discrete, three-month periods at the beginning and the end of the agreement and, further, the restriction only applies to sucralose-only products. Merisant may offer sucralose-only tabletop sweeteners to parties not listed on the schedule to the Toll Manufacturing Agreement and may offer tabletop sweeteners that are a blend of sucralose and one or more other active sweetening ingredients to any potential customer, including those set forth in that list. Because Merisant's ability to solicit customers that it has every legal right to solicit is part of its business plans, Merisant seeks a declaration that the non-competition provision in the Toll Manufacturing Agreement applies only to sales of sucralose-only products to those customers on the specified list to whom Heartland actually provided commercial levels of the product to such customers within two discrete, three-month periods and the beginning and the end of the agreement, and that, contrary to the accusation in Heartland's proof of claim, Merisant has not violated the Toll Manufacturing Agreement.

16.     In short, Merisant's ability to successfully reorganize hinges, in large part, on its right to pursue all customers and to offer them a complete line of sweetener products. This Court should not allow Heartland to frustrate Merisant's movement toward a successful reorganization by improperly seeking to prevent Merisant from doing business with customers that it has every legal right to pursue.

## THE PARTIES

17.     Merisant is a Delaware corporation, with its principal place of business in Chicago, Illinois. Merisant is a wholly owned subsidiary of Merisant Worldwide, Inc. Both Merisant and Merisant Worldwide, Inc. are debtors-in-possession in the related Chapter 11 cases. Among other things, Merisant and its affiliates manufacture and market tabletop sweeteners that are sweetened with aspartame, saccharin and other sweeteners, including a revolutionary, zero calorie, all-natural sweetener marketed under the brand PureVia™.

18.     Upon information and belief, Heartland is an Indiana limited liability company, with its principal place of business in Carmel, Indiana. Heartland markets to a variety of customers tabletop sweeteners that are sweetened with sucralose. Upon information and belief, Teodor H. Gelov is the founder and manager of Heartland.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), in that this is a matter concerning the administration of the Debtors' estates.

20.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are Sections 105(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 7001.

## FACTUAL BACKGROUND

21.     Merisant produces and markets a variety of branded and private-label tabletop sweeteners. Tabletop sweeteners generally are produced with one of three sweetening ingredients – aspartame, saccharin, or sucralose. Merisant has long produced and marketed tabletop sweeteners that are sweetened with aspartame and saccharin, with leading branded products such as Equal®, and extensive experience producing tabletop sweeteners for third parties.

22.     Merisant faced significant erosion of its business in the United States as a result of competition from Splenda®, the artificial sweetener sweetened with sucralose. From December 2002 to December 2007, Splenda®'s dollar share of the United States retail grocery market had grown from approximately 15% to 61% and had surpassed that of Equal® to become the number one premium low-calorie sweetener in the United States. Merisant's net sales declined during that period, particularly in North America which had accounted for 46% and 40% of company's global net sales in 2003 and 2007, respectively. As a result of its eroding net sales in the United States, Merisant experienced significant declines in its cash flows from operations, and management sought ways to stabilize the business. Merisant attempted to improve efficiency and reestablish leadership in the tabletop category by pursuing a portfolio strategy; namely, expanding its contract manufacturing and offering a suite of premium, value and store brand tabletop sweeteners sweetened with aspartame, saccharin and sucralose.

23.     Merisant had provided contract manufacturing services to third parties in the past, and it sought additional contract manufacturing business in order to keep its Manteno, Illinois facility running at optimal utilization. Merisant and Heartland entered into the Toll

9

Manufacturing Agreement in or around February 17, 2006, and Merisant was soon producing a substantial portion of the store brand sucralose tabletop sweetener products sold in the United States.

24.     Given the relative success of the working relationship between Merisant and Heartland in early 2006, the parties sought to expand their business relationship in a way that would benefit both companies. Merisant and Heartland started negotiating a broader strategic relationship beginning in July 2006. In those negotiations, the parties decided that Merisant would become the exclusive distributor of Heartland's products, and subsequently executed the Distribution Agreement for this purpose. Ultimately, the negotiations resulted in both the Distribution Agreement and Option Agreement.

25.     The Distribution Agreement offered Heartland the opportunity to market its products to a larger market than it would have been able to reach on its own. The Distribution Agreement offered Merisant the opportunity to complete its product line through the ability to offer its customers a sucralose-based sweetener to complement its saccharine and aspartame products. The ability to offer customers a full line of tabletop sweeteners offered both companies, as well as their customers, great potential for cost savings, as well as a number of other benefits. (Ex. A at 1.) Heartland also desired to use Merisant's services to assist with developing and executing a marketing strategy to reach foodservice customers and for Heartland's Nevella® branded tabletop sweetener. (*Id.*)

## THE DISTRIBUTION AGREEMENT

26.     On July 12, 2007, Merisant and Heartland entered into the Distribution Agreement.[6] (*See* Ex. A.)

---

[6] This agreement is governed by Illinois law. (Ex. A § 11.2.)

27.  Pursuant to the Distribution Agreement, the parties agreed to jointly market and distribute private label sweeteners in the United States and Mexico (the "Territory") that were made with all three types of sweeteners.  (*Id.* at 1-3.)  As the Agreement explains:



28.

There was never any dispute that all of Heartland's previous retail customers were covered by this definition.

29.  The parties agreed that Merisant would be

Heartland agreed

DB02:8391075.1

067998.1001

████████████████████████████████████████████ At the time the agreement was signed, Merisant's distributor was ACH Food Companies, Inc. ("ACH"). Merisant later decided to terminate its agreement with ACH with respect to distribution to retail customers, and "directly" distribute the products to customers, as permitted under the agreement.

30. Under the Distribution Agreement, Merisant was responsible for

████████████████████████████████████████████████████████

██████████

31. The Distribution Agreement also contained ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

32. The Distribution Agreement was effective as of July 12, 2007, and Heartland was required to immediately transition its customers to Merisant's distribution system. The "transition" was a simple process that essentially required only that Heartland inform its customers that their new vendor would be ACH, Merisant's distributor at the time, and to fill out routine paperwork effectuating that change. Such transitions are common in the tabletop sweetener industry when companies switch brokers or acquire other companies. The fact that Heartland would not take even this simple step was the first sign that Heartland did not intend to honor its commitments under the Distribution Agreement and had other interests.

33. In fact, Heartland began making excuses to avoid transitioning its customers even *before* the Distribution Agreement was signed. Gelov initially requested that the parties' delay relocating Heartland's physical product to ACH's warehouses until after

Gelov received what he expected to be a favorable ruling from the International Trade Commission ("ITC") addressing intellectual property issues relating to Heartland's and others' importation of sucralose into the United States. Gelov anticipated that the ITC would issue that ruling in August 2007. Merisant never agreed that a short delay in transferring the physical product to ACH would justify delaying the transition of Heartland's customers.

**The Parties Explore a Potential Sale of Heartland to Merisant**

34.     Shortly after the Distribution Agreement and Option Agreement were executed, the parties began exploring a potential sale of Heartland to Merisant. ███████

████████████████████████████████████████████████████████

███ Subsequently, Merisant performed due diligence on Heartland.

35.     On or around October 19, 2007, Merisant terminated its current due diligence process, but stated that the termination of these efforts did not modify or waive any of Merisant's rights under the Option Agreement. Merisant still had an 18-month no-shop provision, as well as 3-year exclusive purchase option, which it could decide to exercise at any time during this period. (Ex. C § 3.1(a).)

**Heartland's Excuses For Not Transitioning Its Retail Customers**

36.     While the parties were negotiating a potential sale, Heartland began offering a series of excuses as to why it could not transition its Retail Channel customers to Merisant as required under the Distribution Agreement.

37.     Having failed in his attempt to delay a transition until the ITC issued a ruling, in the fall of 2007, Heartland's Gelov argued that he should not transition his customers until after the holiday season. According to Gelov, retailers would not accept the change from

13

Heartland to a new distributor during the busy holiday season. Merisant explained to Gelov that transitioning the customers prior to the holiday season would not cause any disruptions.

38.     Gelov next claimed that he was concerned about service and that Merisant's distributor, ACH, would not be able to offer "on-time" delivery. There was, however, no factual basis for such a claim given that Heartland never transitioned its customers to ACH. Alternatively, Gelov claimed that some of his customers did not want to work with ACH. Gelov only provided Merisant with the name of one such customer. Not surprisingly, when Merisant discussed Gelov's comment directly with that customer, the customer denied having any such concern.

39.     Heartland's alleged concerns about ACH should have been put to rest in late 2007, when Merisant told Gelov that it would likely be ending its retail distribution agreement with ACH, and distributing the products through a direct model, as permitted under the Distribution Agreement. But this did not satisfy Heartland either. Instead of the issue allegedly preventing the transition being concerns about ACH, Heartland now used the very simple transition from a third party sales system to a direct sales system to Merisant as an excuse not to perform its obligations under the Distribution Agreement.

40.     Specifically, Merisant's contract with ACH provided that ACH would continue to serve as Merisant's distributor for six months after notice of termination had been delivered, or July 27, 2008. Gelov claimed that transitioning his customers "twice" would be disruptive to the customers. Merisant explained to Gelov that the transition from third party sales to direct sales would have absolutely no impact on customers. Such transitions are a common occurrence in the industry. They simply involve notifying customers that their orders

14

will be fulfilled by a different entity and submitting a form agreement to change the customer's "Vendor of Record."

41. Although Heartland did transition one customer in the Foodservice Channel during the summer and fall of 2007, it steadfastly refused to transition all of its customers in the Retail Channel as required by the Distribution Agreement. That Heartland transitioned a customer in its Foodservice Channel was no surprise. Heartland had few such customers, and benefited from Merisant's broad experience with the Foodservice Channel, as well as the ability to bundle its sucralose products with Merisant's products to offer customers the full-line of tabletop sweeteners. Thus, Heartland wanted to use Merisant's Foodservice Channel distribution network to get appointments with potential customers that would not have talked to Heartland alone, while maintaining a close hold on the very important Retail Channel customers.

42. Heartland's refusal to properly transition its retail customers continued throughout early 2008. In March 2008, Merisant requested a meeting with Heartland. At that meeting, Gelov came up with yet another excuse. Heartland now refused to transition its retail customers because it was concerned that it would not be able to bundle its products after the transition. This was false. Merisant explained that Heartland's products would immediately be bundled with Merisant's tabletop sweeteners if Heartland transitioned its customers, and that the bundling would continue after Merisant switched from a third party to a direct retail model. Notably, at the same time that Heartland was lulling Merisant into believing that it intended to comply with its customer transitioning obligations under the Distribution Agreement in short order, Heartland began seeking to distribute its products through its own network of brokers. In fact, Heartland represented to a number of brokers that they could directly distribute Heartland's

15

name-brand and private-label sucralose products blatantly violating the Distribution Agreement and harming Merisant's relationship with its broker.

43.     In or around March 2008, Merisant received a request from Heartland that Merisant coordinate the return of some of Heartland's product from ACH's warehouse. Heartland explained that it believed the products were nearing the end of their use-by-dates (*i.e.,* shelf lives), and therefore could not be sold. Generally, customers will not accept delivery of tabletop sweeteners with use-by dates less than eight months after the date of delivery. To save on shipping costs for products that could not be sold, Merisant offered to request that ACH destroy the products rather than return them to Heartland. Heartland then admitted that it was actually not concerned that the products were nearing the end of their use-by-date, but Heartland was in fact really just running low on its own product and wanted the products back to sell them directly to customers.

44.     Notwithstanding all of Heartland's broken promises, it was still representing to Merisant that it would transition its retail customers and Merisant wanted to make the agreement work. In June 2008, senior management from Merisant and Heartland met at Merisant's offices to discuss the Distribution Agreement. At that meeting, Gelov and Heartland agreed that by July 14, 2008, Heartland would send its customers a letter requesting they submit "Change of Vendor" forms to change their vendor from Heartland to Merisant. Then, on August 15, 2008, Heartland would ship its product to Merisant so that the official transition would occur on September 1, 2008. In addition, in what Merisant was led to believe was preparation to transition the customers, in early July 2008, Heartland personnel visited a Merisant facility. Instead, upon information and belief, Heartland used this visit to gather

16

information about Merisant's confidential intellectual property, and to manufacture concerns to use in an attempt to justify its subsequent repudiation of the Distribution Agreement.

## Heartland Repudiates the Distribution Agreement

45.     Heartland failed to return the required letter to its customers by July 14, 2008.

46.     Instead, on the evening of July 16, 2008, Heartland employee Mike Servie ("Servie") emailed Merisant employee Lee Van Syckle ("Van Syckle") and stated that Heartland had decided "to not transition our retail products," and thanked Merisant for "respecting [Heartland's] decision." Servie purported to offer reasons as to "why we have made the decision to not transition," claiming that Merisant was not ready for the transition. These excuses were simply manufactured, as Merisant was at all times ready to begin the process to transition Heartland's customers to Merisant. Van Syckle responded by email later that evening to make clear that Merisant did not accept Heartland's unilateral decision to not transition its retail customers, and offered to address any of Heartland's concerns.

47.     The following day, July 17, 2008, Servie emailed Van Syckle to explain that Heartland was "anxious to work through the problems that exist in foodservice and trying to make that successful after one year of very little demonstrfated [sic] success." (Emphasis added.) That email made no mention of the more important retail business at issue. Van Syckle again responded and offered to set up meeting to "assure" Heartland that Merisant was ready to transition both the Retail and the Foodservice Channel customers.

48.     Heartland, however, had no legitimate concerns and simply refused to transition all of its retail customers. That Servie's comments were simply a pretext was confirmed on or around July 22, 2008 during a telephone call by Servie to Van Syckle. During

that call, Servie also repeated to Van Syckle that Heartland would never transition its retail customers to Merisant. Heartland had repudiated the Distribution Agreement.

49. Every reason Heartland used to purportedly justify its continued delay was a pretext. Heartland's real desire was to repudiate the contract and keep all of its retail customers for itself. It now appears that Heartland signed the Distribution Agreement with Merisant primarily to gain entrée into the Foodservice Channel through Merisant's established distribution network in that channel.

50. One week after Servie's telephone call to Van Syckle, on July 29, 2008, Merisant rescinded the Distribution Agreement. Merisant issued its "Notice of Rescission" in writing:

> Regrettably, Michael Servie recently informed Lee Van Syckle that Heartland Sweeteners, LLC would not transition its customers for branded and private label tabletop sweeteners in the retail grocery channel Merisant US, Inc. as required by the Distribution Agreement, dated July 12, 2007, between Heartland and Merisant. Mr. Servie unequivocally made clear that Heartland was not merely seeking a delay in the transition but that Heartland was backing out of, and would never perform its obligations under, the Distribution Agreement with respect to the retail grocery channel. In short, Heartland has repudiated the Distribution Agreement.
>
> Merisant cannot sit idly by nor will it allow Heartland to continue to benefit from provisions of the Distribution Agreement while Heartland simultaneously ignores its obligations under that very same agreement. As such, this letter shall serve as notice that Merisant has elected to rescind the Distribution Agreement in accordance with its rights under governing law. . . .

(Ex. D at 1.)

### Heartland's Response to Merisant's Rescission

51. Almost a month after Merisant rescinded the Distribution Agreement, Heartland finally issued a response, stating that Heartland agreed that rescission may be best and proposing that the parties work together on the mechanics of the rescission.

DB02:8391075.1

067998.1001

Notwithstanding, Heartland decided to cherry pick the provisions of the agreement that were beneficial to continue to enforce—*i.e.*, the covenant not to compete. The following day, on August 22, 2008, Merisant reminded Heartland's counsel that, as a matter of law, the provisions of the Distribution Agreement (including the ones that Heartland liked) were not enforceable as a result of Heartland's repudiation. Merisant agreed to cooperate with any transition issues.

52. Heartland and Merisant did not have any further dealings with respect to the Distribution Agreement after September 2008. Indeed, Merisant did not hear anything further from Heartland with respect to this agreement until shortly *after* the expiration of the 18-month time period in which Heartland was prohibited from soliciting offers to acquire its business. The expiration of the "no shop" period meant that Heartland was finally free to solicit third party buyers for its business. And keeping Merisant out of the sucralose market—a market that it has every legal right to participate in—would increase the value of Heartland's business.

53. Accordingly, after the no shop period expired, on February 4, 2009, Heartland sent Merisant a letter baselessly accusing Merisant of violating the non-compete agreement. Prior to that time, Heartland led Merisant to believe that rescission of the Distribution Agreement was acceptable to both parties and did not pursue any arguments to the contrary. Upon information and belief, Heartland believed it faced a dilemma: if it agreed in writing that Merisant had validly rescinded the Distribution Agreement, then the Option Agreement would be rescinded as well and Heartland would be free to shop the company in the fall of 2008. However, in that case, the non-compete provision was rescinded along with the Distribution Agreement, making it unenforceable against Merisant and potentially decreasing Heartland's value to a potential purchaser. But if Heartland just waited approximately six months, or until after January 2009, then it could argue that the exclusivity period for the Option

19

Agreement had expired, shop the company anyway and then try to keep Merisant out of the marketplace by asserting the non-compete was still enforceable. Clearly Heartland chose the latter option. Of course, there really was no such option, given that the Distribution Agreement had been validly rescinded.

54.     On May 27, 2009, Heartland filed a proof of claim asserting that Merisant is violating the Distribution Agreement's non-compete and confidentiality provisions.[7] Shortly thereafter, on June 8, 2009, Heartland moved to lift the automatic stay to send a notice of termination of the Distribution Agreement to Merisant. There is no basis for such a notice given that Merisant rightfully rescinded that agreement in July 2008. Heartland's true motivation was revealed at the end of its motion, when it admitted that it may seek further relief and instigate litigation against Merisant. Heartland wants to belatedly start the clock on the non-compete provision. It simply does not want another competitor in the sucralose market at a time when it is trying to sell the company.

55.     Merisant's ability to offer a full-line of tabletop sweeteners, and therefore its ability to lawfully compete to sell sucralose-based tabletop sweeteners is an important part of Merisant's ability to emerge from bankruptcy proceedings as a profitable company.

## THE TOLL MANUFACTURING AGREEMENT

56.     Heartland and Merisant entered into the Toll Manufacturing Agreement on February 17, 2006.[8] (Ex. B at 1.) Pursuant to this agreement, Merisant produced certain sucralose-based tabletop sweetener products for Heartland. (*Id.*) This agreement allowed Merisant to use manufacturing equipment that could have otherwise been idle and, upon information and believe, it allowed Heartland to manufacture its product more efficiently than it

---

[7] *See supra*, footnote 4.
[8] The Toll Manufacturing Agreement is also governed by Illinois law. (Ex. B § 16.4.)

could have on its own.

57. ██████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████

58.　　The Toll Manufacturing Agreement includes a clause titled ██████

████████████████████████████████████████



████████████████ The plain meaning of this provision is clear: the universe of

Heartland customers is limited to those companies listed on Schedule 8.4, and those companies

will remain on the list so long as Heartland actually provides commercial levels of the product to

such customers within two discrete, three-month periods at the beginning and the end of the

agreement. Moreover, Merisant may sell to those listed customers any product that does not

have sucralose as its sole active sweetening ingredient.

21

59.     On April 29, 2009, Merisant exercised its contractual right to terminate the Toll Manufacturing Agreement by delivering notice to Heartland "that the Agreement will terminate in whole effective as of the date that is sixty (60) after the date hereof." (Ex. E.) Therefore, the one year non-solicitation period provided for by Section 8.4 will begin on June 28, 2009, and end on June 28, 2010. Merisant has not solicited any of the customers it is prohibited from soliciting under Section 8.4 to purchase a product that has sucralose as its sole active sweetening ingredient, and it will not do so for the one-year period beginning on June 28, 2009.

60.     On May 27, 2009, Heartland filed a proof of claim alleging that Merisant is violating Section 8.4 of the Toll Manufacturing Agreement, as well as the confidentiality covenant in Section 12.2.

61.     On June 8, 2009, Heartland moved to lift the automatic stay to send a notice of default under the Toll Manufacturing Agreement to Merisant, asserting that Merisant has violated Sections 8.4 of the Toll Manufacturing Agreement, as well as Section 12.2, Section 6 regarding Heartland's inspection rights, and Sections 8.2 and 8.3 regarding the assistance Merisant is required to provide Heartland to transfer production to another manufacturer. There is no basis for such a notice, and Merisant has always complied in full with Section 8.4 of the Toll Manufacturing Agreement (and every other provision therein) and intends to do so in the future. As with the Distribution Agreement, Heartland's true motivation was revealed at the end of its motion, when it admitted that it may seek further relief and instigate litigation against Merisant.

DB02:8391075.1

067998.1001

62. The ability to offer potential customers a full-line of tabletop sweeteners, while adhering to the plain language of the Toll Manufacturing's non-compete provision, is a cornerstone of Merisant's business plan and key to post-bankruptcy profitability.

## COUNT I

### (Declaratory Judgment on the Distribution Agreement)

63. Merisant restates and realleges Paragraphs 1 through 62 above as though fully set forth herein. Merisant is entitled to a declaratory judgment that the Distribution Agreement is terminated and void as of July 29, 2008 because (1) Heartland repudiated that agreement by expressly stating that it would never transition its retail customers, and (2) Merisant properly rescinded that agreement.

64. An actual controversy exists between the parties with respect to whether Heartland repudiated the Distribution Agreement.

65. In July 2008, Heartland repudiated the Distribution Agreement by expressly stating that it would never transition its retail customers to Merisant, thereby clearly manifesting its intent not to perform its obligations under the agreement, and Merisant exercised its legal right to rescind that agreement.

66. Merisant now seeks a judicial declaration that Heartland repudiated the Distribution Agreement and that Merisant properly rescinded that agreement and therefore has no further obligations under any provisions of the agreement, which is null and void.

67. In the alternative, if this Court determines that Merisant's July 29, 2008 letter did not rescind the Distribution Agreement, Heartland's failure to timely assert Merisant's alleged breach, which Merisant relied on, precludes Heartland from enforcing that agreement.

68.     A judicial determination is necessary and appropriate at this time so that Merisant may, among other things, ascertain its duties and obligations pursuant to the Distribution Agreement.

## COUNT II

### (Declaratory Judgment on the Toll Manufacturing Agreement)

69.     Merisant restates and realleges Paragraphs 1 through 68 above as though fully set forth herein. Merisant is entitled to a declaratory judgment that, pursuant to the plain language of Section 8.4 of the Toll Manufacturing Agreement, the universe of Purchaser Customers is limited to those companies listed on Schedule 8.4, and those companies will remain on the list so long as Heartland actually provided commercial levels of the product to such customers within two discrete, three-month periods at the beginning and the end of the agreement. Moreover, Merisant may sell to <u>any</u> customer any product that does not contain sucralose as its sole sweetening ingredient. In addition, Merisant is not violating Sections 6, 8.2, 8.3, or 12.2 of the Toll Manufacturing Agreement.

70.     An actual controversy exists between the parties with respect to Merisant's obligations under the Toll Manufacturing Agreement, as Heartland has asserted that Merisant is violating Sections 6, 8.2, 8.3, 8.4 or 12.2 of that agreement. Merisant now seeks a judicial declaration that it is not violating Sections 6, 8.2, 8.3, 8.4 or 12.2 of the Toll Manufacturing Agreement.

71.     A judicial determination is necessary and appropriate at this time so that Merisant may, among other things, ascertain its duties and obligations pursuant to Section 8.4 of the Toll Manufacturing Agreement.

## PRAYER FOR RELIEF

**WHEREFORE**, Merisant together with its affiliated Debtor corporations respectfully request that the Court enter judgment in favor of Merisant and against Heartland, and enter an Order or Orders:

a. Declaring that Merisant properly rescinded the Distribution Agreement after Heartland repudiated that agreement;

b. Declaring that Merisant has no further obligations under the Distribution Agreement;

c. Declaring that Merisant is not in breach of Section 2.1 or Article X of the Distribution Agreement;

d. Declaring that the only customers subject to the non-competition provision of the Toll Manufacturing Agreement are the specified list of customers that were attached to that agreement and those companies will remain on the list so long as Heartland actually provided commercial levels of the product to such customers within two discrete, three-month periods and the beginning and the end of the agreement;

e. Declaring that Merisant is not in breach of Sections 6, 8.2, 8.3, 8.4 or 12.2 of the Toll Manufacturing Agreement; and

f. Awarding such other relief as this Court deems just and equitable, including costs and attorneys' fees incurred in prosecuting this action.

DB02:8391075.1                                    067998.1001

Dated: Wilmington, Delaware
      July 2, 2009

Respectfully submitted,

SIDLEY AUSTIN LLP
Matthew A. Clemente
Richard B. Kapnick
Courtney A. Rosen
Scott R. Rauscher
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

    -and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

ATTORNEYS FOR THE DEBTORS AND
DEBTORS-IN-POSSESSION