and assign or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

If the Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the holders of Claims against any of the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be eroded to the detriment of all stakeholders.

## B.    RISKS RELATED TO BUSINESS STRATEGY AND OPERATIONS

### 1.    Failure to Maintain Customer Relationships May Adversely Affect Financial Results.

The loss of one or more major customers, or a material reduction in sales to these customers, as a result of competition from other tabletop sweetener manufacturers or other factors would have a material adverse effect on the Debtors' results of operations.

### 2.    Competition and Consolidation May Reduce Sales and Margins.

The Debtors operate in a highly competitive industry and compete with companies that have greater capital resources, facilities and diversity of product lines. Increased competition for products could result in reduced volumes and/or prices, both of which would reduce the Debtors' sales and margins.

The Debtors' competitors may also introduce new low-calorie sweeteners, which could increase competition. To the extent that current users of the Debtors' products switch to other low-calorie sweeteners, there could be a decrease in the demand for the Debtors' products.

The Debtors' margins are also under pressure from consolidation in the retail food industry in many regions of the world. In the United States, the Debtors have experienced a shift in the channels where consumers purchase their products from the higher margin retail to the lower margin club and mass merchandisers. Such consolidation may significantly increase the Debtors' cost of doing business and may further result in lower sales of the Debtors' products and/or lower margins on sales. In addition, increased competition from private label manufacturers of low calorie tabletop sweeteners may have a negative impact on sales and/or margins.

Merisant Company's core brands *Equal*® and *Canderel*® are sweetened with the artificial sweetener aspartame and have been marketed as premium low-calorie sweeteners for more than 25 years in the United States and Europe, respectively. The introduction of natural, low-calorie sweeteners will increase competition in the category and some consumers will switch allegiance to these new natural alternatives and potentially erode the market share of premium artificial low-calorie sweeteners. As natural low-calorie sweeteners offer consumers the same benefits as artificial low-calorie sweeteners, Merisant Company may, in certain markets, be required to lower prices for its *Equal*® and *Canderel*® branded products in order to maintain the

relevance of these brands for consumers. Any such price reduction would depress Merisant Company's gross margins on these core products and could reduce the profitability of Merisant Company to the extent that Whole Earth's natural sweetener products do not achieve the net sales or margins projected.

    3.    <u>The Natural Sweetener Category is Competitive, and Whole Earth May Be Required to Expend More Resources than Projected and it's Natural Products May Not Achieve the Net Sales or Margins Projected.</u>

As previously noted, Merisant Company formed Whole Earth to develop and market natural sweeteners and sweetened food products. In addition to tasting like sugar, management believes that in order for natural sweeteners to have a broad market appeal, natural low-calorie sweeteners must be priced close to artificial low-calorie sweeteners. Whole Earth's *PureVia*™ all-natural, zero-calorie sweetener is sold in the United States at a premium to the artificial sweetener *Splenda*®, the leading low-calorie sweetener brand in the United States. Whole Earth seeks to reduce this premium further through supply chain efficiencies and product innovations. To the extent that Whole Earth is unable to do so, it may be forced to lower its prices and accept lower gross margins on *PureVia*™ than projected. Competing brands that are sold at a lower price could take market share away from *PureVia*™. Historically, a limited number of premium brands have competed in the low-calorie sweetener category. However, management anticipates that there may be more low-calorie sweetener brands that are marketed as being natural or naturally sweetened than had been the case with artificial sweeteners. This potential proliferation of natural, low-calorie sweetener brands is due in part to there being fewer barriers to entry for natural sweeteners than artificial sweeteners, including because the supply of natural ingredients is less restricted by patent protection. Whole Earth may be required to expend more resources than currently projected in order to differentiate *PureVia*™ from competing brands, gain market share, and promote brand loyalty among its consumers. If Whole Earth fails to adequately market and promote *PureVia*™ in this highly competitive market, Merisant Company may not be able to achieve the projected growth in net sales and EBITDA.

    4.    <u>Changes in Consumer Preferences Could Decrease Revenues and Cash Flow.</u>

The Debtors are subject to the risks of evolving consumer preferences and nutritional and health-related concerns. Substantially all of their revenues are derived from the sale of low-calorie tabletop sweeteners in which aspartame is the primary ingredient. To the extent that consumer preferences evolve away from low-calorie tabletop sweeteners and aspartame-based low-calorie tabletop sweeteners in particular, there will be a decreased demand for the Debtors' products. Consumer perception that there are low-calorie tabletop sweetener alternatives that are healthier or more natural than aspartame could also decrease demand for aspartame-based products. Any shift in consumer preferences away from the Debtors' products, including any shift in preferences from aspartame-based products to sucralose-based products or other low-calorie tabletop sweetener products, could significantly decrease the Debtors' revenues and cash flows and impair their ability to operate their businesses.

    5.    <u>Failure to Attract and Incentivize Employees May Adversely Affect Financial Results.</u>

Among the Debtors' most valuable assets are their highly skilled professionals who have the ability to leave the Debtors and so deprive the Debtors of valuable skills and knowledge that contribute substantially to their business operations. Although the Debtors have tried to incentivize and focus their personnel through the pendency of the Chapter 11 Cases, the Debtors cannot be sure that they will ultimately be able to do so and, if not, that they will be able to replace such key personnel with comparable personnel. In addition, the Debtors cannot be sure that such key personnel will not leave after consummation of the Plan and emergence from chapter 11. Further attrition may hinder the Debtors' ability to operate efficiently, which could have a material adverse effect on their results of operations and financial condition.

> 6.    Foreign Currency Risk May Adversely Affect Financial Results.

The revenues and expenses of the Debtors' international operations generally are denominated in local currencies, which subject the Debtors to exchange rate fluctuations between such local currencies and the U.S. dollar. These exchange rate fluctuations subject the Debtors to currency translation risk with respect to the reported results of their international operations, as well as to other risks sometimes associated with international operations. In the future, the Debtors could experience fluctuations in financial results from their operations outside of the United States, and there can be no assurance they will be able, contractually or otherwise, to reduce the currency risks associated with their international operations.

> 7.    The Debtors' Taxes May Increase.

Merisant repatriates cash generated from its ex-U.S. operations primarily by means of two revolver notes from Merisant Company to SwissCo, both of which mature in 2011. Any future cash repatriation from SwissCo that is not distributed in the form of such loans could be subject to tax in the United States. As of December 31, 2008, the Debtors had estimated net operating loss ("NOL") carryforwards for United States federal income tax purposes of approximately $180 million. Typically, such NOLs may be used to offset future United States federal taxable income. As described in Article XII, below, the Debtors expect that all of their NOLs will be eliminated and certain other tax attributes will be reduced or eliminated as a result of the implementation of the Plan. As a result, the Reorganized Debtors may have to pay United States federal income taxes sooner and in a greater amount than if their NOLs and other tax attributes were not required to be reduced or eliminated.

> 8.    If the Debtors Do Not Manage Costs in the Highly Competitive Tabletop
> Sweetener Industry, Profitability Could Decrease.

The Debtors' success depends in part on their ability to manage costs and be efficient in the highly competitive tabletop sweetener industry. If the Debtors do not continue to manage costs and achieve additional efficiencies, profitability could decrease.

> 9.    Risks Related to the Current Credit Crisis and Global Economic Slowdown.

The Debtors use their operating cash flows and their revolving credit facility to service their debt obligations and operating activities. Current uncertainty in global economic conditions resulting from the recent disruption in worldwide credit markets pose a risk to the

overall global economy that could adversely impact consumer and customer demand for the Debtors' products, as well as their ability to manage normal commercial relationships with their customers, suppliers and creditors. Recent trends indicate the continuation and possible acceleration of consumers purchasing store branded products rather than branded, premium products. If these trends continue, the Debtors' revenue and operating cash flows and, in turn, their ability to operate their business and service their debt obligations could be adversely affected.

Moreover, over the past several months, significant deterioration in the financial condition of many financial institutions has resulted in severe loss of liquidity, higher short-term borrowing costs, lower borrowing availability in global credit markets and more stringent borrowing terms. The global economic slowdown has caused further tightening of the credit markets, more stringent lending standards and terms and higher volatility in interest rates. These factors could adversely affect the ability of the Debtors' customers and suppliers to do business with them.

10.     <u>A Material Portion of the Debtors' Consolidated Revenues are Generated Outside the United States, and any Limitations on the Repatriation of Cash to the United States could hinder the Debtors' Ability to Service its Debt Obligations, Finance its U.S. Operations or Pay Dividends to the Holders of New Merisant Capital Stock.</u>

The Debtors' ex-U.S. subsidiaries generated more than 64% and 54% of the Debtors' consolidated net sales and Operating EBITDA, respectively, during the year ended December 31, 2008. A significant portion of cash generated from ex-U.S. operations is transferred to SwissCo, Merisant Company's indirect Swiss subsidiary, through intercompany loans and transactions. SwissCo repatriates cash to Merisant Company through two intercompany revolver notes. Swiss law limits the amount of dividends, loans and distributions that a Swiss entity, like SwissCo, can make to its stockholders by reference to the amount of surplus capital of the entity and the effect of such distributions on the financial condition of the entity. Management believes that the amounts distributed by SwissCo to Merisant Company to date are permitted under Swiss law. However, if the amount of cash to be repatriated by SwissCo to Merisant Company exceeds the amount of distributions allowable under Swiss law, SwissCo may not be able to repatriate such cash to Merisant Company which could limit the funds available to the Debtors to service their debt obligations and fund their operations in the United States.

11.     <u>The Debtors May Be Adversely Affected By Conditions In the Countries Where They Operate.</u>

The Debtors operate in many countries throughout the world. Economic and political changes in these countries, such as inflation rates, recession, foreign ownership restrictions, restrictions on transfer of funds into or out of a country and similar factors may adversely affect results of operations.

12.     <u>Cost of Compliance with Government Regulation May Adversely Affect Financial Results.</u>

The Debtors are subject to various foreign, federal, state and local laws and regulations that affect the conduct of their operations, including environmental laws. The Debtors cannot be sure that compliance with these laws and regulations or the adoption of modified or additional laws and regulations will not require large expenditures by the Debtors or otherwise have a significant effect on the Debtors' financial condition or results of operations. Among other laws, a change in the tax laws of the United States could materially affect the consequences of the Plan as described herein to the Debtors and the holders of Claims. See Section XII, "Certain Federal Income Tax Consequences of the Plan."

13.    <u>Inability to Protect Trademarks and Other Proprietary Rights Could Damage the Debtors' Competitive Position.</u>

Any infringement or misappropriation of the Debtors' intellectual property could damage their value and limit their ability to compete. The Debtors rely on copyrights, trademarks, trade secrets, confidentiality provisions and licensing arrangements to establish and protect their intellectual property. The Debtors own no patents relating to their products or processes. They may have to engage in litigation to protect the rights to their intellectual property, which could result in significant litigation costs and require a significant amount of time.

The Debtors have invested substantially in the promotion and development of their trademarked brands and establishing their reputation as high-quality products. Actions taken by third parties may damage the Debtors' reputation and the value of their trademarks, which could lead to reduced sales. The Debtors believe that the formulas and blends for their products are trade secrets. The Debtors rely on security procedures and confidentiality agreements to protect this proprietary information; however, such agreements and security procedures may be insufficient to keep others from acquiring this information. Any such dissemination or misappropriation of this information could deprive the Debtors of the value of their proprietary information.

14.    <u>Health-Related Allegations Could Damage Consumer Confidence in the Debtors' Products.</u>

Periodically, claims are made regarding the safety of aspartame consumption. Past claims include allegations that aspartame leads to neurological illnesses and other health problems. Although the Debtors believe that they have had success in presenting scientific evidence to dispute past claims and restore consumer confidence in their products that contain aspartame, there can be no assurance that the Debtors will be similarly successful in refuting legislative actions or other health-related allegations that may be made in the future. The Debtors continue to believe that aspartame and their products that contain aspartame are safe for human consumption. However, if consumers lose confidence in the safety of the Debtors' products, sales and margins would be negatively impacted.

15.    <u>Product Liability Claims or Product Recalls Could Adversely Affect the Debtors' Business Reputation.</u>

The sale of food products for human consumption involves the risk of injury to consumers. Such hazards could result from:

- tampering by unauthorized third parties;

- product contamination;

- the presence of foreign objects, substances, chemicals and other agents; or

- residues introduced during the manufacturing, packaging, storage, handling or transportation phases.

Some of the products the Debtors sell are produced by third parties and such third parties may not maintain quality control to the Debtors' standards to ensure that such products are not adulterated, misbranded, contaminated or otherwise defective. The Debtors, as well as the manufacturers of aspartame, may be subject to claims made by consumers as a result of products manufactured by these third parties, which are marketed under the Debtors' brand names.

Consumption of adulterated products may cause serious health-related illnesses and the Debtors may be subject to claims or lawsuits relating to such matters. Even an inadvertent shipment of adulterated products is a violation of law and may lead to an increased risk of exposure to product liability claims, product recalls and increased scrutiny by federal and state regulatory agencies. Such claims or liabilities may not be covered by insurance or by any rights of indemnity or contribution which the Debtors may have against third parties. In addition, even if a product liability claim is not successful or is not fully pursued, the negative publicity surrounding any assertion that the Debtors' products caused illness or injury could have an adverse effect on their reputation with existing and potential consumers and on our brand image, all of which could negatively impact earnings and cash flows.

16.    Historical Financial Information May Not Be Comparable.

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

17.    Extent of Leverage May Limit Ability to Obtain Additional Financing for Operations.

Although the Plan will result in the elimination of debt, the Reorganized Debtors will continue to have a significant amount of indebtedness.

Such levels of indebtedness may limit the ability of the Reorganized Debtors to obtain additional financing for working capital, marketing, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes. Such levels of indebtedness may also limit the ability of the Reorganized Debtors to adjust to changing market conditions and to withstand competitive pressures, possibly leaving the Reorganized Debtors vulnerable to downturn in general economic conditions or in their businesses or unable to carry out capital spending that is important to their growth and productivity improvement programs.

C.    **RISKS TO CREDITORS WHO WILL RECEIVE NEW MERISANT CONVERTIBLE PREFERRED STOCK, THE NEW MERISANT COMMON STOCK, AND CLASS 5 CVRS**

The ultimate recoveries under the Plan to holders of Class 2 Bank Claims, who, if they elect, will receive shares of New Merisant Convertible Preferred Stock, holders of Merisant Unsecured Claims (Class 3), who will receive shares of New Merisant Common Stock (and may elect to subscribe for Rights Offering Shares and the Private Investment Shares), and holders of Worldwide Unsecured Claims (Class 5), who will receive Class 5 CVRs and may elect to subscribe for Private Investment Shares, pursuant to the Plan will depend on the realizable value of the New Merisant Convertible Preferred Stock or the New Merisant Common Stock. The shares of New Merisant Convertible Preferred Stock, New Merisant Common Stock and the Class 5 CVRs to be issued pursuant to the Plan will be subject to a number of material risks, including, but not limited to, those specified below. Prior to voting on the Plan, each holder of Claims in Classes 2, 3, and 5 should carefully consider the risk factors described below, as well as all of the information contained in the Plan.

1.    Lack of Established Market for the New Merisant Convertible Preferred Stock and New Merisant Common Stock May Adversely Affect Liquidity.

There can be no assurance that an active market for the New Merisant Common Stock or the New Merisant Convertible Preferred Stock will develop, nor can any assurance be given as to the prices at which such stock might be traded. Neither the New Merisant Common Stock nor the New Merisant Convertible Preferred Stock to be issued under the Plan will be listed on or traded on any securities market or exchange. Further, neither the shares of New Merisant Common Stock nor the shares of New Merisant Convertible Preferred Stock to be issued under the Plan have been registered under the Securities Act, any state securities laws or the laws of any other jurisdiction. Absent such registration, the shares of New Merisant Common Stock and New Merisant Convertible Preferred Stock to be issued pursuant to the Plan may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of the Securities Act and other applicable securities laws. As explained in more detail in Article XIII (Certain Federal and State Securities Law Considerations), most recipients of shares of New Merisant Convertible Preferred Stock and New Merisant Common Stock will be able to resell such securities without registration pursuant to the exemption provided by Section 4(1) of the Securities Act.

Shares of New Merisant Common Stock and New Merisant Convertible Preferred Stock will also be subject to transfer restrictions set forth in the Certificate of Incorporation and the Stockholders Agreement, as more fully described in Article IX above.

2.    Wayzata is Expected to Own More than 80% of the New Merisant Common Stock and More than Half of the New Bank Notes and May Exercise Significant Influence over Reorganized Merisant.

If the Plan is confirmed and no other holder of a Class 2 Bank Claim elects to receive New Bank Shares, Wayzata, including certain of its managed funds, will own, collectively, more than 80% of the New Merisant Common Stock (on an as-converted basis) and more than half of

the New Bank Notes based on its current ownership of Merisant Company Noteholder Claims and Bank Claims.

As a result, Wayzata could delay or prevent a change in control of Reorganized Merisant that may be favored by other stockholders and otherwise exercise significant influence over all corporate actions requiring stockholder approval, irrespective of how other stockholders may vote, including the election of directors, any amendment of Reorganized Merisant's Certificate of Incorporation or Bylaws and the approval of mergers and other significant corporate transactions, including a sale of substantially all of Reorganized Merisant's assets. In addition, because amendments to or waivers of covenants under the New Credit Facility generally require the approval or consent of holders of only a majority of the outstanding principal amount under the New Credit Facility, decisions regarding whether to amend or waive compliance with such covenants by the holders of loans under the New Credit Facility can be made by Wayzata whether or not the other holders consent.

In taking any of these actions, Wayzata may act in its own interest, which may conflict with or be unfavorable to the interests of other stockholders of Reorganized Merisant or holders of New Bank Notes.

3.    Value of New Merisant Common Stock May be Diluted.

The Certificate of Incorporation of Reorganized Merisant will authorize the issuance of up to a total of 3,250,000 shares of New Merisant Common Stock. The issuance of additional shares of New Merisant Common Stock, or any security convertible into or exchangeable for shares of New Merisant Common Stock, in the future would dilute the ownership percentage represented by the shares of New Merisant Common Stock to be issued pursuant to the Plan. In addition, the Class 5 CVRs will entitle the holders thereof to a portion of the proceeds that holders of New Merisant Common Stock would otherwise receive upon a Liquidity Event and, upon an IPO, Reorganized Merisant may issue shares of New Merisant Common Stock to holders of the Class 5 CVRs.

4.    The New Merisant Common Stock is Subordinate to Existing and Future Indebtedness and New Merisant Convertible Preferred Stock.

The New Merisant Common Stock is an equity interest in Reorganized Merisant and does not constitute indebtedness. As such, the New Merisant Common Stock will rank junior to all of indebtedness of Reorganized Merisant and to other non-equity claims against Reorganized Merisant and its assets available to satisfy claims against Reorganized Merisant, including in the event of a liquidation of Reorganized Merisant. Additionally, holders of New Merisant Common Stock are subject to the prior dividend and liquidation rights of holders of New Merisant Convertible Preferred Stock. Furthermore, the right of Reorganized Merisant to participate in a distribution of assets upon the liquidation or reorganization of any of its subsidiaries is subject to the prior claims of that subsidiary's creditors and holders of that subsidiary's preferred stock, if any.

5.    The Board of Directors of Reorganized Merisant has the Authority to Issue Shares of New Merisant Convertible Preferred Stock in the Future.

The Certificate of Incorporation of Reorganized Merisant will provide that, subject to the rights of the holders of the New Merisant Convertible Preferred Stock, the Board of Directors will be authorized to issue from time to time, without further approval from the holders of New Merisant Common Stock, up to 875,000 additional shares of preferred stock in one or more series and to fix or alter the designations, preferences, rights and any qualifications, limitations or restrictions of the shares of each series, including the dividend rights, dividend rates, conversion rights, voting rights, terms of redemption, including sinking fund provisions, redemption price or prices, liquidation preferences and the number of shares constituting any series or designations of any series. Such additional shares of preferred stock could have preferences over the New Merisant Common Stock with respect to dividends and liquidation rights. In addition, Reorganized Merisant may issue additional shares of preferred stock in ways which may delay, defer or prevent a change in control of Reorganized Merisant without further action by its stockholders. Such shares of preferred stock may be issued with voting rights that may adversely affect the voting power of the holders of New Merisant Common Stock by increasing the number of outstanding shares having voting rights, and by the creation of class or series voting rights.

      6.     <u>Lack of Dividends on Securities May Adversely Affect Liquidity</u>.

The Debtors do not anticipate that cash dividends or other distributions will be made by Reorganized Merisant or the Reorganized Debtors with respect to the preferred or New Merisant Common Stock in the foreseeable future. In addition, covenants in certain debt instruments to which Reorganized Merisant or the Reorganized Debtors will be a party may restrict the ability of Reorganized Merisant or the Reorganized Debtors to pay dividends and make certain other payments. Holders of shares of New Merisant Convertible Preferred Stock will be entitled to receive, prior to any dividends being paid on the New Merisant Common Stock, ratably an annual dividend of 8% on their shares of New Merisant Convertible Preferred Stock. Further, such restrictions and priorities on dividends may have an adverse impact on the market demand for New Merisant Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the shares of New Merisant Common Stock issued pursuant to the Plan.

## XII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain United States federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the United States Internal Revenue Code of 1986, as amended (the "<u>IRC</u>"), existing and proposed United States Treasury regulations promulgated thereunder and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Plan.

No ruling has been requested or obtained from the United States Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to the holders of Claims or Interests with respect to the United States federal income tax consequences described herein.

\* \* \* \*

Any discussion of United States federal tax issues set forth in this Disclosure Statement was written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any United States federal tax penalties that may be imposed on such person. Each holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

\* \* \* \*

## A.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

### 1.    Cancellation of Indebtedness Income.

A debtor generally must recognize income from the cancellation of debt ("COD Income") to the extent that its debt is discharged for consideration less than the amount of such debt. For these purposes, consideration includes the amount of cash and the fair market value of property, including stock of the debtor. COD Income is not required to be recognized, however, if the debtor is under the jurisdiction of a bankruptcy court in a case under chapter 11 and the discharge is granted, or is effected pursuant to a plan approved, by the court (the "Bankruptcy Exception"). Instead, the debtor is required to reduce certain of its tax attributes by the amount of COD Income, generally in the following order: NOLs, general business and minimum tax credit carryforwards, capital loss carryforwards, the tax basis of the debtor's assets and, finally, foreign tax credit carryforwards ("FTCs") (collectively, "Tax Attributes"). Generally, the reduction in the tax basis of assets cannot exceed the excess of the total tax bases of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge (the "Floor Rule"). A debtor may elect to first apply any portion of the reduction to the tax basis of the debtor's depreciable assets, with any remaining balance applied to the debtor's other Tax Attributes in the order stated above. The Floor Rule does not apply to any reduction in tax basis by reason of this election.

Generally, debtors that realize COD Income in 2009 or 2010 may, in lieu of the rules described above, elect to take into taxable income the COD Income with respect to discharged debt in equal installments in 2014 through 2018 (i.e., the debtor would report 20% of the COD Income in each such year). This election to defer COD Income is made separately with respect to each debt instrument on which COD Income is realized and must be made on the debtor's tax return for the year that includes the transaction that creates the COD Income.

Special rules apply to COD Income realized by a debtor corporation that is a member of a group filing a consolidated United States federal income tax return (the "Consolidated Attribute

Reduction Rules"). The Consolidated Attribute Reduction Rules generally provide that the Tax Attributes attributable to the debtor member are the first to be reduced. For this purpose, Tax Attributes attributable to the debtor member include consolidated Tax Attributes (such as consolidated NOLs) that are attributable to the debtor member, and also include the tax basis of property of the debtor (including subsidiary stock), all of which are reduced in the order described above. To the extent that the COD Income of the debtor member exceeds the Tax Attributes attributable to it, the consolidated Tax Attributes attributable to other members of the consolidated group (including the portion of the consolidated NOLs attributable to other members, but not including the tax basis of property of other members) must be reduced. In the case of a consolidated group with multiple debtor members, each debtor member's Tax Attributes must be reduced before such member's COD Income can be reduced by Tax Attributes attributable to other members of the consolidated group. In addition, to the extent that the debtor member is required to reduce its tax basis in the stock of another group member, that lower-tier member also must reduce its Tax Attributes, including the consolidated Tax Attributes attributable to that lower-tier member. Any required Tax Attribute reduction takes place after the consolidated group has determined its taxable income, and any United States federal income tax liability, for the taxable year in which the COD Income is realized.

The Company expects to realize substantial COD Income as a result of the implementation of the Plan. The precise amount of COD Income will depend on, among other things, the fair market value of the New Merisant Capital Stock, which cannot be known with certainty until after the Effective Date. Pursuant to the Bankruptcy Exception, this COD Income will not be recognized as taxable income, but the Company will have to reduce its Tax Attributes after calculating the tax for the taxable year of discharge. The Company does not expect to make the elections described above to reduce the tax basis of depreciable property first or to defer COD Income to 2014-2018.

2.    Net Operating Losses and Other Tax Attributes.

As of December 31, 2008, the Debtors had approximately $180 million of consolidated NOLs. In addition, the Debtors expect to generate additional consolidated NOLs in 2009 and 2010. The amounts of such consolidated NOLs remain subject to adjustment by the IRS. As a general rule, an NOL incurred by a debtor during a taxable year can be carried back and deducted from its taxable income generated within the two preceding taxable years and the remainder can be carried forward and deducted from the debtor's taxable income over the 20 succeeding taxable years.

The COD Income resulting from the cancellation of the Worldwide Notes will be attributed to Worldwide. Under the Consolidated Attribute Reduction Rules described above, Worldwide will first reduce its Tax Attributes starting with the consolidated NOLs attributable to it. It is expected that the COD Income that Worldwide will realize will significantly exceed the consolidated NOLs attributable to it.

It is expected that most of the remaining COD Income will be attributed to Merisant Company. Under the Consolidated Attribute Reduction Rules described above, Merisant Company will first reduce its Tax Attributes starting with the consolidated NOLs attributable to it. It is expected that the COD Income that Merisant Company will realize will significantly

exceed the consolidated NOLs attributable to it. Any COD Income in excess of the amount of consolidated NOLs attributable to Merisant Company will be applied against its tax basis in its assets. Pursuant to the Floor Rule, however, it is expected that Merisant Company will not reduce its tax basis in its assets.

Any COD Income remaining after the reduction of Tax Attributes described in the two preceding paragraphs will then reduce certain consolidated tax attributes (such as NOLs and FTCs) attributable to other Debtors. In the case of FTCs, each dollar of COD Income will reduce 33⅓ cents of FTCs.

As a result of the application of these rules, it is expected that any NOLs and FTCs of the Debtors that are not absorbed in the calculation of tax for the year of discharge and that cannot be carried back to an earlier taxable year will be eliminated and therefore not available to offset income of the Debtors for taxable years following the year of discharge, thereby potentially resulting in the Debtors having to pay United States federal income taxes sooner and in a greater amount than if their Tax Attributes were not required to be reduced under the foregoing rules. Because of the application of the Floor Rule, however, the Debtors do not expect to reduce their Tax Attributes by the full amount of COD Income realized.

      3.      Annual Section 382 Limitation on Use of NOLs and Built-In Losses.

Section 382 of the IRC contains certain rules limiting the amount of NOLs a corporate taxpayer can utilize in the years following an "ownership change." These rules are relevant only if (i) the loss corporation has NOLs to carry forward to years after the date of the ownership change and/or (ii) the loss corporation has "net unrealized built-in losses" (i.e., net losses economically accrued but unrecognized as of the date of the ownership change in excess of a threshold amount) as of the date of the ownership change. As noted above, it is not expected that the Reorganized Debtors will have NOLs to carry forward to the year following the year in which the Plan is implemented. In addition, the Debtors do not expect to have significant "net unrealized built-in losses" as of the date of the ownership change for purposes of Section 382 of the IRC. Accordingly, it is not expected that these rules will have a material impact on the Reorganized Debtors.

## B.    FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS

The United States federal income tax consequences of the transactions contemplated by the Plan to holders of Claims or Interests that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States; (2) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof; (3) that is an estate, the income of which is subject to United States federal income taxation regardless of its source; or (4) that is a trust (a) over the administration of which a United States Person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control, or (b) that has validly elected to continue to be treated as a United States Person for United States federal income tax purposes. In the case of a partnership, the United States federal income tax treatment of its

partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" means a beneficial owner of a Claim or Interest that is a United States Person. The general United States federal income tax consequences to holders of Claims or Interests that are Non-United States Persons are discussed below under Section XII.B.10 of this Disclosure Statement.

The United States federal income tax consequences to Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for United States federal income tax purposes. Certain holders of Claims or Interests (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary. There also may be state, local and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to holders of Claims or Interests, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

1.     General.

A Holder who receives cash or other consideration (including, without limitation, New Merisant Capital Stock) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors reserve the right, to the extent consistent with the Plan, to allocate for United States federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim, first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a Holder receives less than the principal amount of its Claim, the Debtors intend to allocate the full

125

amount of consideration transferred to such Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such Holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for United States federal income tax purposes.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for United States federal income tax purposes as a result of the consummation of the Plan by Holders of Claims or Interests who hold their Claims or Interests as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Claim or Interest was held by the Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus $3,000 of other income.

If not otherwise so required, a Holder who receives New Merisant Capital Stock in exchange for its Claim will be required to treat gain recognized on a subsequent sale or other taxable disposition of the New Merisant Capital Stock as ordinary income to the extent of (i) any bad debt deductions taken with respect to the Claim and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the Holder upon satisfaction of its Claim, and (ii) any amounts which would have been included in a Holder's gross income if the Holder's Claim had been satisfied in full, but which was not included in income because of the application of the cash method of accounting.

      2.     <u>Market Discount</u>.

The market discount provisions of the IRC may apply to Holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition. If a Holder has accrued market discount with respect to its Claims and such Holder realizes gain upon the exchange of its Claims for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain. Holders who have accrued market discount with respect to their Claims should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.

      3.     <u>Holders of Class 2 Claims</u>.

A Holder of a Class 2 Claim will realize gain or loss for United States federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its Class 2 Claim, determined immediately prior to the Effective Date, and (ii) the sum of (A) the "issue price" of the New Bank Notes, (B) the amount of Bank Cash it receives and (C) the fair market value of the New Merisant Convertible Preferred Stock, if any, it receives. The "issue price" of the New Bank Notes is generally expected to equal the principal amount thereof if neither the New Bank Notes nor the Class 2 Claim is treated as "publicly traded." If the New Bank Notes are treated as publicly traded, then the issue price of the New

126

Bank Notes will be the fair market value of the New Bank Notes on the Effective Date. If the New Bank Notes are not treated as publicly traded but the Class 2 Claim is treated as publicly traded, then the issue price of the New Bank Notes will be determined by reference to the fair market value of the Class 2 Claim. For these purposes, a debt instrument generally is treated as "publicly traded" if, at any time during the 60-day period ending 30 days after the issue date, (i) the debt is listed on a national securities exchange or quoted on an interdealer quotation system sponsored by a national securities association, (ii) it appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields or other pricing information) of one or more identified brokers, dealers or traders or actual prices (including rates, yields or other pricing information) of recent sales transactions or (iii) in certain circumstances, price quotations are readily available from dealers, brokers or traders.

The tax consequences to a Holder of a Class 2 Claim depend on whether its Class 2 Claim is a "security" for United States federal income tax purposes. See "Definition of 'Security'" below. If a Class 2 Claim constitutes a "security" for United States federal income tax purposes and either (i) the New Bank Notes constitute "securities" for United States federal income tax purposes or (ii) the Class 2 Claim Holder receives New Merisant Convertible Preferred Stock in the exchange, then the exchange of the Class 2 Claim will be treated as a recapitalization for United States federal income tax purposes. In such a case, a Class 2 Claim Holder who realizes a loss on the exchange will not be permitted to recognize such loss.

If the exchange of Class 2 Claims is a recapitalization and the New Bank Notes constitute "securities" for United States federal income tax purposes, a Class 2 Claim Holder who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized and (ii) the amount of Bank Cash it receives. A Class 2 Claim Holder's initial tax basis in the property it receives in exchange for its Class 2 Claims should equal (i) the sum of (A) its adjusted tax bases in the Class 2 Claims and (B) the amount of gain it recognizes on the exchange, minus (ii) the amount of Bank Cash it receives in the exchange. Such basis will be allocated between the New Bank Notes and New Merisant Convertible Preferred Stock, if any, it receives based on their relative fair market values on the Effective Date. A Class 2 Claim Holder's holding period in the New Bank Notes and New Merisant Convertible Preferred Stock, if any, it receives will include the holding period in the Class 2 Claim surrendered.

If the exchange of Class 2 Claims is a recapitalization and the New Bank Notes do not constitute "securities" for United States federal income tax purposes, a Class 2 Claim Holder who realizes gain on the exchange will be required to recognize the lesser of (i) the amount of gain realized and (ii) the sum of (A) the fair market value of the New Bank Notes it receives and (B) the amount of Bank Cash it receives. A Class 2 Claim Holder's initial tax basis in the New Merisant Convertible Preferred Stock it receives in exchange for its Class 2 Claims should equal (i) the sum of (A) its adjusted tax bases in the Class 2 Claims and (B) the amount of gain it recognizes on the exchange, minus (ii) the sum of (A) the fair market value of the New Bank Notes it receives and (B) the amount of Bank Cash it receives in the exchange. A Class 2 Claim Holder's initial tax basis in the New Bank Notes it receives in exchange for its Class 2 Claim should equal the fair market value of such New Bank Notes. A Class 2 Claim Holder's holding period in the New Merisant Convertible Preferred Stock it receives will include the holding

period in the Class 2 Claims surrendered. A Class 2 Claim Holder's holding period in the New Bank Notes it receives will commence on the day after the Effective Date.

If (i) a Class 2 Claim does not constitute a "security" for United States federal income tax purposes, or (ii) (A) the New Bank Notes do not constitute "securities" for United States federal income tax purposes and (B) the Class 2 Claim Holder does not receive New Merisant Convertible Preferred Stock in exchange for its Class 2 Claim, then the exchange of the Class 2 Claim will be a taxable transaction, and the Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange. In such a case, a Class 2 Claim Holder's initial tax basis in the New Bank Notes it receives in exchange for its Class 2 Claim should equal the issue price of such New Bank Notes, and the Holder's initial tax basis in the New Merisant Convertible Preferred Stock, if any, it receives in the exchange should equal the fair market value of such New Merisant Convertible Preferred Stock. A Class 2 Claim Holder's holding period in the property it receives in the exchange would commence on the day after the Effective Date.

A Holder who receives New Bank Notes will generally be required to include interest on the New Bank Notes in income in accordance with such Holder's regular method of tax accounting. If, however, the stated principal amount of the New Bank Notes exceeds their issue price (determined as described above) by more than a specified de minimis amount (generally, 25 basis points times the weighted average maturity), such excess will be treated as original issue discount for United States federal income tax purposes. In such a case, a Holder of New Bank Notes will be required to include in income the amount of such original issue discount over the term of the New Bank Notes based on the constant yield method and will be required to include amounts in income before they are received. A Holder's tax basis in a New Bank Note will be increased by the amount of original issue discount included in income and reduced by the amount of cash (other than payments of stated interest) received with respect to the New Bank Note.

4.    Holders of Class 3 Claims.

A Holder of a Class 3 Claim will realize gain or loss for United States federal income tax purposes on the exchange of its Class 3 Claim for New Merisant Common Stock equal to the difference between (i) the adjusted tax basis in the Class 3 Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the fair market value of the New Merisant Common Stock it receives in the exchange (and possibly the fair market value of (A) the Rights, if any, it receives, and (B) the option, if received, to participate in the Private Investment as described below).

The tax consequences to a Holder of a Class 3 Claim depend on whether its Class 3 Claim is a "security" for United States federal income tax purposes. See "Definition of 'Security'" below. If a Class 3 Claim does not constitute a "security" for United States federal income tax purposes, then the exchange of the Class 3 Claim for New Merisant Common Stock will be a taxable transaction, and the Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange. In such a case, a Holder's initial tax basis in the New Merisant Common Stock it receives in the exchange will equal the fair market value of such New Merisant Common Stock on the Effective Date, and a

Holder's holding period in its New Merisant Common Stock would commence on the day after the Effective Date.

If a Holder's Class 3 Claim constitutes a "security" for United States federal income tax purposes, then the exchange of the Class 3 Claim for New Merisant Common Stock will be treated as a tax-free transaction for United States federal income tax purposes. In such a case, a Class 3 Claim Holder should not recognize any gain or loss realized for United States federal income tax purposes with respect to the exchange of its Class 3 Claim. A Class 3 Claim Holder's initial tax basis in the New Merisant Common Stock it receives in exchange for its Class 3 Claim should equal its adjusted tax basis in such Class 3 Claim. A Class 3 Claim Holder's holding period in the New Merisant Common Stock it receives in the exchange will include its holding period in the Class 3 Claim surrendered.

The United States federal income tax consequences to a Class 3 Claim Holder of the receipt of the Rights and the option to participate in the Private Investment is uncertain. The Rights and the option to participate in the Private Investment might be (i) treated as additional consideration for a Holder's Class 3 Claim, (ii) treated as income to the Holder when received or (iii) not taken into account for United States federal income tax purposes. In the case of alternatives (i) and (ii), the Class 3 Claim Holder will acquire a tax basis in each of the Rights and the option to participate in the Private Investment equal to their respective fair market values. This basis will be added to the basis of any Series A-2 Convertible Preferred Stock acquired in the Rights Offering or Private Investment, as applicable. Further, if a Class 3 Claim Holder does not participate in the Rights Offering or Private Investment, as applicable, this basis should give rise to a capital loss on the Subscription Expiration Time.

5.    Holders of Class 4 Claims.

A Holder of a Class 4 Claim that receives cash pursuant to the Plan will realize gain or loss for United States federal income tax purposes as a result of the consummation of the Plan equal to the difference between its adjusted tax basis in its Class 4 Claim, determined immediately prior to the Effective Date, and the amount of cash it receives.

6.    Holders of Class 5 Claims.

A Holder of a Class 5 Claim will realize gain or loss for United States federal income tax purposes on the exchange of its Class 5 Claim for Class 5 CVRs equal to the difference between (i) the adjusted tax basis in the Class 5 Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the fair market value of the Class 5 CVRs it receives in the exchange (and possibly the fair market value of the option, if received, to participate in the Private Investment, as described below). A Holder's initial tax basis in the Class 5 CVRs it receives in the exchange should equal the fair market value of such Class 5 CVRs on the Effective Date, and a Holder's holding period in its Class 5 CVRs should commence on the day after the Effective Date.

The United States federal income tax consequences to a Class 5 Claim Holder of the receipt of the option to participate in the Private Investment is uncertain. The option might be (i) treated as additional consideration for a Holder's Class 5 Claim, (ii) treated as income to the

Holder when received or (iii) not taken into account for United States federal income tax purposes. In the case of alternatives (i) and (ii), the Class 5 Claim Holder will acquire a tax basis in the option equal to its fair market value. This basis will be added to the basis of any Series A-2 Convertible Preferred Stock acquired in the Private Investment. Further, if a Class 5 Claim Holder does not participate in the Private Investment, this basis should give rise to a capital loss at the Subscription Expiration Time.

       7.      Holders of Class 7 Interests.

Pursuant to the Plan, all Merisant Company Equity Interests in Class 7 will be cancelled, annulled and extinguished as of the Effective Date, and Holders of Merisant Company Equity Interests will receive nothing in exchange for such Interests. As a result, each Holder of Merisant Company Equity Interests generally should recognize a loss for United States federal income tax purposes equal to the Holder's tax basis in such Interests extinguished under the Plan unless the Holder previously claimed a loss with respect to such Interests under its regular method of accounting.

       8.      Holders of Class 8 Interests.

Pursuant to the Plan, all Worldwide Equity Interests in Class 8 will be cancelled, annulled and extinguished as of the Effective Date, and Holders of Worldwide Equity Interests will receive nothing in exchange for such Interests. As a result, each Holder of Worldwide Equity Interests generally should recognize a loss for United States federal income tax purposes equal to the Holder's tax basis in such Interests extinguished under the Plan unless the Holder previously claimed a loss with respect to such Interests under its regular method of accounting.

       9.      Definition of "Security".

The term "security" is not defined in the IRC or in the United States Treasury regulations. Whether an instrument constitutes a "security" for United States federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether or not the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

       10.     Non-United States Persons.

A holder of a Claim that is a Non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or

business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

      11.   <u>Information Reporting and Backup Withholding</u>.

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the payor (the relevant Debtor) to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a United States federal income tax return).

**C.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**D.    RESERVATION OF RIGHTS**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XII and the other tax related sections of the Plan up to ten (10) days prior to the date by which objections to Confirmation of the Plan must be filed and served.

**XIII.  CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS**

**A.    EXEMPTION FROM REGISTRATION REQUIREMENTS FOR NEW MERISANT COMMON STOCK AND NEW MERISANT CONVERTIBLE PREFERRED STOCK.**

Upon consummation of the Plan, the Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of (i) shares of New Merisant Common Stock to holders of Merisant Unsecured Claims; (ii) shares of Series A-1 Preferred Stock to holders of Class 2 Bank Claims, (iii) shares of Series A-2 Convertible Preferred Stock constituting the Rights Offering Shares to holders of Eligible Class 3 Claims, and (iii) Series A-2 Convertible Preferred Stock

constituting the Private Investment Shares to Private Investors from the registration requirements of the Securities Act and of any state securities or "blue sky" laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan. The Debtors believe that Reorganized Merisant is a successor to Merisant under the Plan for purposes of section 1145 of the Bankruptcy Code and that the offer and sale of shares of New Merisant Common Stock, Series A-1 Convertible Preferred Stock, and Series A-2 Convertible Preferred Stock under the Plan satisfies the requirements of section 1145 and are therefore exempt from the registration requirements of the Securities Act and state securities laws. Upon consummation of the Plan, the Debtors will rely on Section 4(2) of the Securities Act, and Regulation D promulgated thereunder, to exempt the issuance of shares of Series A-2 Convertible Preferred Stock constituting the Private Investment Shares, the Standby Shares, if necessary, and the New Equity Investment Shares to the Private Investors, the Standby Party and the New Equity Investor, respectively, from the registration requirements of the Securities Act and of any state securities or "blue sky" laws.

## B.    SUBSEQUENT TRANSFERS OF NEW SECURITIES

In general, recipients of shares of New Merisant Common Stock or Series A-2 Convertible Preferred Stock (other than Series A-2 Convertible Preferred Stock issued to the Private Investors, the Standby Party, or the New Equity Investor) will be able to resell such shares of New Merisant Common Stock or Series A-2 Convertible Preferred Stock without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. In addition, shares of New Merisant Common Stock or Series A-2 Convertible Preferred Stock generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of the shares of New Merisant Common Stock or Series A-2 Convertible Preferred Stock issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act. Under Section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of the shares of New Merisant Common Stock or Series A-2 Convertible Preferred Stock issued under the Plan are deemed to be "underwriters," the resale of such shares of New Merisant Common Stock by such persons would not be exempted by section

132

1145 of the Bankruptcy Code from registration under the Securities Act or other applicable laws. Persons deemed to be underwriters may, however, be permitted to sell such shares of New Merisant Common Stock or Series A-2 Convertible Preferred Stock. This rule permits the public resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE SHARES OF NEW MERISANT COMMON STOCK OR SERIES A-2 CONVERTIBLE PREFERRED STOCK ISSUED UNDER THE PLAN, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF NEW MERISANT COMMON STOCK OR SERIES A-2 CONVERTIBLE PREFERRED STOCK ISSUED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## XIV. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the alternatives include (a) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### A.   CONTINUATION OF THE CHAPTER 11 CASES

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as Debtors-in-Possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtors could continue as viable going concerns in protracted Chapter 11 Cases. The Debtors could have difficulty operating with the high costs, operating financing and the eroding confidence of their customers and trade vendors, if the Debtors remained in chapter 11. It is highly unlikely that the Debtors would be able to find alternative bank financing if the DIP Facility were terminated. If the Debtors were able to obtain financing and continue as a viable going concern, the Debtors (or other parties in interest) could ultimately propose another plan or attempt to liquidate the Debtors under chapter 7 or chapter 11. Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

### B.   LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtors.

The Debtors believe that in a liquidation under chapter 7, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in

expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates. The assets available for distribution to creditors and equity holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7. Thus, chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distributions to the holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially.

## XV. CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation of the Plan is preferable to the alternatives described above because it provides the greatest distributions and opportunity for distributions to holders of Claims against any of the Debtors. In addition, any alternative to confirmation of the Plan could result in extensive delays and increased administrative expenses.

Accordingly, the Debtors urge all holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are actually received no later than 4:00 p.m., prevailing Eastern time, on December 4, 2009.

Dated: October 20, 2009

Respectfully submitted,

MERISANT WORLDWIDE, INC. (for itself and on behalf of the Affiliate Debtors, as Debtors and Debtors-in-Possession)


By: /s/ Paul Block_____
     Paul Block
     Authorized Signatory

| SIDLEY AUSTIN LLP | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
|---|---|
| James F. Conlan | Robert S. Brady (No. 2847) |
| James P. Seery | Edmon L. Morton (No. 3856) |
| Matthew A. Clemente | Kenneth J. Enos (No. 4544) |
| Andrew F. O'Neill | The Brandywine Building |
| D'Lisia E. Bergeron | 1000 West Street, 17th Floor |
| One South Dearborn Street | P.O. Box 391 |
| Chicago, Illinois 60603 | Wilmington, Delaware 19899-0391 |
| Telephone:  (312) 853-7000 | Telephone:  (302) 571-6600 |
| Facsimile:  (312) 853-7036 | Facsimile:  (302) 571-1253 |

Counsel to the Debtors and Debtors-in-Possession

# EXHIBIT A

Plan of Reorganization

(To be filed as a separate document)

# EXHIBIT B

Corporate Structure Chart



# Merisant Worldwide, Inc. Corporate Organization Chart

# EXHIBIT C

Selected Historical Financial Information

Merisant Company 10-Q & 10-Q/A for the quarterly period ended September 30, 2008

.0-Q 1 a08-25536_110q.htm 10-Q
Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, DC 20549

---

# FORM 10-Q

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2008**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from      to**

**Commission File Number:  333-114105**

# Merisant Company

(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **52-2218321** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |
| **33 North Dearborn**<br>**Chicago, Illinois** | **60602** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(312) 840-6000**

Former name, former address and former fiscal year, if changed since last report:
**Not applicable.**

ndicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to uch filing requirements for the past 90 days.  Yes ☐  No ☒

ndicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting ompany. See definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. Check one):

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☐ |
| (Do not check if a smaller reporting company) | |

ndicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

ndicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

As of November 13, 2008, the registrant had 100 shares of common stock, par value $0.01 per share, outstanding, all of which were owned by Merisant Worldwide, Inc.

This Quarterly Report is being filed pursuant to a requirement contained in the indenture governing Merisant Company's 9½% Senior Subordinated Notes due 2013.

## MERISANT COMPANY

### INDEX TO REPORT

**FOR THE QUARTER ENDED SEPTEMBER 30, 2008**

|  |  | Page |
|---|---|---|
| **PART I—FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements of Merisant Company | |
| | Unaudited Consolidated Balance Sheets at December 31, 2007 and September 30, 2008 | |
| | Unaudited Consolidated Statements of Operations and Comprehensive Income (Loss) for the Three and Nine Months Ended September 30, 2007 and 2008 | |
| | Unaudited Consolidated Statement of Stockholder's Deficit for the Nine Months Ended September 30, 2008 | |
| | Unaudited Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2007 and 2008 | |
| | Notes to Unaudited Consolidated Financial Statements | |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 2 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 3 |
| Item 4T. | Controls and Procedures | 3 |
| **PART II—OTHER INFORMATION** | | 3 |
| Item 1. | Legal Proceedings | 3 |
| Item 1A. | Risk Factors | 3 |
| Item 6. | Exhibits | 3 |

Table of Contents

# PART I—FINANCIAL INFORMATION

**Item 1. Financial Statements of Merisant Company**

## MERISANT COMPANY
### Unaudited Consolidated Balance Sheets
### (Dollars In Thousands, Except Per Share Amount)

| | At December 31, 2007 | At September 30, 2008 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 51,040 | $ 11,713 |
| Trade accounts receivable, net of allowances of $854 and $1,108, respectively | 74,410 | 62,441 |
| Other receivables | 9,128 | 13,063 |
| Inventories | 13,540 | 25,368 |
| Prepaid expenses and other assets | 6,206 | 4,131 |
| Current portion of note receivable from director | 970 | 970 |
| Deferred income tax assets | 1,620 | 1,783 |
| Total current assets | 156,914 | 119,469 |
| Property and equipment, net | 23,509 | 29,779 |
| Trademarks and other intangible assets, less accumulated amortization and impairment of $164,022 and $179,809, respectively | 160,697 | 147,941 |
| Goodwill | 107,209 | 107,209 |
| Deferred financing costs, less accumulated amortization of $10,052 and $12,564 respectively | 9,586 | 7,367 |
| Non-current portion of note receivable from director | 1,822 | 910 |
| Investment in equity affiliate | 264 | 403 |
| Other non-current assets | 880 | 1,193 |
| Total assets | $ 460,881 | $ 414,271 |
| **LIABILITIES AND STOCKHOLDER'S DEFICIT** | | |
| Accounts payable | $ 22,618 | $ 18,331 |
| Income taxes payable | 1,031 | 644 |
| Accrued interest expense | 12,727 | 6,452 |
| Accrued trade marketing and consumer promotions | 14,353 | 15,123 |
| Accrued incentives | 8,024 | 696 |
| Accrued expenses and other liabilities | 11,056 | 11,996 |
| Current maturities of long-term obligations | 12,178 | 21,218 |
| Total current liabilities | 81,987 | 74,460 |
| Long-term obligations, net of current maturities | 416,838 | 397,290 |
| Deferred income tax liabilities | 23,701 | 26,597 |
| Other liabilities | 6,954 | 7,742 |
| Total liabilities | 529,480 | 506,089 |
| Commitments and contingencies (Note 7) | | |
| Stockholder's Deficit: | | |
| Common stock, $0.01 par value, 100 shares authorized, issued and outstanding | — | — |
| Due for purchase of shares in Merisant Worldwide, Inc. | (107) | (64) |
| Retained deficit | (65,454) | (88,413) |
| Accumulated other comprehensive loss | (3,038) | (3,341) |
| Total stockholder's deficit | (68,599) | (91,818) |
| Total liabilities and stockholder's deficit | $ 460,881 | $ 414,271 |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

3

Table of Contents

**MERISANT COMPANY**
**Unaudited Consolidated Statements of Operations and**
**Comprehensive Income (Loss)**
**(Dollars In Thousands)**

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2007 | 2008 | 2007 | 2008 |
| Net sales | $ 72,837 | $ 64,520 | $ 213,240 | $ 200,486 |
| Cost of sales | 31,518 | 31,632 | 94,120 | 97,461 |
| Gross profit | 41,319 | 32,888 | 119,120 | 103,025 |
| Operating expenses: | | | | |
| Marketing and selling expenses | 15,921 | 14,492 | 48,202 | 48,308 |
| Administration expenses | 8,162 | 6,282 | 33,456 | 25,025 |
| Amortization of intangible assets | 5,264 | 5,264 | 16,718 | 15,792 |
| Restructuring expenses | 211 | 296 | 1,085 | 1,404 |
| Total operating expenses | 29,558 | 26,334 | 99,461 | 90,529 |
| Income from operations | 11,761 | 6,554 | 19,659 | 12,496 |
| Other expense (income): | | | | |
| Interest income | (246) | (70) | (611) | (528) |
| Interest expense | 10,946 | 9,578 | 34,393 | 29,193 |
| Costs of refinancing | — | — | 5,791 | — |
| Other expense (income), net | 117 | 1,871 | (29,962) | 2,505 |
| Total other expense (income) | 10,817 | 11,379 | 9,611 | 31,170 |
| Income (loss) before income taxes | 944 | (4,825) | 10,048 | (18,674) |
| Provision for income taxes | 1,336 | 496 | 5,036 | 3,578 |
| Net income (loss) | $ (392) | $ (5,321) | $ 5,012 | $ (22,252) |
| | | | | |
| Net income (loss) from above | $ (392) | $ (5,321) | $ 5,012 | $ (22,252) |
| Other comprehensive income (loss) | 960 | (2,959) | 1,671 | 303 |
| Total comprehensive income (loss) | $ 568 | $ (8,280) | $ 6,683 | $ (21,949) |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

4

Table of Contents

**MERISANT COMPANY**
**Unaudited Consolidated Statement of Stockholder's Deficit**
**(Dollars In Thousands)**

| | Common Stock | Due for Purchase of Shares in Merisant Worldwide, Inc. | Retained Deficit | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|
| Balance at December 31, 2007 | $ — | $ (107) | $ (65,454) | $ (3,038) | $ (68,599) |
| Foreign currency translation adjustment | — | — | — | (303) | (303) |
| Distribution to Merisant Worldwide, Inc. | — | — | (707) | — | (707) |
| Settlement of loans for purchase of shares in Merisant Worldwide, Inc. | — | 43 | — | — | 43 |
| Net loss | — | — | (22,252) | — | (22,252) |
| Balance at September 30, 2008 | $ — | $ (64) | $ (88,413) | $ (3,341) | $ (91,818) |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

5

Table of Contents

**MERISANT COMPANY**
**Unaudited Consolidated Statements of Cash Flows**
**(Dollars In Thousands)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2007 | 2008 |
| **Operating Activities** | | |
| Net income (loss) | $ 5,012 | $ (22,252) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | |
| Depreciation | 4,919 | 3,657 |
| Gain on liquidation of subsidiary | (284) | — |
| Amortization of intangible assets | 16,718 | 15,792 |
| Amortization of deferred financing costs | 2,520 | 2,513 |
| Write off of deferred financing costs | 3,241 | |
| Euro-denominated loan foreign exchange loss | 1,382 | 341 |
| Equity in income of affiliate | (127) | (139) |
| Deferred income tax provision | 3,141 | 2,704 |
| Changes in operating assets and liabilities, (net of business acquisition): | | |
| Trade accounts receivable | (929) | 11,446 |
| Other receivables | (971) | (3,171) |
| Inventories | 1,005 | (12,384) |
| Prepaid expenses and other assets | (1,992) | 1,784 |
| Accounts payable | (1,112) | (4,508) |
| Accrued expenses and other | (5,770) | (11,292) |
| Net cash provided by (used in) operating activities | 26,753 | (15,509) |
| **Investing Activities** | | |
| Proceeds from sale of property and equipment | 216 | 40 |
| Purchase of business | — | (3,400) |
| Purchases of property and equipment | (2,188) | (8,787) |
| Net cash used in investing activities | (1,972) | (12,147) |
| **Financing Activities** | | |
| Net borrowings under revolving credit facility | — | 12,000 |
| Borrowings under long-term obligations | 85,088 | 11 |
| Principal payments on long-term obligations | (91,649) | (22,838) |
| Payment of deferred financing costs | (2,537) | (294) |
| Distributions to stockholder | (100) | (707) |
| Settlement of loans for purchase of shares in Merisant Worldwide, Inc. | 518 | 43 |
| Net cash used in financing activities | (8,680) | (11,785) |
| Effect of exchange rate on cash and cash equivalents | 656 | 114 |
| Net increase (decrease) in cash and cash equivalents | 16,757 | (39,327) |
| Cash and cash equivalents at beginning of period | 23,730 | 51,040 |
| Cash and cash equivalents at end of period | $ 40,487 | $ 11,713 |

The accompanying notes are an integral part of these unaudited consolidated financial statements.

Table of Contents

**MERISANT COMPANY**
**Notes to Unaudited Consolidated Financial Statements**
**(Dollars In Thousands)**

1.    **Principles of Consolidation**

The consolidated financial statements and notes do not contain certain information included in the annual consolidated financial statements and notes of Merisant Company and subsidiaries.  Unless otherwise indicated or unless the context otherwise requires, all references to the "Company" mean Merisant Company and its consolidated subsidiaries.  The consolidated balance sheet at December 31, 2007 was derived from the Company's audited consolidated financial statements, but does not include all disclosures required by generally accepted accounting principles in the United States of America ("GAAP"). The remaining consolidated financial statements are unaudited. In the opinion of management, all normal, recurring adjustments necessary for a fair presentation of such unaudited financial statements have been included therein. For interim reporting purposes, certain marketing and advertising expenses are charged to results of operations as a percentage of sales. Interim results may not be indicative of results for a full year. These unaudited consolidated financial statements and notes should be read in conjunction with the Company's annual consolidated financial statements.

The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

2.    **Segment Information**

The Company primarily manufactures and markets low-calorie tabletop sweeteners globally. Therefore, the Company's reportable segments are organized and managed principally by geographic region:  North America; Europe/Africa/Middle East, referred to as EAME; Latin America; and Asia/Pacific. The Company's management reviews Operating EBITDA to evaluate segment performance and allocate resources. Operating EBITDA consists of segment earnings before interest expense, income tax expense, depreciation and amortization as well as items such as expenses related to restructuring charges, certain significant charges related to new product development and launch costs, certain litigation costs and certain other non-cash or excludable charges or losses. Other expense (income), net, as reported in the unaudited consolidated financial statements, is included in Operating EBITDA of the respective reportable segments, except for the portion of other expense (income), net that relates to the foreign currency transaction gains or losses associated with the Company's euro-denominated debt (see Note 5) and unrealized gains or losses on derivative instruments. Corporate expenses include corporate staff and related amounts. Corporate expenses, interest and other expenses and the provision for income taxes are centrally managed and, accordingly, such items are not presented by segment since they are excluded from the measure of segment performance reviewed by management. The Company launched a new product line in North America in the first quarter of 2006 which management evaluates and manages separately from its other North American operations. As such, this item is also excluded from the measure of segment performance reviewed by management. The Company's definition of Operating EBITDA is largely driven by similar definitions of Bank EBITDA under its primary credit facilities.  The definition of Bank EBITDA was adjusted in the May 2007 amendment of those facilities and that change is reflected prospectively in the Company's computation of Operating EBITDA.  The Company's assets, which are principally in the United States and Europe, are also managed geographically. A summary of the Company's results of operations by reportable segment for the three and nine months ended September 30, 2007 and 2008 is as follows:

7

Table of Contents

### For the Three Months Ended September 30, 2007

|  | North America | EAME | Latin America | Asia/ Pacific | Consolidated |
|---|---|---|---|---|---|
| Total net sales for reportable segments | $ 29,127 | $ 27,920 | $ 9,508 | $ 6,254 | $ 72,809 |
| Net sales related to new product launch |  |  |  |  | 28 |
| Total consolidated net sales |  |  |  |  | $ 72,837 |
| | | | | | |
| Operating EBITDA | $ 11,298 | $ 9,874 | $ 2,913 | $ 1,971 | $ 26,056 |
| Less (plus): |  |  |  |  |  |
| Corporate expenses |  |  |  |  | 5,216 |
| Restructuring and specified project implementation costs |  |  |  |  | 414 |
| Depreciation expense |  |  |  |  | 1,590 |
| Amortization expense |  |  |  |  | 5,264 |
| Currency loss on euro debt |  |  |  |  | 879 |
| Gain on liquidation or sale of subsidiary |  |  |  |  | (284) |
| Loss related to new product launch |  |  |  |  | 1,314 |
| Other non-cash expense |  |  |  |  | 19 |
| Other expense, net |  |  |  |  | (117) |
| Income from operations |  |  |  |  | 11,761 |
| Interest expense, net |  |  |  |  | 10,700 |
| Other expense, net |  |  |  |  | 117 |
| Income before income taxes |  |  |  |  | $ 944 |

### For the Three Months Ended September 30, 2008

|  | North America | EAME | Latin America | Asia/ Pacific | Consolidated |
|---|---|---|---|---|---|
| Total net sales for reportable segments | $ 22,100 | $ 27,976 | $ 10,529 | $ 3,878 | $ 64,483 |
| Net sales related to new product launch |  |  |  |  | 37 |
| Total consolidated net sales |  |  |  |  | $ 64,520 |
| | | | | | |
| Operating EBITDA | $ 6,230 | $ 5,603 | $ 3,512 | $ 847 | $ 16,192 |
| Less (plus): |  |  |  |  |  |
| Corporate expenses |  |  |  |  | 2,700 |
| Restructuring and specified project implementation costs |  |  |  |  | 325 |
| Depreciation expense |  |  |  |  | 1,382 |
| Amortization expense |  |  |  |  | 5,264 |
| Currency gain on euro debt |  |  |  |  | (651) |
| Loss related to new product launch |  |  |  |  | 2,486 |
| Other non-cash expense |  |  |  |  | 3 |
| Other expense, net |  |  |  |  | (1,871) |
| Income from operations |  |  |  |  | 6,554 |
| Interest expense, net |  |  |  |  | 9,508 |
| Other expense, net |  |  |  |  | 1,871 |
| Loss before income taxes |  |  |  |  | $ (4,825) |

8

Table of Contents

**For the Nine Months Ended September 30, 2007**

| | North America | EAME | Latin America | Asia/ Pacific | Consolidated |
|---|---|---|---|---|---|
| Total net sales for reportable segments | $ 85,655 | $ 84,577 | $ 22,855 | $ 20,157 | $ 213,244 |
| Net sales related to new product launch | | | | | (4) |
| Total consolidated net sales | | | | | $ 213,240 |
| | | | | | |
| Operating EBITDA | $ 31,703 | $ 25,581 | $ 5,913 | $ 7,428 | $ 70,625 |
| Less (plus): | | | | | |
| Corporate expenses | | | | | 19,190 |
| Restructuring and specified project implementation costs | | | | | 1,288 |
| Depreciation expense | | | | | 4,919 |
| Amortization expense | | | | | 16,718 |
| Currency loss on euro debt | | | | | 1,382 |
| Gain on liquidation or sale of subsidiary | | | | | (284) |
| Loss related to new product launch | | | | | 2,852 |
| Other non-cash charge and net gain excludable from Operating EBITDA | | | | | 4,869 |
| Gain from receipt of one-time payment excludable from Operating EBITDA | | | | | (30,000) |
| Other non-cash expense | | | | | 70 |
| Other income, net | | | | | 29,962 |
| Income from operations | | | | | 19,659 |
| Interest expense, net | | | | | 33,782 |
| Cost of refinancing | | | | | 5,791 |
| Other income, net | | | | | (29,962) |
| Income before income taxes | | | | | $ 10,048 |

**For the Nine Months Ended September 30, 2008**

| | North America | EAME | Latin America | Asia/ Pacific | Consolidated |
|---|---|---|---|---|---|
| Total net sales for reportable segments | $ 69,102 | $ 90,454 | $ 27,232 | $ 13,674 | $ 200,462 |
| Net sales related to new product launch | | | | | 24 |
| Total consolidated net sales | | | | | $ 200,486 |
| | | | | | |
| Operating EBITDA | $ 21,167 | $ 22,145 | $ 6,694 | $ 3,225 | $ 53,231 |
| Less (plus): | | | | | |
| Corporate expenses | | | | | 14,229 |
| Restructuring and specified project implementation costs | | | | | 3,204 |
| Depreciation expense | | | | | 3,657 |
| Amortization expense | | | | | 15,792 |
| Currency loss on euro debt | | | | | 341 |
| Loss related to new product launch | | | | | 5,514 |
| Expenses related to credit agreement amendments and waivers | | | | | 435 |
| Other non-cash expense | | | | | 68 |
| Other expense, net | | | | | (2,505) |
| Income from operations | | | | | 12,496 |
| Interest expense, net | | | | | 28,665 |
| Other expense, net | | | | | 2,505 |
| Loss before income taxes | | | | | $ (18,674) |

Table of Contents

### 3.   Restructuring Expenses

During the nine months ended September 30, 2008, the Company continued to evaluate opportunities to increase efficiency and reduce costs. This review resulted in the continuation of workforce reductions and planned changes in the Company's global business model. These actions are designed to improve both financial results and the long-term value of the business. Restructuring expenses for workforce reductions of $211 and $296 were recorded for the three months ended September 30, 2007 and September 30, 2008, respectively, and $1,085 and $1,404 were recorded for the nine months ended September 30, 2007 and 2008, respectively. The 2008 charges principally related to planned termination costs for employees including charges related to 10 additional personnel that were notified of their termination during the nine months ended September 30, 2008. Severance payments and benefits are scheduled to be made over the next nine months.

Reconciliation of the restructuring liability at September 30, 2008 is as follows:

| | | |
|---|---|---:|
| Restructuring liability at December 31, 2007 | $ | 182 |
| Restructuring expenses for the nine months ended September 30, 2008 | | 1,404 |
| Cash payments for the nine months ended September 30, 2008 | | (1,255) |
| Restructuring liability at September 30, 2008 | $ | 331 |

The restructuring liability at December 31, 2007 and September 30, 2008 is included in the line item "Accrued expenses and other liabilities" in the accompanying consolidated balance sheets.

The following table presents restructuring expenses included in each segment and corporate expenses for the three and nine months ended September 30, 2007 and 2008:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---:|---:|---:|---:|
| | 2007 | 2008 | 2007 | 2008 |
| North America | $ — | $ 327 | $ — | $ 327 |
| EAME | 204 | (26) | 502 | 796 |
| Latin America | 5 | (1) | 91 | 7 |
| Asia/Pacific | 2 | (4) | 332 | 127 |
| Corporate | — | — | 160 | 147 |
| Total | $ 211 | $ 296 | $ 1,085 | $ 1,404 |

### 4.   Inventories

Inventories consisted of the following at December 31, 2007 and September 30, 2008:

| | December 31, 2007 | September 30, 2008 |
|---|---:|---:|
| Raw materials and supplies | $ 5,767 | $ 8,598 |
| Work in process | 383 | 1,381 |
| Finished goods | 7,924 | 16,168 |
| Inventory obsolescence reserves | (534) | (779) |
| Total | $ 13,540 | $ 25,368 |

The increase in finished goods is due to planned build up of stock related to recent changes in our foreign manufacturing operations as described further in Note 7.

### 5.   Debt

The Company and its parent, Merisant Worldwide, Inc. ("Merisant Worldwide"), are highly leveraged. At September 30, 2008, Merisant Worldwide and its subsidiaries, including the Company, had $553,557 of long-term debt outstanding, consisting of $135,136 aggregate principal amount of Merisant Worldwide's 12 ¼% senior subordinated discount notes due 2014 (the "Discount Notes"), $225,000 aggregate principal amount of the Company's 9 ½% senior subordinated notes due 2013 (the "Notes"), and $193,421 aggregate principal amount outstanding under the Company's senior credit agreement (the "Senior Credit Agreement" or as amended and restated, the "Amended and Restated Credit Agreement"), excluding capital lease obligations of $89 and unused commitments on the revolving portion of the Senior Credit Agreement of $21,000.

At September 30, 2008, borrowings under the Senior Credit Agreement included $7,416 ("Term A") aggregate principal amount of term loans bearing annual interest of 8.35%, $174,005 ("Term B") aggregate principal amount of term loans bearing annual interest of 6.40% and $12,000 aggregate principal amount in revolver commitments, bearing annual interest of 5.97%. The Term A loans are euro-denominated and are translated into U.S. dollars at the spot rate as of September 30, 2008.

The Term A loans and the revolver commitment are scheduled to terminate in January 2009 and all amounts thereunder are scheduled to be repaid. Most of the Term B loans ($171,803) are due at its final maturity in January 2010. Additionally, interest on the Discount Notes will become payable in cash commencing on May 15, 2009. Semiannual interest payments of $8.6 million are required. The indenture governing the Notes limits the Company's ability to pay dividends or loan cash to Merisant Worldwide, which has no operations of its own.

As of November 13, 2008, borrowings under the Company's revolving credit facility were $28,000. In aggregate, during the twelve months ending September 30, 2009, the Company and Merisant Worldwide are scheduled to pay $78,300 of principal and interest under the Company and Merisant Worldwide's primary debt obligations. Given the disruptions in the credit and financial markets in recent months, uncertainty exists as to whether we will be able to generate results from operations or consummate transactions sufficient to enable us to make all of these payments. The disruptions in the credit and financial markets have also limited access to capital and credit for many companies. We rely on a number of financial institutions and the credit and financial markets to meet our financial commitments and short-term liquidity needs if internal funds are not available. Continuing instability or disruptions of these markets could prohibit or make it more difficult for us to access new capital, significantly increase the cost of capital or limit our ability to refinance, replace or amend our existing indebtedness. We are engaged in discussions with certain of our secured lenders and debt security holders as well as potential financing sources with regard to refinancing or restructuring all or a portion of our debt obligations. However, there can be no assurance that we will be able to refinance, replace or amend our outstanding debt obligations on terms favorable to us, or at all, particularly given current financial market conditions.

On June 23, 2006, the Company entered into an $85,000 senior secured term loan agreement (the "Second Lien Credit Agreement"), the borrowings under which were secured by a second lien on all the assets that secured loans outstanding under the then existing Senior Credit Agreement. The Second Lien Credit Agreement consisted of an aggregate of $85,000 principal amount of term loans, the net proceeds of which were used to prepay $9,540 of euro-denominated Term A loans, prepay $53,320 of Term B loans and to repay $15,000 of revolving loans, in each case, outstanding under the Senior Credit Agreement.

On May 9, 2007, the Company, Merisant Worldwide and certain of the Company's subsidiaries entered into the Amended and Restated Credit Agreement, which, among other things, increased by $85,000 the principal amount of Term B loans that could be borrowed by the Company under the Senior Credit Agreement. The Company paid $2,505 in fees and expenses related to this amendment and restatement which it deferred and is amortizing over the term of the related debt. Upon closing, the Company borrowed the full $85,000 of additional Term B loans available under the Amended and Restated Credit Agreement and used the proceeds plus cash on hand to prepay the principal of all loans outstanding under the Second Lien Credit Agreement totaling $85,000, plus all outstanding interest of $1,438 and a premium of $2,550, or $88,988. The Second Lien Credit Agreement was terminated as a result of the transaction and there was no increase in the Company's long-term debt as a result of this transaction. In addition to the incurrence of fees, this transaction also resulted in a write-off of existing deferred financing fees relating to the extinguishment of previously outstanding debt under the Second Lien Credit Agreement of $3,241.

Upon closing of the above transaction and execution of the related amendment, the interest rate on all term loans and revolving loans outstanding under the Amended and Restated Credit Agreement increased from euro-LIBOR and LIBOR plus 325 basis points per annum to euro-LIBOR and LIBOR plus 350 basis points per annum. As a result of the termination of the Second Lien Credit Agreement, the Company's effective interest rate on variable interest rate debt decreased from 10.63% per annum prior to the closing of this transaction to 8.73% per annum subsequent to this transaction.

The Company paid interest on borrowings under the Senior Credit Agreement, the Second Lien Credit Agreement, and on the Notes totaling $35,933 and $32,703 for the nine months ended September 30, 2007 and 2008, respectively.

The Amended and Restated Credit Agreement preserves prior amendments, amends future financial covenant ratios and levels and contains a number of additional amendments, including to the definition of Bank EBITDA, that give the Company more flexibility to operate its business and de-leverage its balance sheet.

The Amended and Restated Credit Agreement contains covenants, including financial covenants that must be met on a quarterly basis. "Bank EBITDA" is the measure by which the financial covenants contained in the Amended and Restated Credit Agreement are measured. However, Bank EBITDA is not a measure of liquidity under GAAP. Accordingly, while providing useful information with respect to an assessment of liquidity as measured in accordance with the covenants in the Company's primary debt obligations, this measure should not be considered in isolation from, or as a substitute for, consolidated statement of cash flow data prepared in accordance with GAAP as an indication of liquidity. In addition, the Bank EBITDA measure presented may differ from, and may not be comparable to, similarly titled measures used by other

companies.

The Company was in compliance with its covenants under the Amended and Restated Credit Agreement as of September 30, 2008.

The Company was required to prepay $15,226 of the principal amount of term loans outstanding under the Amended and Restated Credit Agreement five business days after filing the annual financial statements with excess cash as required and calculated under the terms of the Amended and Restated Credit Agreement. The prepayment was completed on April 4, 2008.

11

Table of Contents

6.    **Transactions with Related Parties**

The Company has a deferred compensation payable to Arnold Donald, its former Chairman and a current director, and a note receivable in the same amount from Mr. Donald. The Company recorded $43 and $30 of interest income on the note receivable for the three months ended September 30, 2007 and 2008, respectively, and $129 and $89 of interest income on the note receivable for the nine months ended September 30, 2007 and 2008, respectively, and an equal amount of interest expense in the respective periods.

The Company is party to an agreement with Brand Architecture International ("Brand Architecture") pursuant to which Brand Architecture has agreed to provide consulting services relating to the development of brand architecture for the Company's brands. The Company paid approximately $15 and $371 to Brand Architecture for the three months ended September 30, 2007 and 2008, respectively, and approximately $315 and $569 for the nine months ended September 30, 2007 and 2008, respectively, including the reimbursement to Brand Architecture for expenses relating to its work. Adam Stagliano, a member of the Company's board of directors, is a founding director and the President and Chief Strategic Officer of Brand Architecture.

During the nine months ended September 30, 2007 and 2008, the Company made distributions of $100 and $707, respectively, to its sole stockholder, Merisant Worldwide.

7.    **Commitments and Contingencies**

The Company has an investment in an affiliate located in the Philippines that is accounted for using the equity method. The affiliate, a 50/50 joint venture, distributes sugar substitute sweeteners for the international consumer food markets, primarily under the *Equal*® brand. In addition to its investment in the joint venture, the Company is committed to a 50% share in any new borrowings of the joint venture. As of December 31, 2007 and September 30, 2008, there were no additional joint venture borrowings.

In July 2008, the Company started handling order processing, warehousing and trade marketing internally and through a third-party broker and logistics provider for retail grocery and drug customers in the United States rather than through its primary domestic distributors. The Company anticipates that this operational change will reduce its operating costs, improve the efficiency of its inventory management and distribution capabilities, and provide more transparency in customer relations. In July 2008, the Company paid the distributor $300 to facilitate this and other changes in the distribution agreement.

The Company has initiated a multi-site manufacturing strategy for EAME. In connection with this strategy, the Company formed CzechPak Manufacturing s.r.o. to operate a new manufacturing facility located in the Czech Republic. The Company will shift a portion of its current production and equipment to this new facility from Krüger GmbH & Co. KG, its current contract manufacturer located in Germany. In connection with this transition, the Company and Krüger amended the parties' manufacturing agreement. Under the terms of the amended agreement, certain products will no longer be manufactured by Krüger and the Company will be able to move the equipment currently used by Krüger to manufacture and package these products to its CzechPak facility. The parties extended the expiration of the manufacturing agreement from 2010 to 2012 and the Company agreed to meet certain minimum purchase commitments for each of Krüger's facilities. Commencing January 2009 the aggregate amount of such commitments is €29.2 million. In addition, the Company agreed to acquire any raw materials, packaging and work in progress for the discontinued products and to increase conversion fees per unit for the products that Krüger will continue to produce. The Company also agreed to provide credit enhancements in the event that Krüger is unable to obtain a certain level of credit insurance for its production commitments. The Company built up additional inventory of finished products to meet anticipated market demand during the transition period.

The Company is subject to various other claims, pending and possible legal actions for product liability and other damages, and other matters arising out of the conduct of the Company's business, including tax uncertainties arising from doing business in various European and Latin American jurisdictions. The Company believes, based on current knowledge and consultation with counsel, that the outcome of such claims and actions will not have a material adverse effect on the Company's consolidated financial position or results of operations.

12

Table of Contents

## 8.   Income Taxes

In June 2006, the Financial Accounting Standards Board ("FASB") issued Interpretation No. 48, Accounting for Uncertainty in Income Taxes - an interpretation of FASB Statement No. 109 ("FIN 48"), that clarifies the accounting and recognition for income tax positions taken or expected to be taken in the Company's tax returns. The Company adopted FIN 48 on January 1, 2007, and recorded the cumulative effect of a change in accounting principle by recording a decrease in the liability for uncertain tax positions of $5,757, that was accounted for as a credit to opening retained earnings. At December 31, 2007 and September 30, 2008, the total liability, including interest and penalties of $715 and $771, respectively, for uncertain tax positions recorded in the Company's balance sheet in non-current Other liabilities was $2,815 and $2,805, respectively. No uncertain tax position reserves were reversed or settled during the nine months ended September 30, 2008. The entire amount of this consolidated worldwide liability for uncertain tax positions would affect the Company's effective tax rate upon favorable resolution of the uncertain tax positions. Absent new experience in defending these uncertain tax positions in the various jurisdictions to which they relate, the Company cannot currently estimate a range of possible change of the September 30, 2008 liability over the next twelve months.

The Company files a consolidated U.S. income tax return and tax returns in various state and local jurisdictions. The Company's subsidiaries also file tax returns in various foreign jurisdictions. In addition to the U.S., the Company's major taxing jurisdictions include Switzerland, France, the United Kingdom, Belgium, Australia, Argentina and Mexico. In the U.S., all tax years from inception in 2000 through the present are open. The Company's Switzerland subsidiary operates under a tax holiday, resulting in no uncertain tax positions for that entity for any tax year. Local audits of the tax returns for the Company's France subsidiary have been completed through 2004. In the United Kingdom, the Company assumes that tax years through 2005 are closed due to local practice. In Belgium and Australia, tax years through 2003 and 2001, respectively, are closed due to the local statute of limitations. In Argentina and Mexico only 2000 and 2001 are considered closed tax years due to the local statute of limitations.

Interest and penalties related to tax positions taken in the Company's tax returns are recorded in income tax expense in the consolidated statements of operations.

## 9.   Expansion of Operations

On April 9, 2008, Nativia Guarani, S.A., the Company's indirect, wholly-owned subsidiary ("Nativia Guarani"), purchased a stevia processing facility and business located in Paraguay and related tangible and intangible assets from Imperio Guarani, S.A. ("Imperio Guarani") in an asset purchase transaction. The purchase price was $5.0 million, $0.6 million of which was paid in 2007 and $3.4 million of which was paid upon the closing of the acquisition on April 9, 2008. The remaining $1.0 million of the purchase price may be paid to Imperio Guarani over the next 27 months if Imperio Guarani continues to perform under related long-term contracts during that period. This remaining purchase price liability is classified as current payables and other non-current liabilities as appropriate. In conjunction with the transaction, the Company paid $0.5 million in reimbursable value added tax which is classified as other non-current assets. The Company is currently analyzing the recovery period. None of the working capital of the business was acquired, so the total cost of the acquisition was allocated to long-lived fixed and intangible assets acquired based on their respective fair values (as decreased due to resulting "negative goodwill") in accordance with FASB No. 141- Business Combinations. The allocation resulted in $2.1 million of fixed assets (predominately machinery and equipment), $2.2 million of internally-developed technology and $0.7 million of tradenames and customer relationships. Depreciation and amortization of these allocated balances will be deductible for income tax purposes over expected lives of two to ten years. These assets will be tested for impairment as required under FASB No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets. The preliminary values assigned to the intangible assets were based upon future discounted cash flows related to the existing products revenue streams.

The acquisition was accounted for by the purchase method and the results of operations of the acquired business have been included in our Consolidated Statement of Operations since the date of acquisition and are not yet material. Pro forma financial information is not presented as the effect of this acquisition is not material to the Company's results of operations and financial position.

Upon the consummation of the acquisition, Whole Earth Sweetener Company LLC, a wholly owned subsidiary of the Company ("Whole Earth"), and Nativia Guarani entered into long-term contracts with Imperio Guarani and a consulting agreement with Sergio Chase, the principal owner of Imperio Guarani. Imperio Guarani will exclusively supply dried stevia leaves to Nativia Guarani and collaborate on research and development projects. Management believes that the Nativia Guarani business and agreements with Imperio Guarani and Mr. Chase will assist the

13

Company in several ways. A number of larger and better capitalized companies will be competing for stevia leaves and extracts, and vertical integration provides Whole Earth with more control over its supply of this natural ingredient although the Company will continue to source high purity Reb A from other suppliers. In addition, the Company believes that Nativia Guarani and our strategic relationship with Imperio Guarani will permit Whole Earth to promote sustainable farming practices and develop improved agricultural and processing methods and technologies that may offer competitive advantages.

## 10.    Consolidating Guarantor and Non-Guarantor Financial Information

The following tables set forth the consolidating statements of operations for the three and nine months ended September 30, 2007 and September 30, 2008, the consolidating balance sheets at December 31, 2007 and September 30, 2008 and the statements of cash flow for the nine months ended September 30, 2007 and 2008. The following information is included herein as a result of the guarantee by certain of the Company's wholly owned U.S. subsidiaries ("Guarantor Companies") of the Notes. None of the Company's other subsidiaries guarantee the Notes. Each of the guarantees is joint and several and full and unconditional.

### Unaudited Consolidating Statement of Operations
### For the Three Months Ended September 30, 2007

| | Merisant Company | Guarantor Companies | Non-Guarantor Companies | Consolidating Eliminations | Consolidated |
|---|---:|---:|---:|---:|---:|
| Net sales | $ — | $ 31,104 | $ 42,899 | $ (1,166) | $ 72,837 |
| Cost of sales | — | 14,573 | 18,111 | (1,166) | 31,518 |
| Gross profit | — | 16,531 | 24,788 | — | 41,319 |
| Operating expenses: | | | | | |
| Marketing and selling expenses | — | 7,004 | 8,917 | — | 15,921 |
| Administration expenses | 51 | 5,616 | 2,495 | — | 8,162 |
| Amortization of intangible assets | 2,020 | — | 3,244 | — | 5,264 |
| Restructuring expenses | — | — | 211 | — | 211 |
| Total operating expenses | 2,071 | 12,620 | 14,867 | — | 29,558 |
| Income (loss) from operations | (2,071) | 3,911 | 9,921 | — | 11,761 |
| Other expense (income): | | | | | |
| Interest income | (110) | — | (1,009) | 873 | (246) |
| Interest expense | 11,815 | — | 4 | (873) | 10,946 |
| Other expense (income), net | 881 | (78) | (686) | — | 117 |
| Total other expense (income) | 12,586 | (78) | (1,691) | — | 10,817 |
| Income (loss) before income taxes and equity in consolidated subsidiaries | (14,657) | 3,989 | 11,612 | — | 944 |
| Provision for income taxes | 527 | 726 | 83 | — | 1,336 |
| Equity in consolidated subsidiaries | 14,792 | 11,529 | — | (26,321) | |
| Net income (loss) | $ (392) | $ 14,792 | $ 11,529 | $ (26,321) | $ (392) |

14

Table of Contents

**Unaudited Consolidating Statement of Operations**
**For the Three Months Ended September 30, 2008**

| | Merisant Company | Guarantor Companies | Non-Guarantor Companies | Consolidating Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net sales | $ — | $ 24,824 | $ 41,646 | $ (1,410) | $ 64,520 |
| Cost of sales | — | 13,364 | 19,678 | (1,410) | 31,632 |
| Gross profit | — | 10,920 | 21,968 | — | 32,888 |
| Operating expenses: | | | | | |
| Marketing and selling expenses | — | 6,065 | 8,427 | — | 14,492 |
| Administration expenses | (90) | 3,904 | 2,468 | — | 6,282 |
| Amortization of intangible assets | 2,020 | — | 3,244 | — | 5,264 |
| Restructuring expenses | — | 327 | (31) | — | 296 |
| Total operating expenses | 1,930 | 10,296 | 14,108 | — | 26,334 |
| Income (loss) from operations | (1,930) | 624 | 7,860 | — | 6,554 |
| Other expense (income): | | | | | |
| Interest income | (31) | — | (799) | 760 | (70) |
| Interest expense | 10,334 | — | 4 | (760) | 9,578 |
| Other expense (income), net | (398) | 58 | 2,211 | — | 1,871 |
| Total other expense (income) | 9,905 | 58 | 1,416 | — | 11,379 |
| Income (loss) before income taxes and equity in consolidated subsidiaries | (11,835) | 566 | 6,444 | — | (4,825) |
| Provision for income taxes | (55) | 729 | (178) | — | 496 |
| Equity in consolidated subsidiaries | 6,459 | 6,622 | — | (13,081) | — |
| Net income (loss) | $ (5,321) | $ 6,459 | $ 6,622 | $ (13,081) | $ (5,321) |

**Unaudited Consolidating Statement of Operations**
**For the Nine Months Ended September 30, 2007**

| | Merisant Company | Guarantor Companies | Non-Guarantor Companies | Consolidating Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net sales | $ — | $ 91,905 | $ 124,826 | $ (3,491) | $ 213,240 |
| Cost of sales | — | 44,042 | 53,569 | (3,491) | 94,120 |
| Gross profit | — | 47,863 | 71,257 | — | 119,120 |
| Operating expenses: | | | | | |
| Marketing and selling expenses | — | 20,274 | 27,928 | — | 48,202 |
| Administration expenses | 290 | 25,236 | 7,930 | — | 33,456 |
| Amortization of intangible assets | 6,876 | — | 9,842 | — | 16,718 |
| Restructuring expenses | — | 160 | 925 | — | 1,085 |
| Total operating expenses | 7,166 | 45,670 | 46,625 | — | 99,461 |
| Income (loss) from operations | (7,166) | 2,193 | 24,632 | — | 19,659 |
| Other expense (income): | | | | | |
| Interest income | (209) | (4) | (2,567) | 2,169 | (611) |
| Interest expense | 36,507 | — | 55 | (2,169) | 34,393 |
| Cost of refinancing | 5,791 | — | — | — | 5,791 |
| Other expense (income), net | (28,612) | (168) | (1,182) | — | (29,962) |
| Total other expense (income) | 13,477 | (172) | (3,694) | — | 9,611 |
| Income (loss) before income taxes and equity in consolidated subsidiaries | (20,643) | 2,365 | 28,326 | — | 10,048 |
| Provision for income taxes | 1,209 | 2,231 | 1,596 | — | 5,036 |
| Equity in consolidated subsidiaries | 26,864 | 26,730 | — | (53,594) | — |
| Net income (loss) | $ 5,012 | $ 26,864 | $ 26,730 | $ (53,594) | $ 5,012 |

Table of Contents

**Unaudited Consolidating Statement of Operations**
**For the Nine Months Ended September 30, 2008**

| | Merisant Company | Guarantor Companies | Non-Guarantor Companies | Consolidating Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net sales | $ — | $ 75,234 | $ 129,109 | $ (3,857) | $ 200,486 |
| Cost of sales | — | 39,691 | 61,627 | (3,857) | 97,461 |
| Gross profit | — | 35,543 | 67,482 | — | 103,025 |
| Operating expenses: | | | | | |
| Marketing and selling expenses | — | 18,352 | 29,956 | — | 48,308 |
| Administration expenses | 843 | 16,171 | 8,011 | — | 25,025 |
| Amortization of intangible assets | 6,060 | — | 9,732 | — | 15,792 |
| Restructuring expenses | — | 474 | 930 | — | 1,404 |
| Total operating expenses | 6,903 | 34,997 | 48,629 | — | 90,529 |
| Income (loss) from operations | (6,903) | 546 | 18,853 | — | 12,496 |
| Other expense (income): | | | | | |
| Interest income | (117) | — | (2,471) | 2,060 | (528) |
| Interest expense | 31,242 | — | 11 | (2,060) | 29,193 |
| Other expense (income), net | 595 | 186 | 1,724 | — | 2,505 |
| Total other expense (income) | 31,720 | 186 | (736) | — | 31,170 |
| Income (loss) before income taxes and equity in consolidated subsidiaries | (38,623) | 360 | 19,589 | — | (18,674) |
| Provision for income taxes | 948 | 2,209 | 421 | — | 3,578 |
| Equity in consolidated subsidiaries | 17,319 | 19,168 | — | (36,487) | — |
| Net income (loss) | $ (22,252) | $ 17,319 | $ 19,168 | $ (36,487) | $ (22,252) |

16

Table of Contents

**Unaudited Condensed Consolidating Balance Sheet**
**At December 31, 2007**

| | Merisant Company | Guarantor Companies | Non-Guarantor Companies | Consolidating Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | $ 12,351 | $ 3,305 | $ 35,384 | $ — | $ 51,040 |
| Trade accounts receivable, net of allowance for doubtful accounts | — | 18,259 | 56,151 | — | 74,410 |
| Other receivables and intercompany receivables | 40 | 5,387 | 9,060 | (5,359) | 9,128 |
| Inventories | — | 6,038 | 7,502 | — | 13,540 |
| Other current assets | 1,315 | 4,734 | 2,747 | — | 8,796 |
| Total current assets | 13,706 | 37,723 | 110,844 | (5,359) | 156,914 |
| Property and equipment, net | 600 | 16,535 | 6,374 | | 23,509 |
| Trademarks and other intangible assets, less accumulated amortization | 58,242 | — | 102,455 | — | 160,697 |
| Goodwill, less accumulated amortization | — | 107,209 | — | — | 107,209 |
| Deferred financing costs, less accumulated amortization | 9,586 | — | — | — | 9,586 |
| Other non-current assets | 1,822 | 579 | 301 | — | 2,702 |
| Investment in subsidiary and intercompany debt | 368,271 | 264,388 | 264 | (632,659) | 264 |
| Total assets | $ 452,227 | $ 426,434 | $ 220,238 | $ (638,018) | $ 460,881 |
| **Liabilities** | | | | | |
| Accounts payable and intercompany payables | $ 73,743 | $ 11,752 | $ 13,544 | $ (76,421) | $ 22,618 |
| Income taxes payable | — | 2 | 1,029 | — | 1,031 |
| Accrued expenses and other liabilities | 12,818 | 13,474 | 19,868 | — | 46,160 |
| Current maturities of long-term obligations | 12,119 | 59 | — | — | 12,178 |
| Total current liabilities | 98,680 | 25,287 | 34,441 | (76,421) | 81,987 |
| Long-term obligations and intercompany debt | 416,773 | 166,144 | — | (166,079) | 416,838 |
| Other liabilities | 5,373 | 22,202 | 3,080 | — | 30,655 |
| Total liabilities | 520,826 | 213,633 | 37,521 | (242,500) | 529,480 |
| **Stockholder's Equity (Deficit)** | | | | | |
| Total stockholder's equity (deficit) | (68,599) | 212,801 | 182,717 | (395,518) | (68,599) |
| Total liabilities and stockholder's equity (deficit) | $ 452,227 | $ 426,434 | $ 220,238 | $ (638,018) | $ 460,881 |

17

Table of Contents

## Unaudited Condensed Consolidating Balance Sheet
### at September 30, 2008

| | Merisant Company | Guarantor Companies | Non-Guarantor Companies | Consolidating Eliminations | Consolidated |
|---|---:|---:|---:|---:|---:|
| **Assets** | | | | | |
| Cash and cash equivalents | $ 952 | $ 1,486 | $ 9,275 | $ — | $ 11,713 |
| Trade accounts receivable, net of allowances | — | 11,471 | 50,970 | — | 62,441 |
| Other receivables and intercompany receivables | 1,925 | 5,209 | 12,651 | (6,722) | 13,063 |
| Inventories | — | 8,431 | 16,937 | — | 25,368 |
| Other current assets | 1,369 | 3,312 | 2,203 | — | 6,884 |
| Total current assets | 4,246 | 29,909 | 92,036 | (6,722) | 119,469 |
| Property and equipment, net | — | 16,830 | 12,949 | — | 29,779 |
| Trademarks and other intangible assets, net | 52,182 | — | 95,759 | — | 147,941 |
| Goodwill | — | 107,209 | — | — | 107,209 |
| Deferred financing costs, net | 7,367 | — | — | — | 7,367 |
| Other non-current assets | 910 | 445 | 748 | — | 2,103 |
| Investment in subsidiary and intercompany debt | 387,137 | 292,253 | 403 | (679,390) | 403 |
| Total assets | $ 451,842 | $ 446,646 | $ 201,895 | $ (686,112) | $ 414,271 |
| **Liabilities** | | | | | |
| Accounts payable and intercompany payable | $ 112,420 | $ 10,531 | $ 10,250 | $ (114,870) | $ 18,331 |
| Income taxes payable | — | — | 644 | — | 644 |
| Accrued expenses and other liabilities | 6,811 | 8,098 | 19,358 | — | 34,267 |
| Current maturities of long-term obligations | 21,177 | 41 | — | — | 21,218 |
| Total current liabilities | 140,408 | 18,670 | 30,252 | (114,870) | 74,460 |
| Long-term obligations and intercompany debt | 397,243 | 163,476 | — | (163,429) | 397,290 |
| Other liabilities | 6,009 | 25,683 | 2,647 | — | 34,339 |
| Total liabilities | 543,660 | 207,829 | 32,899 | (278,299) | 506,089 |
| **Stockholder's Equity (Deficit)** | | | | | |
| Total stockholder's equity (deficit) | (91,818) | 238,817 | 168,996 | (407,813) | (91,818) |
| Total liabilities and stockholder's equity (deficit) | $ 451,842 | $ 446,646 | $ 201,895 | $ (686,112) | $ 414,271 |

18

Table of Contents

**Unaudited Consolidating Statement of Cash Flows**
**For the Nine Months Ended September 30, 2007**

| | Merisant Company | Guarantor Companies | Non-Guarantor Companies | Consolidating Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Operating activities** | | | | | |
| Net cash provided by (used in) operating activities | $ (11,013) | $ 2,873 | $ 88,487 | $ (53,594) | $ 26,753 |
| **Investing activities** | | | | | |
| Proceeds from sale of property and equipment | — | 26 | 190 | — | 216 |
| Purchases from sale of property and equipment | — | (1,362) | (826) | — | (2,188) |
| Net cash used in investing activities | — | (1,336) | (636) | — | (1,972) |
| **Financing activities** | | | | | |
| Borrowings under long-term obligations | 85,000 | 88 | — | — | 85,088 |
| Principal payments on long-term obligations, excluding revolving credit facility | (91,605) | (44) | — | — | (91,649) |
| Payment of deferred financing costs | (2,537) | — | — | — | (2,537) |
| Settlement of loans for purchase of shares in Merisant Worldwide, Inc. | 318 | 200 | — | — | 518 |
| Receivable/payable, parent company | 32,254 | 758 | (86,606) | 53,594 | — |
| Distribution to stockholder | (100) | — | — | — | (100) |
| Net cash provided by (used in) financing activities | 23,330 | 1,002 | (86,606) | 53,594 | (8,680) |
| Effect of exchange rate on cash | — | — | 656 | — | 656 |
| Net increase in cash and cash equivalents | 12,317 | 2,539 | 1,901 | — | 16,757 |
| Cash and cash equivalents at beginning of period | 782 | 3,088 | 19,860 | — | 23,730 |
| Cash and cash equivalents at end of period | $ 13,099 | $ 5,627 | $ 21,761 | $ — | $ 40,487 |

19

Table of Contents

**Unaudited Consolidating Statement of Cash Flows**
**For the Nine Months Ended September 30, 2008**

| | Merisant Company | Guarantor Companies | Non-Guarantor Companies | Consolidating Eliminations | Consolidated |
|---|---|---|---|---|---|
| **Operating activities** | | | | | |
| Net cash provided by (used in) operating activities | $ (35,698) | $ 2,798 | $ 53,878 | $ (36,487) | $ (15,509) |
| **Investing activities** | | | | | |
| Proceeds from sale of property and equipment | — | — | 40 | — | 40 |
| Purchase of business | — | — | (3,400) | — | (3,400) |
| Purchases of property and equipment | — | (2,350) | (6,437) | — | (8,787) |
| Net cash used in investing activities | — | (2,350) | (9,797) | — | (12,147) |
| **Financing activities** | | | | | |
| Borrowings under revolving credit facility | 12,000 | — | — | — | 12,000 |
| Borrowings under long term obligations | — | 11 | — | — | 11 |
| Principal payments on long-term obligations, excluding revolving credit facility | (22,792) | (46) | — | — | (22,838) |
| Payment of deferred financing costs | (294) | — | — | — | (294) |
| Receivable/payable, parent company | 36,049 | (2,232) | (70,304) | 36,487 | — |
| Distribution to shareholder | (707) | — | — | — | (707) |
| Settlement of loans for purchase of shares in Merisant Worldwide, Inc. | 43 | — | — | — | 43 |
| Net cash provided by (used in) financing activities | 24,299 | (2,267) | (70,304) | 36,487 | (11,785) |
| Effect of exchange rate on cash | — | — | 114 | — | 114 |
| Net decrease in cash and cash equivalents | (11,399) | (1,819) | (26,108) | — | (39,327) |
| Cash and cash equivalents at beginning of period | 12,351 | 3,305 | 35,384 | — | 51,040 |
| Cash and cash equivalents at end of period | $ 952 | $ 1,486 | $ 9,275 | $ — | $ 11,713 |

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion should be read in conjunction with our unaudited consolidated financial statements and accompanying notes included elsewhere in this document. Our discussion of results by reportable segment should be read in conjunction with Note 2 to the unaudited consolidated financial statements included elsewhere in this document, which illustrates the reconciliation of Operating EBITDA to income (loss) before income taxes. Unless otherwise indicated or unless the context requires otherwise, all references in this discussion to "Merisant", "us", "we", "our" or "our company" mean Merisant Company and its consolidated subsidiaries.*

**Overview**

Our company is a worldwide leader in the marketing of low-calorie tabletop sweeteners, with an estimated 22% dollar share as of December 31, 2007 of a stable global retail market, which we estimate at $1.6 billion. We believe that our company has the leading dollar market share as of December 31, 2007 in almost half of what we estimate as the top twenty geographic markets for low-calorie tabletop sweetener sales. Our premium-priced brands, *Equal*® and *Canderel*®, are among the most recognized low-calorie tabletop sweetener products in the world, with aided brand awareness estimated at between 90% and 95% in our four top markets. In addition to *Equal*® and *Canderel*®, we market our products under 9 other regional brands that enjoy significant brand recognition in their target markets. We sell our brands in over 100 countries.

Our business is the result of over 25 years of history in the low-calorie tabletop sweetener industry, first as a division of G.D. Searle & Co. ("Searle") and later Monsanto Company ("Monsanto"). Searle invented the key sweetening ingredient in many of our products, aspartame, in 1965. Aspartame was first approved for consumer use in France in 1979, where Searle marketed the product under the *Canderel*® brand. By the early 1980s, *Canderel*® was being marketed in much of Europe. In 1981, the U.S. Food and Drug Administration approved the tabletop use of aspartame. The following year, Searle

Table of Contents

launched *Equal®* in the United States. Monsanto entered the sweetener market in 1985 through its acquisition of Searle. Our company is a Delaware corporation that was formed in 2000 by an investor group led by an affiliate of Pegasus Capital Advisors, L.P. to acquire Monsanto's tabletop sweetener business.

Our worldwide headquarters is located in Chicago, Illinois, and we have principal regional offices in Mexico City, Mexico, Neuchâtel, Switzerland, and Paris, France. We own and operate manufacturing facilities in Manteno, Illinois, Zarate, Argentina and Teplice, Czech Republic and own processing lines that are operated exclusively for us at plants located in Bergisch and Stendal, Germany and Bankrason, Thailand. We have formed a new wholly-owned subsidiary, CzechPak Manufacturing s.r.o., to manufacture products at a facility located in the Czech Republic, which commenced production in August 2008. The CzechPak facility initially will produce *Canderel®* branded products for EAME region. As of November 13, 2008, we had 20 direct and indirect active subsidiaries, including four subsidiaries in the United States, seven subsidiaries in Europe, six subsidiaries in Mexico, Central America and South America, and three subsidiaries in the Asia Pacific region, including Australia and India. In addition, our Swiss subsidiary holds a 50% interest in a joint venture in the Philippines.

Our core business continues to be products sweetened with aspartame, and the *Equal®* and *Canderel®* tabletop sweetener products accounted for approximately 85% of our net sales in 2007. The majority of our 19 other regional brands around the world are also sweetened with aspartame.

### Market Trends and Strategy

Our company's premium-priced brands had enjoyed a strong market position among low-calorie sweeteners in many of our key markets. In recent years, however, we have faced significant competition from McNeil Nutritionals LLC, a subsidiary of Johnson & Johnson ("McNeil"), which markets and distributes the artificial sweetener *Splenda®*. *Splenda®* is sweetened with sucralose, which is produced through a complex chemical process that converts sucrose molecules into a synthetic compound. From December 2002 to December 2007, *Splenda®*'s dollar share of the United States retail grocery market has grown from approximately 15% to 61% and has surpassed that of *Equal®* to become the number one premium low-calorie sweetener in the United States. While we believe that the introduction of *Splenda®* has increased the size of the market for low-calorie sweeteners in general, our net sales have declined during this period, particularly in North America which had accounted for 46% and 40% of our net sales in 2003 and 2007, respectively. As a result of declining net sales, we have experienced significant declines in our Bank EBITDA from $110.2 million in 2003 to a low of $67.2 million in 2006, before increasing to $69.9 million in 2007. For a description of Bank EBITDA and a reconciliation of Bank EBITDA to cash flow from operating activities, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources".

A new management team launched efforts to revitalize our company's business. Paul Block was appointed Chief Executive Officer in November 2004 and has led an initiative to strengthen our company's core brands, improve the efficiency of our operations, reduce costs and transform our company into a sweetener and sweetened food company. Mr. Block has recruited individuals from outside our company and promoted individuals from within the organization to form a new senior management team with the goal of developing a culture of innovation with a focus on the development and launch of new products designed to revitalize the existing customer base and attract new consumers.

Our company seeks to stabilize and then grow revenues through the following five strategic initiatives:

- Promote new usage among existing consumers and expand the *Equal®* and *Canderel®* brand positioning to attract new consumers through invasive marketing campaigns and improved sales execution.

- Increase the pace of product innovation to bring new products and brand extensions to the market, including products sweetened with high intensity sweeteners other than aspartame.

- Develop and test products that have the potential to transform our company's brand portfolio, including by building a platform for all natural, low-calorie sweeteners and sweetened foods.

- Dedicate significant resources to improving the efficiency of operations by, among other things, implementing programs to streamline manufacturing capabilities and improving the efficiency of certain support services. We have successfully reduced costs and made our business more efficient, which has significantly contributed to the current stabilization of Bank EBITDA over the past two years.

- Offer private label low-calorie sweeteners to retail and food service customers and leverage supply chain expertise globally.

21

Table of Contents

We believe that these strategies taken together have positioned our company to pursue opportunities for future growth in the low-calorie tabletop sweetener and sweetened food category. Many of our major markets are increasingly competitive as more branded and private label tabletop sweeteners compete for limited space on retail grocery shelves and in restaurant caddies. Although our premium brands *Equal®* and *Canderel®* are among the most recognized brands in the world, our company must offer more than these quality products in order to remain relevant to our customers and to consumers. Our strategies allow us to offer our retail grocery and food service customers a suite of branded and private label low-calorie tabletop sweeteners that contain a range of synthetic and natural sweeteners. We seek to offer our retail grocery and food service customers a range of quality products and the benefits of our manufacturing capabilities.

## Recent Developments

### Launch of PureVia™ Brand and Related Agreements

On July 31, 2008, Whole Earth Sweetener Company LLC, a wholly-owned subsidiary of Merisant Company ("Whole Earth"), announced that PepsiCo, Inc. ("PepsiCo") and Whole Earth had formed an unprecedented partnership to jointly own the *PureVia™* trademark and market the *PureVia™* brand globally. Whole Earth owns the *PureVia* trademark for tabletop sweeteners, and PepsiCo owns the trademark for beverages and certain other food categories. Whole Earth anticipates that it will launch a *PureVia™* all-natural, zero calorie tabletop sweetener in the United States in the fall of 2008.

*PureVia™* branded products will be sweetened with high purity Reb A, an all-natural, purified extract of the stevia plant that is approximately 200 times sweeter than sugar. PepsiCo and Whole Earth have entered into an ingredient branding agreement with PureCircle Limited, a supplier of high purity Reb A ("PureCircle"). Among other things, the parties will collaborate on marketing high purity Reb A under the *PureVia™* brand. PureCircle will be permitted to license the trademark on an exclusive and royalty-free basis from either PepsiCo or Whole Earth in order to identify the branded ingredient in product categories to be agreed to by the parties. PureCircle will be permitted to sublicense the trademark to customers approved by PepsiCo and Whole Earth for the purpose of identifying the ingredient in the agreed upon product categories.

Whole Earth has entered into a non-exclusive supply agreement with PureCircle pursuant to which PureCircle will supply high purity Reb A to Whole Earth. The supply agreement has an initial term of five years.

The active sweetening ingredient in *PureVia™* tabletop sweetener is high purity Reb A. This ingredient differs from most stevia products sold as dietary supplements in the United States because it is a highly pure form of only one of several steviol glycosides found in the stevia plant and because of its purity the ingredient contains little or no residual plant material.

Whole Earth believes that it has demonstrated that high purity Reb A is generally recognized as safe (referred to as "GRAS") and that the ingredient may therefore be sold as a food in the United States. In general, the Food, Drug, and Cosmetic Act provides that any substance that is added to food must be pre-approved by U.S. Food and Drug Administration, unless the substance is generally recognized, among qualified experts, as having been adequately shown to be safe under the conditions of its intended use. Management believes that Whole Earth has demonstrated the GRAS status of high purity Reb A through scientific procedures in accordance with FDA regulations. These procedures require the same quantity and quality of scientific evidence as is required to obtain approval to of the substance as a food additive and ordinarily is based upon published studies. Companies may elect to use GRAS ingredients on a self-affirmed basis or they may submit a notification and supporting documentation to the FDA for review. In May 2008, Whole Earth submitted a notification and supporting scientific data to the FDA that high purity Reb A is GRAS for use in beverages, foods and tabletop sweeteners. The FDA could ask questions and seek additional information from Whole Earth or it may provide a letter indicating that it has no objections. It is anticipated that the FDA could deliver a no objection letter in the fall of 2008.

### Vertical Integration of Stevia Supply

On April 9, 2008, Whole Earth acquired the stevia processing business and related assets in Paraguay through its indirect, wholly-owned subsidiary, Nativia Guarani, S.A. In connection with this acquisition, Whole Earth and Nativia Guarani entered into long-term agricultural supply, research and development, purchase option and consulting agreements with its local partner Imperio Guarani, S.A. and Sergio Chase, the principal owner of Imperio Guarani. Imperio Guarani has developed a network of small, independent farmers from whom the company acquires stevia leaves, and Imperio Guarani will sell dried stevia leaves exclusively to Nativia Guarani. Among other things, Imperio Guarani and Whole Earth will

22

Table of Contents

collaborate on further extending this network of farmers, improving stevia varieties as well as developing improved stevia growing, harvesting and processing technologies. Imperio Guarani has granted Whole Earth an exclusive option to acquire its business and the land currently leased by Nativia Guarani from affiliates of Imperio Guarani.

The Nativia Guarani facility currently mills dried stevia leaves and produces a stevia extract that has not yet been purified into high purity Reb A. Pending the results of its current research and development efforts and the commercialization of those technologies, Whole Earth may use this stevia extract for its own products where steviol glycosides may be used, offer the extract for sale as an ingredient or further purify the extract into high purity Reb A.

Management believes that the Nativia Guarani business and agreements with Imperio Guarani and Mr. Chase will assist the company in several ways. A number of larger and better capitalized companies will be competing for stevia leaves and extracts, and vertical integration provides Whole Earth with more control over its supply of this natural ingredient, although Whole Earth will continue to source high purity Reb A from PureCircle and other suppliers. In addition, management believes that the formation of Nativia Guarani and our company's strategic relationship with Imperio Guarani will permit Whole Earth to promote sustainable farming practices and develop improved agricultural and processing methods and technologies that may offer competitive advantages.

### CzechPak Manufacturing Facility

We have built a new manufacturing facility in the Czech Republic which is operated by our newly formed subsidiary CzechPak Manufacturing s.r.o. The CzechPak facility initially will employ approximately 80 people and produce *Canderel®* branded products for EAME region. The facility commenced production in August 2008. We anticipate that the CzechPak facility will reduce our manufacturing costs, allow us to introduce new products more rapidly, test new products on a limited basis and improve both operational efficiency and working capital by reducing lead times and the amount of inventory held by our distributors. We will shift a portion of our current production and equipment to this new facility from Krüger GmbH & Co. KG, our current contract manufacturer located in Germany. In connection with this transition, Merisant and Krüger amended the parties' manufacturing agreement. Under the terms of the amended agreement, certain products will no longer be manufactured by Krüger and we will be able to move the equipment currently used by Krüger to manufacture and package these products to our CzechPak facility. The parties extended the expiration of the manufacturing agreement from 2010 to 2012 and we agreed to meet certain minimum purchase commitments for each of Krueger's facilities. Commencing January 2009 the aggregate amount of such commitments is €29.2 million. In addition, we agreed to acquire any raw materials, packaging and work in progress for the discontinued products and to increase conversion fees per unit for the products that Krüger will continue to produce. We also agreed to provide credit enhancements in the event that Krüger is unable to obtain a certain level of credit insurance for its production commitments.

### Capital Constraints and Need to Refinance or Restructure

We believe that the development and introduction of new products under our *Equal®* and *Canderel®* brands may help to stabilize our core business while *PureVia™* and other innovative, all-natural sweeteners and sweetened food products from Whole Earth present growth opportunities for us. However, we may be constrained in our ability to realize fully the value of these new products as a result of our current capital structure. The successful launch of new products and marketing of our core brands requires capital, and we must use a significant portion of our cash flows from operations to service our outstanding debt. We had an aggregate of $418.5 million of short and long-term debt outstanding at September 30, 2008, including capital lease obligations and borrowings from our revolving credit facility. We paid $32.7 million in interest costs for the nine months ended September 30, 2008, $21.4 million of which represented interest payments on our 9 ½% senior subordinated notes due 2013 (the "Notes"). If we cannot generate cash flows from operations significantly in excess of our debt obligations, we may not have the resources required to fully realize the value of our strategic initiatives.

In order to maximize value, management is focused on refinancing or restructuring all or part of our debt obligations. By January 11, 2009, approximately $7.4 million principal amount of the Term A loans and $28.0 million of revolving loans currently outstanding under our senior credit facility as of November 13, 2008 will become due and payable, and we will no longer be able to draw revolving loans or issue letters of credit under our senior credit facility. We have a total of $45.9 million in interest and principal payments that become due and payable in January 2009. In addition, interest on the 12 ¼% senior subordinated discount notes due 2014 (the "Discount Notes") of Merisant Worldwide, Inc. ("Merisant Worldwide"), our parent company, will become payable in cash commencing on May 15, 2009. The indenture governing the Notes limits our company's ability to pay dividends or loan cash to Merisant Worldwide, which has no operations of its own.

23

Table of Contents

As of November 13, 2008, borrowings under our revolving credit facility were $28.0 million. In aggregate, during the twelve months ending September 30, 2009, we and Merisant Worldwide are scheduled to pay $78.3 million of principal and interest under our and Merisant Worldwide's primary debt obligations. Given the disruptions in the credit and financial markets in recent months, uncertainty exists as to whether we will be able to generate results from operations or consummate transactions sufficient to enable us to make all of these payments. The disruptions in the credit and financial markets have also limited access to capital and credit for many companies. We rely on a number of financial institutions and the credit and financial markets to meet our financial commitments and short-term liquidity needs if internal funds are not available. Continuing instability or disruptions of these markets could prohibit or make it more difficult for us to access new capital, significantly increase the cost of capital or limit our ability to refinance, replace or amend our existing indebtedness. We are engaged in discussions with certain of our secured lenders and debt security holders as well as potential financing sources with regard to refinancing or restructuring all or a portion of our debt obligations. However, there can be no assurance that we will be able to refinance, replace or amend our outstanding debt obligations on terms favorable to us, or at all, particularly given current financial market conditions.

24

Table of Contents

## Results of Operations

For each of the periods discussed below, the information set forth under the caption "Consolidated Results" represents an overview of our company's results of operations on a consolidated basis. Additional detail regarding the results of operations can be found under the caption "Segment Results" for each period discussed below.

### Three Months Ended September 30, 2008 Compared to Three Months Ended September 30, 2007

The following table sets forth certain of our company's financial data for the three month periods ended September 30, 2007 and 2008 (totals may not foot due to rounding).

| | Three Months Ended September 30, | | Three Months Ended September 30, | | Better/(Worse) than Prior Year | |
| | 2007 | 2008 | 2007 | 2008 | Dollars | % |
| | (in millions) | | As % of Net Sales | | | |
|---|---|---|---|---|---|---|
| Net sales | $ 72.8 | $ 64.5 | 100% | 100% | $ (8.3) | (11)% |
| Cost of sales | 31.5 | 31.6 | 43% | 49% | (0.1) | (0)% |
| Gross profit | 41.3 | 32.9 | 57% | 51% | (8.4) | (20)% |
| Operating expenses: | | | | | | |
| Marketing and selling expenses | 15.9 | 14.5 | 22% | 22% | 1.4 | 9% |
| Administration expenses | 7.8 | 5.5 | 11% | 8% | 2.3 | 29% |
| Research and development costs | 0.4 | 0.8 | 0% | 1% | (0.4) | (118)% |
| Amortization of intangible assets | 5.3 | 5.3 | 7% | 8% | 0.0 | 0% |
| Restructuring expenses | 0.2 | 0.3 | 0% | 0% | (0.1) | (40)% |
| Total operating expenses | 29.6 | 26.3 | 41% | 41% | 3.2 | 11% |
| Income from operations | 11.7 | 6.6 | 16% | 10% | (5.2) | (44)% |
| Other expenses (income): | | | | | | |
| Interest income | (0.2) | (0.1) | (0)% | (0)% | (0.2) | (72)% |
| Interest expense | 10.9 | 9.6 | 15% | 15% | 1.4 | 12% |
| Other expense (income), net | 0.1 | 1.9 | (0)% | 3% | (1.8) | (1,500)% |
| Total other expenses | 10.8 | 11.4 | 15% | 18% | (0.6) | (5)% |
| Income (loss) before income taxes | 0.9 | (4.8) | 1% | (7)% | (5.8) | (611)% |
| Provision for income taxes | 1.3 | 0.5 | 2% | 1% | 0.8 | 63% |
| Net loss | $ (0.4) | $ (5.3) | (1)% | (8)% | $ (4.9) | (1,258)% |

## Consolidated Results

*Net sales.* Overall, net sales declined in the third quarter of 2008 compared to the third quarter of 2007. The decline was related to lower sales in North America and Asia/Pacific partially offset by higher sales in Latin America. Overall net

Table of Contents

ales in EAME during the third quarter of 2008 were stable compared to the same period last year. In North America, net sales declined as a result of our transition from a distribution sales model for our retail business to a direct sales model along with a decline in consumer consumption. These negative impacts on net sales were slightly offset by decreased trade marketing spending. In Asia/Pacific, we are implementing a change in our supply chain that decreased shipments to our distributor in Australia. Offsetting these declines slightly was improved performance in the Latin America region along with the consolidated sales impact of the devaluation of the U.S. dollar compared to the third quarter of 2007 and the resulting currency translation which accounted for approximately $1.6 million of incremental net sales in the third quarter of 2008. In the EAME region, UK sales increased in conjunction with a price increase. In Latin America, Argentina also implemented a price increase which positively impacted the net sales compared to the same quarter in 2007. In Mexico, we continue to maintain high brand awareness, though our competitor, *Splenda®*, has invested heavily in advertising over the past 21 months. This has resulted in a decrease in consumer demand for our products along with pricing pressure particularly in the club channel.

*Cost of sales.* Cost of sales increased, despite the decline in sales, due to one-time start up costs related to our manufacturing plant in the Czech Republic, sales increases in lower margin products, the impact of purchasing product in euro for sales in countries with weaker currencies and unfavorable raw material purchase prices. Overall, gross profit as a percentage of net sales declined from 57% for the three months ended September 30, 2007 to 51% for the three months ended September 30, 2008 due to the increases in costs discussed above as well as increased trade marketing in France.

*Operating expenses.* Marketing and selling expenses decreased due to lower performance-based incentives in all regions along with lower brand support in North America. This was partially offset by higher brand support in Latin America related to our *Canderel®* anniversary promotion, unfavorable currency impacts in the EAME region and increased costs related to our new product launch. Administration expenses decreased mainly due to lower litigation and performance-based incentives.

During the third quarter of 2008, we continued our restructuring initiatives to improve both financial results and the long-term value of the business. As a result of these actions, we recorded restructuring charges for workforce reductions of $0.3 million in the third quarter of 2008 as compared to $0.2 million in the third quarter of 2007. The restructuring charges incurred in the third quarter of 2008 relate primarily to new employee termination costs and are expected to be substantially paid by May 31, 2009. Additional information regarding restructuring charges and the related liability can be found in Note 3 to the unaudited consolidated financial statements located elsewhere in this document.

*Interest.* Our interest expense decreased as a net result of overall decreases in interest rates on variable interest debt instruments and lower principal balances for the third quarter of 2008 compared to the third quarter of 2007.

*Other expense, net.* In the third quarter of 2008, a $0.7 million currency gain on the euro-denominated debt was more than offset by unfavorable balance sheet remeasurement impacts. In the third quarter of 2007, we recorded a loss on the euro-denominated debt of $0.9 million which was more than offset by favorable balance sheet remeasurement impacts.

*Taxes.* For the three months ended September 30, 2008, we recorded a $0.5 million tax provision on a loss before income taxes of $4.8 million. The unusual relationship of our tax provision to the pre-tax loss in the third quarter of 2008 relates to a combination of factors. These factors include increased tax loss carryforwards, primarily generated in the United States, for which we have not recorded a tax benefit, as well as provisions for future tax costs which may be incurred upon the potential repatriation of certain 2008 foreign earnings that are not deemed to be permanently reinvested. With regard to the deferred income tax assets on the tax loss carryforwards, we determined that we have not satisfied the "more likely than not" test and we increased our total valuation allowance by $5.5 million in the third quarter of 2008 to a total of $79.9 million. We will continue to assess the valuation allowances, and, to the extent we determine that such allowances are no longer required, these deferred income tax assets will be recognized in the future. The similar unusual relationship in 2007 is due to the same factors.

Table of Contents

## Segment Results

The following table presents net sales and Operating EBITDA expressed in millions of dollars for each reportable segment (totals may not foot due to rounding):

| | Net Sales | | | | Operating EBITDA (1) | | | |
|---|---|---|---|---|---|---|---|---|
| | Three Months Ended September 30, | | Better/(Worse) than Prior Year | | Three Months Ended September 30, | | Better/(Worse) than Prior Year | |
| | 2007 | 2008 | $ | % | 2007 | 2008 | $ | % |
| | (in millions) | | | | (in millions) | | | |
| North America (2) | $ 29.1 | $ 22.1 | $ (7.0) | (24)% | $ 11.3 | $ 6.2 | (5.1) | (45)% |
| Operating EBITDA Margin | | | | | 39% | 28% | (11)% | |
| EAME | 27.9 | 28.0 | 0.1 | 0% | 9.9 | 5.6 | (4.3) | (43)% |
| Operating EBITDA Margin | | | | | 35% | 20% | (15)% | |
| Latin America | 9.5 | 10.5 | 1.0 | 11% | 2.9 | 3.5 | 0.6 | 21% |
| Operating EBITDA Margin | | | | | 31% | 33% | 3% | |
| Asia/Pacific | 6.3 | 3.9 | (2.4) | (38)% | 2.0 | 0.8 | (1.1) | (57)% |
| Operating EBITDA Margin | | | | | 32% | 22% | (10)% | |

---

(1)  "Operating EBITDA" as used with respect to our operating segments is a measure upon which we assess the financial performance of these segments. Operating EBITDA excludes interest expense, income tax expense and depreciation and amortization, as well as items such as restructuring expenses, certain significant charges related to new product development and launch costs, certain litigation costs, costs related to the transition to a new exclusive distributor in the United States and certain other non-cash items. Our definition of Operating EBITDA largely mirrors the definition of Bank EBITDA under our Senior Credit Facility. That definition changed in the May 2007 amendment of those credit facilities, and that change is reflected prospectively in our computation of Operating EBITDA for the 2007 period. See Note 2 to the unaudited consolidated financial statements for a description of Operating EBITDA and a reconciliation of Operating EBITDA to income (loss) before income taxes. Operating EBITDA margin represents Operating EBITDA as a percentage of net sales.

(2)  North America segment results exclude immaterial sales and $2.5 million of negative Operating EBITDA related to a new product launch which management evaluates separately from this geographical segment for the three month period ended September 30, 2008.

### North America

*Net sales.*  In North America, the net sales decline was driven by the planned impact of our transition from our distributor model to a direct sales distribution model. Shipments to our distributor were significantly reduced during the month of July as the distributor continued to ship product to the trade and consume the remaining product on hand. Also contributing to the decline was decreased sales volume in the club, food service, and ingredient channels along with a decrease in consumer consumption in the retail, club and food service channels. These negative variances were partially offset by decreased trade spending in the food service and retail channels.

*Operating EBITDA.*  The decrease in Operating EBITDA and Operating EBITDA margin was primarily related to the margin impact of lower net sales. These unfavorable impacts were partially offset by lower overall brand support and lower sales and marketing administration costs.

### EAME

*Net sales.*  In the EAME region, net sales were stable during the third quarter of 2008 compared to the same period of 2007 as net sales in the Middle East and the UK along with the positive currency translation impact were offset by weak performance in France. Strong net sales performance in the Middle East was related to our intentional increases in distributor inventory levels in preparation for our change in manufacturing locations. In the first quarter of 2007, as a result of diversion

Table of Contents

of product into the retail channel, we discontinued sales to certain UK distributors in an effort to stop the diversion. In the third quarter of 2008, sales in the UK continued to perform at levels realized in the second half of 2007 after stopping the diversion of product. In addition, we implemented a price increase in the UK. Continued softness in consumer demand as well as increased trade spending reduced sales in France. The devaluation of the U.S. dollar and the resulting currency translation effect on our financial statements accounted for approximately $1.2 million of the net sales increase in the EAME region.

*Operating EBITDA.* Operating EBITDA and Operating EBITDA margin decreases are mainly due to unfavorable currency impacts related to cost of goods sold, one-time start up costs related to our new manufacturing operations in the Czech Republic, and unfavorable impacts of the remeasurement of the Swiss entity's balance sheet. These negative impacts were slightly offset by reduced general administrative costs due mainly to savings from lower performance-based incentives, restructuring actions and facility related changes in France.

Our CzechPak facility commenced production in August 2008 and will manufacture *Canderel®* products for the EAME region. We anticipate that the CzechPak facility will reduce our manufacturing costs, allow us to introduce new products more rapidly, test new products on a more limited basis and improve both operational efficiency and working capital by reducing lead times and the amount of inventory held by our distributors in the region.

Until the start-up of the CzechPak facility, most of our *Canderel®* products for the EAME region had been manufactured by Krüger GmbH & Co. KG under a long-term contract manufacturing agreement. We intend to shift a portion of the production currently handled by Krüger to the CzechPak facility. On October 8, 2008, we entered into an agreement with Krüger that amends the terms of the manufacturing agreement. Under the terms of the amended agreement, certain products will no longer be manufactured by Krüger and we will be able to move the equipment currently used by Krüger to manufacture and package these products to our CzechPak facility. The parties extended the expiration of the manufacturing agreement from 2010 to 2012 and we agreed to meet certain minimum purchase commitments for each of Krueger's facilities. Commencing January 2009 the aggregate amount of such commitments is €29.2 million. In addition, we agreed to acquire any raw materials, packaging and work in progress for the discontinued products and to increase conversion fees per unit for the products that Krüger will continue to produce. We also agreed to provide credit enhancements in the event that Krüger is unable to obtain a certain level of credit insurance for its production commitments.

*Latin America*

*Net sales.* Improved sales in the third quarter of 2008 relates primarily to a price increase implemented in Argentina. In addition, Peru sales volume increased due to strong performance from a new distributor and its effective execution of promotions. Venezuela sales performance also improved as a result of strong promotional activity. These positive results were partially offset by declines in Mexico sales volume.

*Operating EBITDA.* Operating EBITDA and Operating EBITDA margin increased due to the increase in net sales despite higher raw material costs across the region and increased brand support in Mexico.

*Asia/Pacific*

*Net sales.* Net sales in the Asia/Pacific region decreased due to lower shipments to our distributor in Australia related to a change in manufacturing locations. In preparation for the transition, we decreased inventory levels at our distributor. We have commenced manufacturing operations at a local facility late in the third quarter. Overall, market trends in this region have remained stable.

*Operating EBITDA.* Operating EBITDA and Operating EBITDA margin decreased primarily due to the decreased sales coupled with higher cost of goods sold related to unfavorable currency variances.

**Corporate Expenses**

Corporate expenses decreased from $5.2 million in the third quarter of 2007 to $2.7 million in the third quarter of 2008, primarily due to lower performance-based incentives, lower consulting fees and lower legal costs.

Table of Contents

### Nine Months Ended September 30, 2008 Compared to Nine Months Ended September 30, 2007

The following table sets forth certain of our company's financial data for the nine month periods ended September 30, 2007 and 2008 (totals may not foot due to rounding).

| | Nine Months Ended September 30, | | Nine Months Ended September 30, | | Better/(Worse) than Prior Year | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2007 | 2008 | Dollars | % |
| | (in millions) | | As% of Net Sales | | | |
| Net sales | $ 213.2 | $ 200.5 | 100% | 100% | $ (12.8) | (6)% |
| Cost of sales | 94.1 | 97.5 | 44% | 49% | (3.3) | (4)% |
| Gross profit | 119.1 | 103.0 | 56% | 51% | (16.1) | (14)% |
| Operating expenses: | | | | | | |
| Marketing and selling expenses | 48.2 | 48.3 | 23% | 24% | (0.1) | (0)% |
| Administration expenses | 32.4 | 22.9 | 15% | 11% | 9.4 | 29% |
| Research and development expenses | 1.1 | 2.1 | 1% | 1% | (1.0) | (94)% |
| Amortization of intangible assets | 16.7 | 15.8 | 8% | 8% | 0.9 | 6% |
| Restructuring expenses | 1.1 | 1.4 | 1% | 1% | (0.3) | (29)% |
| Total operating expenses | 99.5 | 90.5 | 47% | 45% | 8.9 | 9% |
| Income from operations | 19.7 | 12.5 | 9% | 6% | (7.1) | (36)% |
| Other expenses (income): | | | | | | |
| Interest income | (0.6) | (0.5) | (0)% | (0)% | (0.1) | (14)% |
| Interest expense | 34.4 | 29.2 | 16% | 15% | 5.2 | 15% |
| Costs of refinancing | 5.8 | — | 3% | —% | 5.8 | 100% |
| Other expense (income), net | (30.0) | 2.5 | (14)% | 1% | (32.5) | (108)% |
| Total other expense (income) | (9.6) | 31.2 | (5)% | 16% | (21.6) | (224)% |
| Income (loss) before income taxes | 10.0 | (18.6) | 5% | (9)% | (28.7) | (286)% |
| Provision for income taxes | 5.0 | 3.6 | 2% | 2% | 1.4 | 28% |
| Net income (loss) | $ 5.0 | $ (22.3) | 2% | (11)% | $ (27.3) | (544)% |

### Consolidated Results

*Net sales.* Overall, net sales declined in the nine months ended September 30, 2008 compared to the nine months ended September 30, 2007. The decline was related to lower sales in North America and Asia/Pacific offset by higher sales in EAME and Latin America. In North America, net sales declined as a result of a decline in consumer consumption and a decline in inventory levels maintained by our distributor in the food service channel. In the retail channel, the planned transition from a distributor model to a direct sales model negatively impacted sales as distributor inventory levels were significantly reduced and we commenced direct shipments to our customers. These negative impacts on net sales were slightly offset by decreased trade marketing spending. In Asia/Pacific, we had high net sales in the first quarter of 2007 related to shipments to new distributors to establish beginning inventory levels which did not repeat in 2008. This impact was exasperated during 2008 as we transitioned to a local manufacturer and reduced distributor inventory levels further in the region to shorten lead times. Offsetting these declines were improved performance in the EAME and Latin America regions along with the consolidated sales impact of the devaluation of the U.S. dollar and the resulting currency translation impact which accounted for approximately $8.3 million of incremental net sales. In the EAME region, UK sales continued the momentum achieved in the second half of 2007 as the impact of the late 2006 diversion has subsided. Additionally, strong market trends and a third quarter price increase have contributed to the positive performance in the UK. In Latin America, we implemented a price increase in Argentina to offset rising costs and a new distributor in Peru has maintained strong performance.

*Cost of sales.* Cost of sales increased, despite the slight decline in sales, due to sales increases in lower margin products, such as contract manufacturing, one time costs related to the start up of new manufacturing operations, the impact of purchasing product in euro for sales in countries with weaker currencies and unfavorable raw material purchase prices.

29

Table of Contents

Overall, gross profit as a percentage of net sales declined from 56% for the nine months ended September 30, 2007 to 51% for the nine months ended September 30, 2008 due to the increases in costs discussed above, and to a lesser extent, increased trade marketing in France.

*Operating expenses.* Marketing and selling expenses increased slightly due to higher brand support in Latin America, unfavorable currency impacts, and increased costs related to our new product launch. These unfavorable impacts were partially offset by lower brand support and commissions in North America, lower brand support in Asia/Pacific, as well as lower performance-based incentives in all regions. Administration expenses decreased mainly due to lower litigation costs and lower performance-based incentives.

During the nine months ended September 30, 2008, we continued our restructuring initiatives to improve both financial results and the long-term value of the business. As a result of these actions, we recorded restructuring charges for workforce reductions of $1.4 million in the first nine months of 2008 as compared to $1.1 million in the first nine months of 2007. The restructuring charges incurred in 2008 relate primarily to new employee termination costs and are expected to be substantially paid by May 31, 2009. Additional information regarding restructuring charges and the related liability can be found in Note 3 to the unaudited consolidated financial statements located elsewhere in this document.

*Interest.* Our interest expense decreased as a net result of lower interest bearing loans under our Amended and Restated Credit Agreement compared to the higher interest bearing loans under our Second Lien Credit Agreement in 2007, as well as overall decreases in interest rates on variable interest debt instruments. Our borrowings under the Senior Credit Agreement and Second Lien Credit Agreement had a weighted average interest rate of approximately 10.3% per annum upon the closing of the Second Lien Credit Agreement. In May 2007, we refinanced and therefore terminated the Second Lien Credit Agreement as described below.

*Costs of refinancing.* Costs of refinancing for the nine months ended September 30, 2007 related to the extinguishment of debt under the Second Lien Credit Agreement. As a result of this transaction, a premium of $2.6 million was incurred to pay all debt and interest outstanding under the Second Lien Credit Agreement and $3.2 million of existing deferred financing fees was written off.

*Other expense, net.* In the second quarter of 2007, we experienced an unusually high level of other income as compared to the more typical other expenses realized in 2008. The other income in the second quarter of 2007 was primarily the result of a one-time cash payment received pursuant to an agreement with a third party. In the first nine months of 2008, we recorded a $0.3 million currency loss on the euro-denominated debt as well as an unfavorable balance sheet remeasurement impact. In the first nine months of 2007, we recorded a loss of $1.4 million on the euro-denominated debt which was partially offset by a favorable balance sheet remeasurement impact.

*Taxes.* For the nine months ended September 30, 2008, we recorded a $3.6 million tax provision on a loss before income taxes of $18.6 million. The unusual relationship of our tax provision to the pre-tax loss in the nine months ended September 30, 2008 relates to a combination of factors. These factors include increased tax loss carryforwards, primarily generated in the United States, for which we have not recorded a tax benefit, as well as provisions for future tax costs which may be incurred upon the potential repatriation of certain 2008 foreign earnings that are not deemed to be permanently reinvested. With regard to the deferred income tax assets on the tax loss carryforwards, we determined that we have not satisfied the "more likely than not" test and we increased our total valuation allowance by $10.4 million in the nine months ended September 30, 2008 to a total of $79.9 million. We will continue to assess the valuation allowances, and, to the extent we determine that such allowances are no longer required, these deferred income tax assets will be recognized in the future. The similar unusual relationship in 2007 is due to the same factors.

30

Table of Contents

## Segment Results

The following table presents net sales and Operating EBITDA expressed in millions of dollars for each reportable segment (totals may not foot due to rounding):

| | Net Sales | | | | Operating EBITDA (1) | | | |
|---|---|---|---|---|---|---|---|---|
| | Nine Months Ended September 30, | | Better/(Worse) than Prior Year | | Nine Months Ended September 30, | | Better/(Worse) than Prior Year | |
| | 2007 | 2008 | $ | % | 2007 | 2008 | $ | % |
| | | (in millions) | | | | | (in millions) | |
| North America (2) | $ 85.7 | $ 69.1 | (16.6) | (19)% | $ 31.6 | $ 21.2 | (10.5) | (33)% |
| Operating EBITDA Margin | | | | | 37% | 31% | (6)% | |
| EAME | 84.6 | 90.5 | 5.9 | 7% | 25.6 | 22.1 | (3.4) | (13)% |
| Operating EBITDA Margin | | | | | 30% | 25% | (6)% | |
| Latin America | 22.9 | 27.2 | 4.3 | 19% | 5.9 | 6.7 | 0.8 | 13% |
| Operating EBITDA Margin | | | | | 26% | 25% | (1)% | |
| Asia/Pacific | 20.2 | 13.7 | (6.5) | (32)% | 7.4 | 3.2 | (4.2) | (57)% |
| Operating EBITDA Margin | | | | | 37% | 24% | (13)% | |

---

1)  "Operating EBITDA" as used with respect to our operating segments is a measure upon which we assess the financial performance of these segments. Operating EBITDA excludes interest expense, income tax expense and depreciation and amortization, as well as items such as restructuring expenses, certain significant charges related to new product development and launch costs, certain litigation costs, costs related to the transition to a new exclusive distributor in the United States and certain other non-cash items. Our definition of Operating EBITDA largely mirrors the definition of Bank EBITDA under our Senior Credit Facility. That definition changed in the May 2007 amendment of those credit facilities, and that change is reflected prospectively in our computation of Operating EBITDA for the 2007 period. See Note 2 to the unaudited consolidated financial statements for a description of Operating EBITDA and a reconciliation of Operating EBITDA to income (loss) before income taxes. Operating EBITDA margin represents Operating EBITDA as a percentage of net sales.

2)  North America segment results exclude immaterial sales and $5.5 million of negative Operating EBITDA related to a new product launch which management evaluates separately from this geographical segment for the nine month period ended September 30, 2008.

### North America

Net sales.  In North America, the net sales decline was driven by the planned impact of our transition from our distributor to a direct sales model for the retail channel.  In addition, our distributor inventory levels were higher than usual at December 31, 2007 in the food service channel which resulted in a decrease in shipments during the first nine months of 2008 compared to the first nine months of 2007.  We also experienced decreased consumer consumption in the food service and retail channels slightly offset by decreased trade marketing spending.  In the club channel, though the timing and extent of our promotional activities varied when comparing the first nine months of 2007 to the first nine months of 2008, we have experienced decreases in consumption and sales volume.

On January 29, 2008, we delivered notice to ACH Food Companies, Inc. ("ACH") that the distribution agreement between Merisant US, Inc. and ACH would terminate on July 27, 2008 with respect only to the retail grocery channel.  We have partially terminated the distribution agreement so that we can pursue a direct distribution model for retail customers in the United States.  We will handle order processing, warehousing and trade marketing internally and through a third-party broker and logistics providers for retail grocery and drug customers in the United States which we anticipate will reduce our operating costs, improve the efficiency of our inventory management and distribution capabilities, and provide more transparency in customer relations.  In July 2008, we paid the distributor $0.3 million to facilitate this and other changes in the distribution agreement.  This expense is included in operating expenses for the nine months ended September 30, 2008.

31

Table of Contents

*Operating EBITDA.* The decrease in Operating EBITDA and Operating EBITDA margin were primarily related to the margin impact of lower net sales. This unfavorable impact was partially offset by lower overall brand support and  commissions.

## EAME

*Net sales.* In the EAME region, the increase in net sales was driven primarily by the UK, the Middle East and Belgium along with the positive currency translation impact. In the first quarter of 2007, as a result of diversion of product into the retail channel, we discontinued sales to certain UK distributors in an effort to stop the diversion. In the first half of 2008, sales in the UK continued to perform at levels realized in the second half of 2007 after stopping the diversion of product and we have experienced a strong market demand.  Strong net sales performance in the Middle East was related to our intentional increases in distributor inventory levels in preparation for our change in manufacturing locations.  In Belgium, our distributor carried higher inventories than expected at December 31, 2006, negatively impacting sales in the first quarter of 2007 and thus reflecting a favorable period to period comparison.  Continued softness in consumer demand as well as increased trade spending reduced net sales in France. The devaluation of the U.S. dollar compared to the same period in 2007 and the resulting currency translation effect on our financial statements accounted for approximately $6.8 million of the net sales increase in the EAME region.

*Operating EBITDA.*  Operating EBITDA and Operating EBITDA margin decreased despite the increase in net sales due to unfavorable currency impacts on the cost of goods sold, unfavorable balance sheet remeasurements and one-time costs related to the start up of new manufacturing operations in the Czech Republic that are not excluded from Bank EBITDA.

## Latin America

*Net sales.*  Net sales improvement relates primarily to a price increase implemented in Argentina along with continued strong performance from our distributor in Peru which distributes both locally and throughout the region.  In addition, net sales in Mexico for the nine months ended September 30, 2008 improved compared to the same period in 2007.  However, unusually low sales were reported in Mexico in the first half of 2007 as we converted to a direct distribution model for the grocery channel.  Overall, trends in Mexico indicate a decrease in consumer demand for our product as our competitor, *Splenda®*, experiences positive results from its heavy consumer and trade promotion spending.

*Operating EBITDA.* Operating EBITDA and Operating EBITDA margin increased due to the increase in net sales despite higher brand support in Mexico and the overall impact of increased cost of goods sold.

## Asia/Pacific

*Net sales.* Net sales in the Asia/Pacific region decreased primarily due to unusually high sales in the first quarter of 2007 related to shipments to new distributors in Australia and India to establish beginning inventory levels which did not repeat in 2008.  Net sales were also impacted by a decrease in inventory levels at our Asia/Pacific distributors in 2008 related to the start-up of our local production as we shorten lead times.

*Operating EBITDA.* Operating EBITDA and Operating EBITDA margin decreased primarily due to the decreased sales coupled with higher cost of goods sold and lower brand support against significantly lower sales.

## Corporate Expenses

Corporate expenses decreased from $19.2 million in the nine months ended September 30, 2007 to $14.2 million in the nine months ended September 30, 2008, primarily due to lower litigation costs relating to our lawsuit against McNeil incurred in 2007 and lower performance-based incentives.

## Liquidity and Capital Resources

Our liquidity needs are primarily met through internally generated cash flow supplemented in 2007 by a one-time  payment received pursuant to an agreement with a third party. As needed, we also borrow money under the revolving credit facility of the Amended and Restated Credit Agreement. Our primary uses of cash are cost of sales, operating expenses, debt service, capital expenditures and distributions to our stockholder and, in 2008, the acquisition of Nativia Guarani. Foreign subsidiaries generated approximately 59% of consolidated net sales during the year ended December 31, 2007, and our U.S. operations have relied upon the repatriation of cash from our foreign subsidiaries to satisfy many of our domestic cash requirements. Historically, our U.S. operations had received a vast majority of funds from foreign subsidiaries through our

Table of Contents

Swiss subsidiary in the form of payments pursuant to a promissory note. This promissory note was repaid in full in January 2006. On March 30, 2006, we issued a revolver note to our Swiss subsidiary, which will mature in 2011. We may borrow up to $200 million from our Swiss subsidiary during the term of the revolver note, and we expect to repatriate cash to the United States through borrowings under this revolver note. The principal balance relating to this revolving note as of September 30, 2008 was $102 million.

We had $11.7 million of cash and cash equivalents as of September 30, 2008 compared to $51.0 million of cash and cash equivalents at December 31, 2007. The decrease is related to debt and interest payments along with 2008 operating cash expenditures that included the purchase of Nativia Guarani and higher than usual capital expenditures. We were also required to prepay $15.2 million of the principal amount of term loans outstanding under our Amended and Restated Credit Agreement five business days after filing our 2007 Annual Report with excess cash as required and calculated under the terms of our Amended and Restated Credit Agreement. This prepayment was made on April 4, 2008 and decreased our cash balance accordingly. The decrease was offset with $12.0 million in borrowings from our revolving credit facility. Our net cash outflows in the fourth quarter of 2008 are expected to be less than the average run rate of the first three quarters of 2008 as several one-time outflows are not expected to repeat. These items include a three to six month inventory build in the EAME, the purchase of the Nativia Guarani business, and the prepayment of debt principal.

Accounts receivable levels, time to payment and inventory levels impact the amount of internally generated cash flow. The following table shows information with respect to accounts receivable and inventory as of December 31, 2007 and September 30, 2008. Accounts receivable decreased in the nine months ended September 30, 2008 primarily due to higher sales in the fourth quarter of 2007 compared to the third quarter of 2008. Inventory levels increased in the nine months ended September 30, 2008 as compared to December 31, 2007, primarily due to planned increases in finished goods quantities on hand in our foreign subsidiaries related to supply chain synchronization efforts to decrease lead times and to prepare for the commencement of operations at our manufacturing plant in the Czech Republic.

|  | December 31, 2007 | September 30, 2008 |
|---|---|---|
| Accounts receivable (in millions) | $ 74.4 | $ 62.4 |
| Days sales outstanding | 92 | 82 |
| Inventory (in millions) | $ 13.5 | $ 25.4 |
| Days sales in inventory | 38 | 66 |

*Nine Months Ended September 30, 2008 Compared to Nine Months Ended September 30, 2007*

For the nine months ended September 30, 2008, net cash used by operating activities was $15.5 million compared to cash provided of $26.8 million for the nine months ended September 30, 2007. Operating cash flows decreased $42.3 million versus the nine months ended September 30, 2007, due to a decrease in the contribution from working capital of $8.4 million and decreased net income after adjusting for non-cash items of $33.9 million primarily due to the gain related to a one-time payment received in 2007 pursuant to an agreement with a third party.

Net cash used in investing activities totaled $12.1 million for the nine months ended September 30, 2008 compared to $2.0 million for the nine months ended September 30, 2007 due to increased spending on capital expenditures, primarily related to our new manufacturing operations in the Czech Republic and a business acquisition in 2008.

For the nine months ended September 30, 2008, financing activities used $11.8 million in cash as compared to using $8.7 million in cash for the nine months ended September 30, 2007. For the nine months ended September 30, 2008, we used cash to pay our scheduled and additional required principal payments under the Amended and Restated Credit Agreement and borrowed $12.0 million under our revolving credit facility. For the nine months ended September 30, 2007, cash was provided from $85.0 million in borrowings under the Amended and Restated Credit Agreement and we used cash to pay our scheduled principal payments under the Senior Credit Agreement, to pay all outstanding borrowings, interest and premium under the Second Lien Credit Agreement and to pay costs associated with the Amended and Restated Credit Agreement. In addition, distributions of $0.1 million and $0.7 million were made to our sole stockholder in the first nine months of 2007 and the first nine months of 2008, respectively, for the purpose of paying administrative expenses. Borrowings under our revolving credit facility were $0 at December 31, 2007, $12.0 million at September 30, 2008 and $28.0 million at November 13, 2008.

*Capital Expenditures*

Capital expenditures in 2008 are expected to be in the range of $15 million to $17 million. The majority of the 2008 capital expenditures related to the establishment of our new manufacturing operations in the Czech Republic. We believe

Table of Contents

hat internally generated cash flow, together with borrowing available under the Amended and Restated Credit Agreement, will be sufficient to fund capital expenditures during the remainder of 2008. We are seeking to refinance our existing Amended and Restated Credit Agreement prior to the scheduled maturity of our revolving credit facility in January 2009.

*Financing*

On July 11, 2003, we issued $225.0 million principal amount of the Notes and refinanced our credit facility with the Senior Credit Agreement. A portion of the proceeds of the Notes and the Senior Credit Agreement were used to pay a dividend to our sole stockholder. The Notes are unsecured obligations and are subordinated in right of payment to all existing and future senior indebtedness of our company. The Notes mature on July 15, 2013. The stated rate of interest for the Notes is 9½% per annum. Interest is payable semi-annually in arrears on January 15th and July 15th.

The Senior Credit Agreement, as of September 30, 2008, provides for aggregate commitments of up to $310.0 million, consisting of a revolving loan facility of $35.0 million, of which a portion is available at our option in euro or dollars or in the form of letters of credit denominated in dollars or euro, as well as term loan facilities of $275.0 million, consisting of a euro Term A loan of an original amount of $50.0 million, and a Term B loan of an original amount of $225.0 million, denominated in dollars. The euro Term A loan and the revolving loan facility mature in January 2009 while the Term B loan matures in 2010. The Senior Credit Agreement is guaranteed by our sole stockholder and each of our domestic subsidiaries. The Senior Credit Agreement and the guarantees of the guarantors are secured by a first-priority security interest in substantially all of our assets and the assets of the guarantors.

On June 23, 2006, we entered into the Second Lien Credit Agreement, the borrowings under which were substantially used to pay down amounts outstanding under the Senior Credit Agreement. The Second Lien Credit Agreement increased the aggregate principal amount of our indebtedness by $7.2 million and increased our interest expense. Our loans outstanding under the Senior Credit Agreement had a weighted average interest rate of approximately 9.0% per annum prior to the closing of the Second Lien Credit Agreement. Our borrowings under the Senior Credit Agreement and Second Lien Credit Agreement had a weighted average interest rate of approximately 10.3% per annum upon the closing of the Second Lien Credit Agreement.

On May 9, 2007, we amended and restated our Senior Credit Agreement (the "Amended and Restated Credit Agreement"), which, among other things, increased by $85.0 million the principal amount of Tranche B Term Loans that could be borrowed by us under the facility. We paid $2.5 million in fees and expenses related to this amendment and restatement which were deferred and are being amortized over the term of the related debt. Upon closing, we borrowed the full $85.0 million of additional Tranche B Term Loans and used the proceeds plus cash on hand to prepay the principal of all loans outstanding under the Second Lien Credit Agreement totaling $85.0 million, plus all outstanding interest of $1.4 million and a premium of $2.6 million, or $89.0 million. The Second Lien Credit Agreement has been terminated as a result of the transaction and there was no increase in our long term debt. In addition to the incurrence of fees, this transaction resulted in a write-off of existing deferred financing fees relating to the extinguishment of previously outstanding debt in the amount of $3.2 million.

Upon closing of the above transaction and execution of the related amendment, the interest rate on all term loans and revolving loans outstanding under the Amended and Restated Credit Agreement increased from euro-LIBOR and LIBOR plus 325 basis points per annum to euro-LIBOR and LIBOR plus 350 basis points per annum. As a result of the termination of the Second Lien Credit Agreement, our effective interest rate on variable interest rate debt decreased from 10.63% per annum prior to the closing of this transaction to 8.73% per annum subsequent to this transaction. As of September 30, 2008, we had $193.4 million in borrowings outstanding under the Amended and Restated Credit Agreement and $12.0 million in borrowings under our revolving credit line with effective interest rates of 7.43% and 5.97%, respectively. As a result of the $15.2 million prepayment of term loans under the Amended and Restated Credit Agreement and a reduction of the LIBOR, we anticipate that our cash interest expense will decrease by approximately $4.0 million for the year ending December 31, 2008 compared to the year ended December 31, 2007. The effective interest rate under the Amended and Restated Credit Agreement is significantly below current market conditions for companies with comparable credit risk. As such, if we refinance or restructure our credit facility in the current credit environment, we expect to be subject to substantially higher interest rates.

**Bank EBITDA.** The Amended and Restated Credit Agreement requires us to maintain compliance with a consolidated first-lien leverage ratio covenant, a consolidated leverage ratio covenant and a consolidated interest coverage ratio covenant. These ratios are measured on the basis of Bank EBITDA for the four fiscal quarters ending at least 45 days prior to the payment date. Bank EBITDA is discussed here because it is the measure upon which the covenants contained in the Amended and Restated Credit Agreement are measured. However, Bank EBITDA is not a measure of liquidity under

34

Table of Contents

GAAP. Accordingly, while providing useful information with respect to assessing compliance with covenants under our primary debt obligations, this measure should not be considered in isolation from, or as a substitute for, consolidated statement of cash flow data prepared in accordance with GAAP as an indication of liquidity. In addition, the Bank EBITDA measure presented may differ from, and may not be comparable to, similarly titled measures used by other companies.

We are engaged in discussions with certain of our secured lenders and debt security holders as well as potential financing sources with regard to refinancing or restructuring all or a portion of our debt obligations. However, there can be no assurance that we will be able to refinance, replace or amend our outstanding debt obligations on terms favorable to us, or at all, particularly given current financial market conditions.

Bank EBITDA as defined under the Amended and Restated Credit Agreement excludes interest expense, income tax and gross receipts tax expense, depreciation and amortization as well as certain other expenses and non-cash items, including:

- any extraordinary, unusual or non-recurring non-cash expenses or losses (including non-cash losses on sales of assets outside of the ordinary course of business);

- non-cash contributions and other non-cash compensation expense;

- non-cash losses attributable to equity in non-consolidated subsidiaries;

- transaction costs associated with the 2003 recapitalization transaction which are expensed and not amortized;

- any cash expenses incurred in connection with any waiver of a Default or Event of Default and any amendment to the Amended and Restated Credit Agreement;

- any non-cash foreign currency translation adjustments;

- any extraordinary or non-recurring cash losses or expenses arising from restructuring not to exceed in the aggregate (A) if such period ends prior to January 1, 2006, $14,600,000, or (B) if such period begins on or after January 1, 2006, (x) $11,000,000 with respect to any such non-recurring cash losses or expenses arising from the implementation of our plan known as "Project Arrow" and related restructuring, (y) $4,000,000 with respect to any such non-recurring cash losses or expenses arising from the transition from Heinz to ACH as our exclusive distributor in the United States, and (z) any cash expenses incurred in connection with (i) any waiver of a default or event of default and any amendment to the Senior Credit Agreement including the fees and expenses of any attorneys and financial advisers retained by the administrative agent pursuant thereto with respect to any such waiver or amendment and (ii) the negotiation, execution and closing of the Second Lien Credit Agreement and any waiver of a default or event of default and any amendment to the Second Lien Credit Agreement including the fees and expenses of any attorneys and financial advisers retained by the administrative agent with respect to any such waiver or amendment;

- expenses incurred by us or any subsidiary prior to January 1, 2007 in connection with the development and commercialization of our all-natural, zero-calorie sweetener to be marketed under the *Sweet Simplicity*® trademark in an amount not to exceed in the aggregate $3,000,000 and prior to January 1, 2009 in an amount not to exceed in the aggregate $15,000,000; and

- expenses incurred between January 1, 2007 and December 31, 2007 in connection with our litigation against McNeil and McNeil-PPC, Inc. in an amount not to exceed $4,000,000.

Bank EBITDA for the nine months ended September 30, 2008 under the Amended and Restated Credit Agreement was $39.0 million as compared to $51.4 million for the nine months ended September 30, 2007, adjusted to reflect litigation costs and *Sweet Simplicity*® product launch costs on a comparable basis with the current definition of Bank EBITDA. We were in compliance with the covenants under the Amended and Restricted Credit Agreement at September 30, 2008.

Table of Contents

The following table illustrates the reconciliation of Bank EBITDA to cash flow from operating activities, which management believes is the most nearly equivalent GAAP measure:

| | Nine Months Ended September 30, 2008 (in millions) |
|---|---|
| Net cash used by operating activities | $ (15.5) |
| Provision for income taxes, net of deferred income tax provision | 0.9 |
| Interest expense, net of non-cash interest expense | 26.2 |
| Restructuring expenses (a) | 3.2 |
| Other non-cash items | 6.0 |
| Equity in (income) loss of affiliates | 0.1 |
| Net change in operating assets and liabilities, net of business acquisition | 18.1 |
| Bank EBITDA | $ 39.0 |

(a)    The charges principally relate to planned employee termination costs that have been announced in the period presented and specified project implementation costs.

## Forward Looking Statements

Certain information included or incorporated in this report may be deemed to be "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. All statements, other than statements of historical facts, included or incorporated in this report are forward-looking statements. In particular, statements made under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations," relating to overall volume trends, pricing trends and industry forces, anticipated results, expectations for funding capital expenditures and operations and increased market share, refinancing efforts and the availability of financing  and the sufficiency of capital to meet working capital, capital expenditures requirements and strategies are forward-looking statements. When used in this document, the words "anticipate," "estimate," "project" and similar expressions are intended to identify forward-looking statements.

These statements are based on assumptions and assessments made by management in light of their experience and their perception of historical trends, current conditions, expected future developments and other factors they believe to be appropriate. Any forward-looking statements are not guarantees of future performance and are subject to risks and uncertainties that could cause actual results, developments and business decisions to differ materially from those contemplated by such forward-looking statements. We disclaim any duty to update any forward-looking statements, except as required by law. Some of the factors that may cause actual results, developments and business decisions to differ materially from those contemplated by such forward-looking statements include the following:  the availability of financing; changes in consumer preferences and nutritional and health-related concerns; increased competition; changes in the terms on which we may obtain aspartame; damaged consumer confidence in our products as a result of health-related allegations; product liability claims; fluctuations in exchange rates and other currency risks; disruptions in our business as a result of strikes or work stoppages; changes in our relationship with our largest distributor; and changes in economic and political conditions in the countries in which we market and produce our products.

## Item 3.  Quantitative and Qualitative Disclosures About Market Risk

## Foreign Operations

With approximately 60% and 66% of consolidated total net sales generated by subsidiaries outside of the United States in the nine months ended September 30, 2007 and September 30, 2008, respectively, our ability to obtain funds necessary to meet our domestic obligations is subject to applicable laws, foreign taxes and intercompany pricing laws, including those relating to the flow of funds between our foreign affiliates pursuant to, for example, purchase agreements, licensing agreements or other arrangements. Historically, our U.S. operations have received a vast majority of funds from foreign affiliates through our Swiss subsidiary in the form of payments pursuant to a promissory note.  The note was repaid in full in January 2006. On March 30, 2006, we issued a revolver note to our Swiss subsidiary, which will mature in 2011. Our U.S. operations may borrow up to $200 million from our Swiss subsidiary during the term of the revolver note.  We are repatriating cash to the United States through borrowings under this revolver note, which total $102 million as of September 30, 2008. Regulators in the United States and other foreign countries where we operate may closely monitor our corporate structure and how it affects intercompany fund transfers.

Table of Contents

In addition, as of September 30, 2008, foreign affiliates comprised approximately 49% of our consolidated total assets. Accordingly, we have experienced and will continue to be exposed to foreign exchange risk.

### Foreign Currency and Interest Rate Risks

Inherent in our operations are certain risks related to changes in foreign currency exchange rates and interest rates. We bear foreign exchange risk because a majority of our financing was obtained in U.S. dollars although a significant portion of revenues are earned in the various currencies of our foreign subsidiaries' operations.  Under the Amended and Restated Credit Agreement, a portion of our financing was obtained in euro.  This euro-denominated loan decreases our transactional exposure to euro exchange fluctuations until the euro principal and interest are repaid. Decreases in sales and earnings from euro denominated countries that result from the euro weakening against the U.S. dollar are offset by the decrease in the euro denominated debt obligations (i.e., foreign currency transaction gain) and interest expense that also results from such a decrease in exchange rate.  Likewise, any increase in sales and earnings from the euro denominated countries that results from a strengthening euro against the U.S. dollar offsets the increase in the euro denominated debt obligations (i.e., foreign currency transaction loss) and interest expense that results from such an exchange rate increase.  Upon maturity of our euro-denominated debt in January 2009, our exposure to fluctuations in currency exchange rates will increase.

A significant portion of our debt bears interest at a fixed rate.  Interest rate exposure results from our floating rate borrowings. For the nine months ended September 30, 2008, a 1.0% per annum increase or decrease in interest rates would have resulted in an increase or decrease in cash interest costs for our variable rate term loans of approximately $2.0 million.  The interest rates that our debt is subject to are significantly below current market interest rates for companies with comparable credit risk.  As such, if we refinance or restructure our debt under current market conditions we expect to be subject to significantly higher interest rates.

In the normal course of business, we identify risks relating to foreign currency exchange rates and interest rates and mitigate their financial impact through corporate policies and, at times, through the use of derivative financial instruments.  We use derivatives only where there is an underlying exposure and do not use them for trading or speculative purposes. The counter parties to the hedging activities would be highly rated financial institutions. We did not have any foreign currency forward exchange contracts or interest rate derivatives outstanding at September 30, 2008.

### Inflation Risk

We anticipate that inflation will increase our costs and inflation may also reduce consumption as more consumers reduce their discretionary spending.  In prior periods, we generally have been able to offset the impact of inflation through a combination of cost-cutting measures and price increases, but as the global economy weakens it will likely become increasingly difficult to mitigate the impact of rising costs.

### Item 4T.  Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

We conducted an evaluation, under the supervision of the Chief Executive Officer and Vice President, Finance, Controller (Principal Financial Officer), of the effectiveness as of September 30, 2008 of our disclosure controls and procedures (as defined in Exchange Act Rule 15d-15(e)). Based on this evaluation, the Chief Executive Officer and Principal Financial Officer concluded that, as of September 30, 2008, our disclosure controls and procedures were effective.

### Changes in Internal Control Over Financial Reporting

There have been no changes in our internal control over financial reporting during the most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### PART II—OTHER INFORMATION

### Item 1.  Legal Proceedings

From time to time, our company is involved in litigation concerning its business operations.

37

Table of Contents

Our company is subject to various other claims, pending and possible legal actions for product liability and other damages, and other matters arising out of the conduct of our business, including tax uncertainties arising from doing business in various European and Latin American jurisdictions. We believe, based on current knowledge and consultation with counsel, that the outcome of such claims and actions will not have a material adverse effect on our consolidated financial position or results of operations.

### Item 1A.  Risk Factors

The most significant risk factors applicable to our company are described in Part I, Item 1A "Risk Factors" of our Annual Report on Form 10-K for the year ended December 31, 2007.

*We face risks related to the current credit crisis and global economic slowdown.*

We use our operating cash flows and our revolving credit facility to service our debt obligations and operating activities.  Current uncertainty in global economic conditions resulting from the recent disruption in worldwide credit markets pose a risk to the overall global economy that could adversely impact consumer and customer demand for our products, as well as our ability to manage normal commercial relationships with our customers, suppliers and creditors.  Recent trends indicate the continuation and possible acceleration of consumers purchasing store branded products rather than branded, premium products.  If these trends continue, our revenue and operating cash flows and, in turn, our ability to operate our business and service our debt obligations could be adversely affected.

Moreover, over the past several months, significant deterioration in the financial condition of many financial institutions has resulted in severe loss of liquidity, higher short-term borrowing costs, lower borrowing availability in global credit markets and more stringent borrowing terms.  The global economic slowdown has caused further tightening of the credit markets, more stringent lending standards and terms and higher volatility in interest rates.  These factors could adversely affect the ability of our customers and suppliers to do business with us.  We are engaged in discussions with certain of our secured lenders and debt security holders as well as potential financing sources with regard to refinancing or restructuring all or a portion of our debt obligations.  However, there can be no assurance that we will be able to refinance, replace or amend our outstanding debt obligations on terms favorable to us, or at all, particularly given current financial market conditions.

### Item 6.  Exhibits

| Exhibit No. | Description |
|---|---|
| 31.1 | Certificate of Paul Block pursuant to Rule 15d-14 under the Securities Exchange Act of 1934. |
| 31.2 | Certificate of Julie Wool pursuant to Rule 15d-14 under the Securities Exchange Act of 1934. |
| 32.1 | Certificate of Paul Block pursuant to 18 U.S.C. Section 1350. |
| 32.2 | Certificate of Julie Wool pursuant to 18 U.S.C. Section 1350. |

Table of Contents

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

MERISANT COMPANY

Date: November 13, 2008

By:    /s/ Julie Wool
       _____
       Julie Wool
       Vice President, Finance, Controller
       (on behalf of the Company and in capacity
       of principal financial officer)

39

10-Q/A 1 a08-28727_110qa.htm 10-Q/A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

---

# FORM 10-Q/A

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2008**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**

**Commission File Number:  333-114105**

# Merisant Company
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **52-2218321** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |
| **33 North Dearborn** **Chicago, Illinois** | **60602** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(312) 840-6000**

Former name, former address and former fiscal year, if changed since last report:
**Not applicable.**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90

days.  Yes ☐  No ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐                          Accelerated filer ☐

Non-accelerated filer ☒                          Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

As of November 14, 2008, the registrant had 100 shares of common stock, par value $0.01 per share, outstanding, all of which were owned by Merisant Worldwide, Inc.

This Amendment to the Quarterly Report is being filed pursuant to a requirement contained in the indenture governing Merisant Company's $9^1/_2$% Senior Subordinated Notes due 2013.

**Explanatory Note**

This Amendment (this "Amendment") to the Merisant Company's ("Merisant") Quarterly Report on Form 10-Q dated November 18, 2008, originally filed on November 13, 2008 (the "Original Filing"), is being filed to correct certain information presented in "Part I—Financial Information, Item 1. Financial Statements of Merisant Company" and in "Part I—Financial Information, Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations" in each case relating to Operating EBITDA for EAME and Latin America.

## PART I—FINANCIAL INFORMATION.

**Item 1.**　　　　**Financial Statements of Merisant Company**

Merisant had reported in Note 2 to the Unaudited Consolidated Financial Statements of the Original Filing that Operating EBITDA for Latin America for the three- and nine-month periods ended September 30, 2008 was $3,512 and $6,694, respectively, and that Operating EBITDA for EAME for the three- and nine-month periods ended September 30, 2008 was $5,603 and $22,145, respectively. Instead, Operating EBITDA for Latin America for the three- and nine-month periods ended September 30, 2008 was $2,612 and $5,794, respectively, and Operating EBITDA for EAME for the three- and nine-month periods ended September 30, 2008 was $6,503 and $23,045, respectively. Operating EBITDA for Merisant on a consolidated basis did not change. Dollar amounts in this section are stated in thousands.

**Item 2.**　　　　**Management's Discussion and Analysis of Financial Condition and Results of Operations**

Merisant had reported in "Management's Discussion and Analysis of Financial Condition and Results of Operation—Results of Operations—Segment Results" of the Original Filing that Operating EBITDA for Latin America for the three- and nine-month periods ended September 30, 2008 was $3.5 million and $6.7 million, respectively, and that Operating EBITDA for EAME for the three- and nine-month periods ended September 30, 2008 was $5.6 million and $22.1 million, respectively. Instead, Operating EBITDA for Latin America for the three- and nine-month periods ended September 30, 2008 was $2.6 million and $5.8 million, respectively, and Operating EBITDA for EAME for the three- and nine-month periods ended September 30, 2008 was $6.5 million and $23.0 million, respectively. As a result of this adjustment, Latin America Operating EBITDA and Operating EBITDA margin for the three- and nine-month periods ended September 30, 2008 decreased due to higher raw material increases across the region and higher brand support in Mexico despite the increase in net sales. Operating EBITDA for Merisant on a consolidated basis did not change.

## PART II—OTHER INFORMATION

### Item 6. Exhibits

| Exhibit No. | Description |
| --- | --- |
| 31.1 | Certificate of Paul Block pursuant to Rule 15d-14 under the Securities Exchange Act of 1934. |
| 31.2 | Certificate of Julie Wool pursuant to Rule 15d-14 under the Securities Exchange Act of 1934. |
| 32.1 | Certificate of Paul Block pursuant to 18 U.S.C. Section 1350. |

32.2        Certificate of Julie Wool pursuant to 18 U.S.C. Section 1350.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

MERISANT COMPANY

Date: November 18, 2008                                By:   /s/ Julie Wool
                                                             Julie Wool
                                                             Vice President, Finance, Controller
                                                             (on behalf of the Company and in capacity
                                                             of principal financial officer)

3

# EXHIBIT D

Projections

## PROJECTED FINANCIAL INFORMATION

THE FOLLOWING PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE COMPANY'S INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE COMPANY DOES NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.  THE COMPANY DOES NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE COMPANY BELIEVES THAT THE PROJECTIONS ARE BASED ON ESTIMATES AND ASSUMPTIONS THAT ARE REASONABLE.  THE ESTIMATES AND ASSUMPTIONS MAY NOT BE REALIZED, HOWEVER, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE COMPANY'S CONTROL.  NO REPRESENTATIONS CAN BE OR ARE MADE AS TO WHETHER THE ACTUAL RESULTS WILL BE WITHIN THE RANGE SET FORTH IN ITS PROJECTIONS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THEREFORE MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  SEE ARTICLE XI, "CERTAIN RISK FACTORS TO BE CONSIDERED."

**Merisant Worldwide**
Condensed Consolidated Statement of Operations
*Unaudited, $ in thousands*

| | Plan | Forecast | | | |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013 |
| Net Sales | $ 235,289 | $ 259,319 | $ 288,445 | $ 318,172 | $ 343,424 |
| | | | | | |
| Cost of Goods Sold | 119,454 | 131,582 | 147,833 | 162,480 | 176,042 |
| **Gross Profit** | $ 115,835 | $ 127,737 | $ 140,612 | $ 155,691 | $ 167,382 |
| | | | | | |
| Selling, General and Administrative Expenses | 116,453 | 111,369 | 118,382 | 120,551 | 122,034 |
| **Operating Income** | $ (618) | $ 16,368 | $ 22,230 | $ 35,141 | $ 45,348 |
| | | | | | |
| Other Expense (Income) | (1,354) | (206) | (214) | (227) | (240) |
| Interest Expense, net | 11,885 | 7,541 | 7,023 | 8,356 | 8,523 |
| Write-off of Deferred Financing Costs | 4,971 | - | - | - | - |
| **Income (Loss) Before Taxes** | $ (16,121) | $ 9,033 | $ 15,421 | $ 27,012 | $ 37,065 |
| | | | | | |
| Income Tax Provision (Benefit) | 4,550 | 5,000 | 7,500 | 7,500 | 7,500 |
| **Net Income before Preferred Dividends** | $ (20,671) | $ 4,033 | $ 7,921 | $ 19,512 | $ 29,565 |
| | | | | | |
| Preferred Dividends (Non-Cash) | - | 7,000 - | 7,560 | 8,165 | 8,818 |
| **Net Income to Common Shareholders** | $ (20,671) | $ (2,967) | $ 361 | $ 11,347 | $ 20,747 |
| | | | | | |
| *Memo: EBITDA* | | | | | |
| Operating Income | $ (618) | $ 16,368 | $ 22,230 | $ 35,141 | $ 45,348 |
| Depreciation | 5,655 | 5,319 | 5,324 | 5,331 | 5,339 |
| Amortization | 21,740 | 22,242 | 22,242 | 22,242 | 22,242 |
| Restructuring | 14,937 | 898 | 898 | 898 | 898 |
| Other Expense (Income) | 1,354 | 206 | 214 | 227 | 240 |
| **EBITDA** | $ 43,067 | $ 45,034 | $ 50,908 | $ 63,839 | $ 74,068 |

Fiscal Year Ending December 31,

*See accompanying Notes to the Condensed Consolidated Financial Statements*

**Merisant Worldwide**
Condensed Consolidated Statement of Cash Flows
*Unaudited, $ in thousands*

| | Fiscal Year Ending December 31, | | | | |
|---|---|---|---|---|---|
| | Plan | Forecast | | | |
| | 2009 | 2010 | 2011 | 2012 | 2013 |
| OPERATING ACTIVITIES | | | | | |
| Net Income | $ (20,671) | $ (2,967) | $ 361 | $ 11,347 | $ 20,747 |
| *Adjustments to reconcile net income to net* | | | | | |
| *cash flow from operations:* | | | | | |
| Depreciation | 5,655 | 5,319 | 5,324 | 5,331 | 5,339 |
| Amortization | 21,740 | 22,242 | 22,242 | 22,242 | 22,242 |
| Convertible Preferred Non-Cash Dividend | - | 7,000 | 7,560 | 8,165 | 8,818 |
| Other | 8,881 | - | (32) | - | - |
| Changes in Assets and Liabilities | | | | | |
| Accounts Receivable | 652 | (1,631) | (6,266) | (6,700) | (5,754) |
| Inventory | 4,682 | (1,743) | (2,336) | (2,105) | (1,949) |
| Prepaid Expenses and Other Assets | 211 | (874) | (182) | - | (500) |
| Accounts Payable | (3,622) | 881 | 1,181 | 1,064 | 985 |
| Accrued Expenses and Other Liabilities | 1,427 | 1,049 | 50 | 51 | 53 |
| **Net Cash Flow From Operations** | $ 18,955 | $ 29,276 | $ 27,901 | $ 39,395 | $ 49,981 |
| | | | | | |
| INVESTING ACTIVITIES | | | | | |
| Purchases of Property, Plant and Equipment | (5,789) | (6,000) | (6,000) | (6,000) | (6,000) |
| Other | - | - | - | - | - |
| **Net Cash Flow from Investing** | $ (5,789) | $ (6,000) | $ (6,000) | $ (6,000) | $ (6,000) |
| | | | | | |
| FINANCING ACTIVITIES | | | | | |
| Principal Payments on Long-Term Debt | - | (1,500) | (1,500) | (1,500) | (1,500) |
| Other | - | - | - | - | - |
| **Net Cash Flow from Investing** | $ - | $ (1,500) | $ (1,500) | $ (1,500) | $ (1,500) |
| | | | | | |
| **Net Change in Cash and Cash Equivalents** | $ 13,165 | $ 21,776 | $ 20,401 | $ 31,895 | $ 42,481 |
| | | | | | |
| Cash and Cash Equivalents - Beginning of Period | $ 25,461 | $ 31,326 | $ 53,102 | $ 73,503 | $ 105,398 |
| Net Change in Cash and Cash Equivalents | 13,165 | 21,776 | 20,401 | 31,895 | 42,481 |
| **Cash and Cash Equivalents - End of Period** | $ 38,626 | $ 53,102 | $ 73,503 | $ 105,398 | $ 147,879 |

*See accompanying Notes to the Condensed Consolidated Financial Statements*

**Merisant Worldwide**
Condensed Consolidated Balance Sheet
*Unaudited, $ in thousands*

| | Pro Forma Projected December 31, | | | | |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2013 |
| **ASSETS** | | | | | |
| Cash and Cash Equivalents | $ 30,426 | $ 52,184 | $ 72,567 | $ 104,443 | $ 146,905 |
| Accounts Receivable | 68,410 | 70,042 | 76,308 | 83,008 | 88,762 |
| Inventory | 17,170 | 18,913 | 21,249 | 23,354 | 25,304 |
| Prepaid Expenses | 2,961 | 3,835 | 4,017 | 4,017 | 4,517 |
| Deferred income taxes | 2,230 | 2,230 | 2,230 | 2,230 | 2,230 |
| Total Current Assets | $ 121,198 | $ 147,205 | $ 176,372 | $ 217,053 | $ 267,719 |
| Property and equipment, net | 32,994 | 33,675 | 34,351 | 35,020 | 35,681 |
| Trademarks and other intangibles, net | 120,171 | 97,928 | 75,686 | 53,444 | 31,202 |
| Goodwill | 44,487 | 44,487 | 44,487 | 44,487 | 44,487 |
| Other noncurrent assets | 995 | 995 | 995 | 995 | 995 |
| Total Assets | $ 319,845 | $ 324,290 | $ 331,892 | $ 351,000 | $ 380,084 |
| **LIABILITIES** | | | | | |
| Accounts payable | $ 8,678 | $ 9,559 | $ 10,739 | $ 11,804 | $ 12,789 |
| Income taxes payable | 420 | 420 | 420 | 420 | 420 |
| Accrued expenses and other liabilities | 28,395 | 29,444 | 29,494 | 29,545 | 29,598 |
| Total Current Liabilities | $ 37,492 | $ 39,423 | $ 40,653 | $ 41,768 | $ 42,807 |
| New Bank Notes | 150,000 | 148,500 | 147,000 | 145,500 | 144,000 |
| Deferred Tax Liability | 25,413 | 25,413 | 25,413 | 25,413 | 25,413 |
| Other Liabilities | 6,940 | 6,940 | 6,908 | 6,908 | 6,908 |
| Liabilities Subject-to-Compromise | - | - | - | - | - |
| **Total Liabilities** | $ 219,845 | $ 220,275 | $ 219,974 | $ 219,589 | $ 219,127 |
| **Convertible Preferred Stock** | $ 87,500 | $ 94,500 | $ 102,060 | $ 110,225 | $ 119,043 |
| **Shareholders Equity (Deficit)** | $ 12,500 | $ 9,515 | $ 9,858 | $ 21,186 | $ 41,915 |
| **Total Liabilities and Shareholders Equity (Deficit)** | $ 319,845 | $ 324,290 | $ 331,892 | $ 351,000 | $ 380,084 |

*See accompanying Notes to the Condensed Consolidated Financial Statements*

**Notes to Condensed Consolidated Financial Statements**

The Debtors, with the assistance of various professionals, prepared the projections for the four years ending December 31, 2010, 2011, 2012, and 2013. The projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Company, industry performance, general business and economic conditions and other matters, most of which are beyond the control of the Company. Therefore, although the projections are necessarily presented with numerical specificity, the actual results achieved during the projection period will vary from the projected results. These variations may be material. Although the Company believes that the assumptions underlying the projections, when considered on an overall basis, are reasonable in light of current circumstances, no representation can be or is being made with respect to the accuracy of the projections or the ability of the Company to achieve the projected results of operations. In deciding whether to vote to accept or reject the Plan, claimants must make their own determinations as to the reasonableness of such assumptions and the reliability of the projections. The projections are based on, and assume the successful implementation of, the Company's strategic initiatives and restructuring.

Additional information relating to the principal assumptions used in preparing the Projections is set forth below:

*Net Sales*

The Debtors' operations include both its (a) Base Business which includes branded products *Equal* and *Canderel,* stevia-based product brand extensions such as *Canderel Green,* as well as other branded and private label artificial sweetener products, and (b) *PureVia* which includes the all-natural, high-purity, stevia-based product sold globally under the *PureVia* brand.

**(a) Base Business**
- North America: Net sales are expected to decline approximately 2% in 2010, and 3% in years 2011 to 2013. The decrease is primarily driven by the loss of contract volumes and unfavorable mix due to increasing private label volumes.

- Europe, Africa and Middle East (EAME): Net sales are expected to increase at an average rate of approximately 3% per year throughout the forecast period. Contributing to the increase is the launch of the stevia-based *Canderel Green* product and anticipated higher private label volumes. These factors are partially offset by cannibalization of the base *Canderel* sales by the launch of the stevia-based *Canderel Green* product.

- Latin America: Net sales are expected to grow steadily (~5% per year) throughout the forecast period. This increase is driven by favorable mix arising from higher sucralose and stevia sales vis-à-vis current aspartame products.

- Asia Pacific: Net sales are expected to grow steadily (~6% per year) throughout the forecast period. Australia and New Zealand are expected to grow at approximately 1% per year, while emerging markets such as India, Thailand and China are projected to experience 8% to 15% annual net sales growth.

**(b) PureVia**
Net sales are expected to increase to over $90 million by 2013, compared to a projected $5 million in 2009. PureVia was launched in the U.S. at the end of 2008, and is anticipated to launch globally over the next two years. The first launches are planned for Q4 2009 in key markets France, Switzerland and Australia. Mexico and Latin America are set to follow in the first half of 2010. The launch in other Western European countries is planned for early 2011.

*Gross Margin*

Gross margin as a percentage of net sales is expected to remain relatively consistent throughout the forecast period at approximately 49%. In EAME, Growth in higher margin products, such as *Canderel Green*, is expected to offset growth in lower margin products, such as *PureVia* and private label products. Additionally, improved cost absorption is expected as the Debtors' major facilities currently have substantial excess capacity. The forecast also assumes moderate savings on material costs as the Company has added headcount to continue focusing on material cost savings.

*Selling, General and Administrative Expenses*

Selling, general and administrative ("SG&A") expenses include variable selling, brand support and administrative expenses, along with amortization of intangible assets. SG&A is expected to rise from $111 million in 2009 to $122 million in 2013. As a percentage of net sales, however, SG&A is expected to fall from 43% in 2009 to 36% in 2013. Brand support will increase to reflect the global launch of the *PureVia* brand and *Canderel Green*, and will be partially offset by lower brand support for existing products in North America. Administrative costs are expected to grow with inflation at a rate of 2% per year.

*Interest Expense, net*

Interest expense represents the interest associated with the $150 million New Bank Notes. The facility is projected to require scheduled amortization of 1.00% per year. Interest on this facility is paid in cash at a rate of LIBOR + 350 bps, subject to a 2.00% LIBOR floor through the end of 2012. Cash held by the Reorganized Debtors is assumed to earn interest at a rate of 2.00%. Interest expense, net, is projected to range between $7 and $9 million per year throughout the forecast period.

*Taxes*

The projections assume tax expense is equal to cash taxes and all cash taxes paid are in foreign jurisdictions. The Debtors expect to generate federal tax losses in the U.S. and to utilize these tax losses, subject to statutory limitations, during the carry forward period to offset future federal taxable income. In addition, the Debtors will utilize other available tax attributes to further reduce their tax expense, if any. As such, with the utilization of federal tax losses and other tax attributes, the Debtors' will significantly reduce their cash burden with respect to the payment of income taxes during the forecast period.

*Preferred Dividends*

Preferred dividends represent the non-cash accrual of New Merisant Convertible Preferred Stock at a rate of 8.0% per annum. The accrual increases only the liquidation preference of the security; the conversion ratio to New Merisant Common Stock remains unchanged.

*Working Capital*

The Reorganized Debtors' working capital is composed of accounts receivable, inventory, accounts payable, and certain other accrued expenses and liabilities. Working capital, as a percentage of net sales, is expected to increase from approximately 18% to 20% over the forecast period. Working capital terms have remained relatively constant throughout the bankruptcy process. The moderate increase projected is largely a result of both (a) inventory build-up related to new product launches and (b) an increasing

percentage of sales occurring outside North America, where it is common for trade receivable terms to be less favorable.

*Capital Expenditures*

The Reorganized Debtors anticipate capital expenditures to be approximately $6 million per year through 2013. Sufficient excess capacity exists at current facilities to accommodate significant growth beyond the forecast period.

**Merisant Worldwide**
Pro Forma Condensed Consolidated Balance Sheet
*Unaudited, $ in thousands*

| | | | December 31, 2009 | | | | |
|---|---|---|---|---|---|---|---|
| | | Projected | | Pro Forma Adjustments | | | Pro Forma |
| **ASSETS** | | | | | | | |
| Cash and Cash Equivalents | $ | 37,726 | $ | (7,300) [(1)] | $ | | 30,426 |
| Accounts Receivable | | 68,410 | | | | | 68,410 |
| Inventory | | 17,170 | | | | | 17,170 |
| Prepaid Expenses | | 2,961 | | | | | 2,961 |
| Deferred income taxes | | 2,230 | | | | | 2,230 |
|    Total Current Assets | $ | 128,498 | $ | (7,300) | $ | | 121,198 |
| Property and equipment, net | | 32,994 | | - | | | 32,994 |
| Trademarks and other intangibles, net | | 120,171 | | - | | | 120,171 |
| Goodwill | | 107,209 | | (62,722) [(2)] | | | 44,487 |
| Other noncurrent assets | | 995 | | - | | | 995 |
|    **Total Assets** | $ | 389,867 | $ | (70,022) | $ | | 319,845 |
| **LIABILITIES** | | | | | | | |
| Accounts payable | $ | 8,678 | $ | - | $ | | 8,678 |
| Income taxes payable | | 420 | | - | | | 420 |
| Accrued expenses and other liabilities | | 30,795 | | (2,400) [(3)] | | | 28,395 |
|    Total Current Liabilities | $ | 39,892 | $ | (2,400) | $ | | 37,492 |
| New Bank Notes | | - | | 150,000 [(4)] | | | 150,000 |
| Deferred Tax Liability | | 25,413 | | - | | | 25,413 |
| Other Liabilities | | 6,940 | | - | | | 6,940 |
| Liabilities Subject-to-Compromise | | 577,519 | | (577,519) | | | - |
| **Total Liabilities** | $ | 649,764 | $ | (429,919) | $ | | 219,845 |
| **Convertible Preferred Stock** | $ | - | $ | 87,500 [(5)] | $ | | 87,500 |
| **Shareholders Equity (Deficit)** | $ | (259,897) | $ | 272,397 [(6)] | $ | | 12,500 |
| **Total Liabilities and Shareholders Equity (Deficit)** | $ | 389,867 | $ | (70,022) | $ | | 319,845 |

8

**Notes to the Pro Forma Condensed Consolidated Balance Sheet**

(1) Represents payments of cash to settle priority and administrative claims of $0.1 million, restructuring fees of $4.8 million, and other accrued liabilities of $2.4 million

(2) Represents the write-off of goodwill pursuant to fresh start accounting

(3) Represents cash paid to settle other accrued liabilities of $2.4 million upon emergence

(4) Represents the New Bank Notes due 2013, which are assumed to be in the maximum amount of $150.0 million  Original principal outstanding of $204.9 million is reduced by $54.9 million comprised of: (a) the voluntary debt-for-New Merisant Convertible Preferred Stock swap, (b) proceeds from the new privately placed New Merisant Convertible Preferred Stock, and (c) proceeds from the New Merisant Convertible Preferred Stock Rights Offering..

(5) Represents the issuance of $87.5 million of New Merisant Convertible Preferred Stock in connection with (a) the voluntary debt-for-New Merisant Convertible Preferred Stock swap, (b) the privately placed New Merisant Convertible Preferred Stock, and (c) the New Merisant Convertible Preferred Stock Rights Offering

(6) Represents the adoption of fresh start accounting and the write-off of amounts due to the 9.5% Unsecured Notes due 2013

## REORGANIZATION VALUE

In conjunction with formulating the Plan, the Debtors have estimated the post-confirmation going-concern enterprise value of the Reorganized Debtors (the "Reorganized Enterprise Value"). At the Debtors' request, Blackstone performed an analysis of the estimated reorganization value of Reorganized Debtors on a going-concern basis as of December 31, 2009.

Reorganized Enterprise Value

Blackstone considered two valuation methodologies to determine Reorganized Enterprise Value: (i) comparable public company analysis based on trading multiples, and (ii) discounted cash flow analysis using the perpetuity growth method. The methodologies rely on the financial projections developed by management of the Debtors. Based on these methodologies, the estimated Reorganized Enterprise Value is approximately $230 to $270 million with a midpoint of $250 million.

### (i) Comparable Public Company Analyses

The Comparable Public Company analyses examine the value of comparable companies as a multiple of their key operating statistics and then apply a range of multiples to the projected 2009 and 2010 EBITDA of the Reorganized Debtors. The estimated revenue and EBITDA for comparable companies are based on consensus estimates by equity analysts as compiled by Capital IQ / Reuters.

A key factor to the Comparable Public Company Analysis approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors. The selection of truly comparable companies is often difficult and subject to interpretation. Criteria for selecting comparable companies include, among other relevant characteristics, lines of business, business risks, key business drivers, growth prospects, maturity of businesses, market presence and brands, size and scale of operations. After considering these criteria, Blackstone selected the following comparable companies: B&G Foods Inc, Chiquita Brands International Inc., Tate & Lyle plc, McCormick & Co Inc., and the J.M. Smucker Company.

Blackstone selected a range of 5.5x to 6.5x for 2009 EBITDA of the Reorganized Debtors and 5.0x to 6.0x for 2010 EBITDA of the Reorganized Debtors. Such range reflects the unique growth and risk characteristics of the Reorganized Debtors relative to comparable companies.

### (ii) Discounted Cash Flow Analysis

The Discounted Cash Flow Analysis estimates value by calculating the present value of projected future cash flows. The present value is obtained by discounting the future cash flows by the weighted average cost of capital ("WACC") of the Reorganized Debtors. The WACC is calculated as the average of the cost of equity and the after-tax cost of debt, weighted by the ratios of total equity to capitalization and total debt to capitalization. Blackstone selected a WACC range of between 15.8 and 17.8% for the purposes of this analysis.

The Reorganized Enterprise Value was determined using the perpetuity growth method, and is calculated as the sum of the present value of the cash flows for fiscal years 2010 through 2013, plus the estimated value of cash flows beyond the projection period by assuming that the Reorganized Debtors will achieve a constant growth rate in future cash flows.

Reorganized Equity Value

In order to calculate the equity value of the Reorganized Debtors, the Reorganized Enterprise Value is reduced by the face amount of up to $150 million of the New Bank Notes.  Reorganized Equity Value is estimated to be approximately $80 to $120 million with a midpoint of $100 million.

THE DEBTORS BELIEVE THAT THE FOREGOING VALUATION ACCURATELY REFLECTS THE REORGANIZED ENTERPRISE VALUE.  HOWEVER, THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS WHICH ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE COMPANY AND BLACKSTONE.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE ESTIMATED VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.  ADDITIONALLY, THE REORGANIZED ENTERPRISE VALUE ESTIMATED BY BLACKSTONE DOES NOT NECESSARILY REFLECT, AND SHOULD NOT BE CONSTRUED AS REFLECTING, VALUES THAT WILL BE ATTAINED IN THE PUBLIC OR PRIVATE MARKETS.  THE VALUE DESCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE.  SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZED ENTERPRISE VALUE RANGES ASSOCIATED WITH THE DEBTORS' VALUATION ANALYSIS.  INDEED, THERE CAN BE NO ASSURANCE THAT A TRADING MARKET WILL DEVELOP FOR THE NEW BANK NOTES OR THE NEW MERISANT CAPITAL STOCK.

\* \* \*

# EXHIBIT E

Liquidation Analysis

**MERISANT COMPANY**
**LIQUIDATION ANALYSIS**

I. Overview

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Allowed Claim or interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. The first step in meeting this test is to determine the dollar amount that would be generated from a hypothetical liquidation of the assets of the Debtors in the context of a chapter 7 liquidation in which a chapter 7 trustee is appointed and charged with reducing to cash any and all assets of the Debtors. The trustee would be required to either (i) sell the assets owned by the Debtors and their non-Debtor affiliates as going-concerns or (ii) shut down the Debtors' businesses and sell the individual assets of the Debtors and the non-Debtor affiliates. Accordingly, this is the assumption employed where applicable in preparing the Liquidation Analysis. THERE EXISTS A RISK THAT IF THE DEBTORS WERE TO CONVERT THEIR CASES TO CHAPTER 7, THE TRUSTEE WOULD: (i) BE UNABLE TO LIQUIDATE THE ASSETS AS GOING-CONCERNS BECAUSE OF PROVISIONS OF THE BANKRUPTCY CODE THAT LIMIT THE ABILITY OF A CHAPTER 7 TRUSTEE TO OPERATE, AND THEREFORE LIQUIDATE, THE ASSETS AS GOING-CONCERNS; OR (ii) NOT ELECT TO LIQUIDATE THE ASSETS AS GOING-CONCERNS AND WOULD INSTEAD SELL THE INDIVIDUAL ASSETS OF THE DEBTORS.

This Liquidation Analysis estimates the range of proceeds that would be generated from the liquidation of the Debtors' assets in the context of chapter 7 cases assuming that the Debtors would have no access to cash collateral. The gross amount of cash available from a liquidation would be the sum of the proceeds from the disposition of the Debtors' assets, including cash held by the Debtors (and its non-Debtor affiliates' assets and cash if available to the trustee) at the time of the commencement of the hypothetical chapter 7 case. Such amount is reduced by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for purposes of the hypothetical liquidation. Any remaining net cash would be allocated to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code.

The Liquidation Analysis assumes all of the assets of Merisant Worldwide and its subsidiaries are liquidated and the corporate office in Chicago and all administrative functions worldwide are closed.

A general summary of the assumptions used by the Debtors in preparing this Liquidation
Analysis follows. More specific assumptions are discussed in the Notes to Liquidation Analysis section.

In estimating the gross amount of proceeds available under a hypothetical chapter 7 liquidation, estimates were made of the cash proceeds that might be realized from the liquidation of the Debtors' assets based upon the projected book value of assets at December 31, 2009. These values have not been subject to any review, compilation or audit by any independent accounting firm. In order to effectuate an expedited liquidation, 6 months of wind-down expenses, including those related to trustee fees, professional fees and operating/wind-down expenses, have been included in the analysis.

THE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS. Underlying the Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties

and contingencies beyond the control of the Debtors or a chapter 7 trustee. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the Debtors' assets will result in an accurate estimate of the proceeds that would be realized were the Debtors to undergo an actual liquidation in chapter 7.   Additionally, the actual amounts of claims against the estates could vary significantly from the estimate set forth herein, depending on the claims asserted during the pendency of the chapter 7 cases. For example, the Debtors have assumed that wind-down costs and related professional fees will be paid before secured claims. The Liquidation Analysis does not include potential recoveries from avoidance actions. Furthermore, due to the nature of the Debtors' business, material value was ascribed to intangible assets, which may not yield any proceeds in liquidation in chapter 7. Accordingly, the actual liquidation value of the Debtors is speculative in nature and could vary materially from the estimates provided herein.

Subject to the qualifications, assumptions and schedules herein, this Liquidation Analysis estimates a range of gross proceeds less wind-down costs of $80.6 million to $121.2 million. With secured claims totaling approximately $204.9 million, there will not be adequate proceeds to make full payment on secured claims in either the low or high scenario. Consequently, there will be no proceeds available for the unsecured creditors. The assumptions and schedules supporting these results are set forth herein.

The table below is a summary of the recovery estimates on assets that would be available for distribution in the assumed hypothetical chapter 7 cases.  The table represents recovery from the domestic operations as well as from the liquidation of the foreign operations.

II. Liquidation and Recoveries Analysis – Consolidated Merisant Worldwide Inc.

| | Book Value 12/31/2008 | Estimated Recovery Low % | Low $ | Estimated Recovery High % | High $ |
|---|---|---|---|---|---|
| Cash and cash equivalents | $ 37,726 | 100% | $ 37,726 | 100% | $ 37,726 |
| Accounts receivable, net | 68,410 | 49% | 33,552 | 68% | 46,334 |
| Inventories | 17,170 | 49% | 8,482 | 69% | 11,882 |
| Prepaid expenses and other assets | 6,187 | 0% | - | 5% | 309 |
| Property and equipment, net | 32,994 | 27% | 8,941 | 54% | 17,883 |
| Trademarks, net | 120,171 | 11% | 12,618 | 26% | 30,643 |
| Goodwill | 107,209 | 0% | - | 0% | - |
| Assets / Proceeds, gross | $ 430,045 | | $ 101,320 | | $ 144,777 |
| Non-debtor liabilities | (29,901) | | (29,901) | | (29,901) |
| Assets / Proceeds, net | $ 400,143 | | $ 71,418 | | $ 114,876 |

| | Estimated Claim | Low | High |
|---|---|---|---|
| Gross Proceeds | | $ 71,418 | $ 114,876 |
| **Chapter 7 Administrative Claims** | | | |
| Trustee Fees | | 1,908 | 3,212 |
| Runoff Expenses | | 12,830 | 12,830 |
| Professional Fees | | 3,000 | 3,000 |
| Total Chapter 7 Administrative Claims | | 17,738 | 19,042 |
| **Net Proceeds Available for Payment of Claims** | | $ 53,680 | $ 95,834 |
| Net Proceeds Available for Priority and Administrative Claims | $ 15 | $ 15 | $ 15 |
| *% Recovery* | | *100%* | *100%* |
| Net Proceeds Available for Secured Creditors | $ 204,850 | $ 53,665 | $ 95,819 |
| *% Recovery* | | *26%* | *47%* |
| Net Proceeds Available for Unsecured Creditors | | $ - | $ - |

III. Notes to Liquidation Analysis

**ASSETS & GROSS PROCEEDS**

- **Cash** – assumed to yield a 100% recovery based on the assumption that the Debtors can freely repatriate cash from non-debtor entities, subject to satisfying non-debtor liabilities.

- **Accounts receivable** – overall blended recovery range assumed to be 45% – 61%.
  - U.S. trade receivables (approximately 13% of total) are assumed to yield a near-full recovery, except for ACH accounts, which are likely to be netted against accounts payable balances.
  - Foreign trade receivables (approximately 64% of total) are assumed to yield lower recovery than U.S. accounts receivable due to difficulty in enforcing collection in certain foreign jurisdictions.
  - Other non-trade receivables (approximately 23% of total) include primarily VAT receivables, of which approximately 50% are assumed to be collected. The low realization rate on the VAT receivables is due to fact that the receivables originate in multiple international jurisdictions. In a liquidation context wherein the Debtors are winding down its foreign operations, the Debtors believe that it is unlikely that they will be able to realize at a rate greater than 50% on the VAT receivables.

3

- **Inventory** – comprised of raw materials, supplies and packaging, work-in-progress, and finished goods. Inventory is expected to yield an overall blended recovery of 49% - 69%.
  - o Raw materials include raw aspartame, sucralose and other product (approximately 20% of total) are assumed to be largely salable, as the artificial sweetener product can be easily sold to a competitor or returned to the supplier at a modest discount.
  - o Supplies and packaging (approximately 20% of total) are assumed to yield minimal recovery as packaging is already branded and of little use to any other part of the value chain.
  - o Work-in-progress (approximately 4% of total) are assumed to be non-salable, as operations will not continue to convert product to become finished goods.
  - o Finished goods (approximately 56% of total) are assumed to yield significant recovery as the inventory can be distributed to retail, grocery and mass channels with relative ease

- **Prepaid expenses and other assets** – includes primarily prepaid rent, insurance and certain unrecoverable overhead costs, and deferred income taxes. A small portion of prepaid rent may be reimbursable. This analysis assumes a 0 – 5% recovery.

- **Property, plant and equipment, net** – recovery is dependent on the mix and salability of assets. This analysis assumes an overall blended recovery rate of 27% - 54%.
  - o Machinery, equipment and other (approximately 77% of total) in Manteno, CzechPak and Zarate facilities. It is anticipated that this machinery and equipment can be sold to competitors at a discount.
  - o Internally-developed software (approximately 3% of total) assumes no recovery.
  - o Land and building (approximately 10% of total) assumes that land can be sold for book value while buildings will be sold for a significant discount to net book value.
  - o Building improvements (approximately 5% of total) includes improvements in Chicago offices. This analysis ascribes minimal value to potential recoveries to building improvements.
  - o Construction-in-Progress (approximately 5% of total) is assumed to achieve a minimal value in recovery.

- **Trademarks, net** – includes Equal®, Canderel® and other trademarks. Each trademark is assumed to yield a modest recovery, with an overall blended recovery rate of 11% to 26%
  - o U.S. trademarks (approximately 60% of total) are primarily related to the Equal® brand. This analysis assumes that the brand can be sold to a competitor or other consumer products manufacturer at a significant discount to net book value. Management believes that the realization rate at which the U.S. trademarks would be sold would be approximately 10% - 25%.
  - o Foreign trademarks (approximately 30% of total) are primarily related to the Canderel® brand. This analysis assumes that the brand can be sold to a competitor or other consumer products manufacturer at a significant discount to net book value. Based on a review of the competitive positioning of the Company's foreign operations, management believes that the realization rate at which the foreign trademarks would be sold would be approximately 15% - 35%.
  - o Other intangibles (approximately 10% of total) include customer databases, and improved efficiency implementation. This analysis ascribes no value to other intangibles.

- **Goodwill** – assumes no recovery.

- **Non-debtor liabilities** – must be satisfied in full prior to repatriation of any proceeds from non-debtor entities, to the extent that proceeds from non-debtor assets exceed non-debtor liabilities. These include trade payables, VAT payables, accrued expenses, tax liabilities, and other long-term liabilities.

## WIND-DOWN COSTS

- **Trustee fees** – assumed to be 3.0% of gross proceeds, excluding cash and cash equivalents, and are estimated to be $1.9 million to $3.2 million.

- **Runoff expenses** – assumed to include run-off expenses plus severance. Calculated as 6 months of runoff overhead expenses, plus payroll and benefits at reduced levels over the 6 month period (50% for 2 months, 25% for 4 months), plus 1 to 4 months severance, which varies by country, upon termination. Total runoff expenses are estimated to be $12.8 million.

- **Professional fees** – assumed to average $500,000 per month in legal, financial and operational advisor fees to support both the Debtor and the Secured Creditors for 6 months. In sum, this is estimated to be $3 million.

IV.    Claims

## ADMINISTRATIVE AND PRIORITY CLAIMS

Administrative expense claims are approximately $10,000 and reflect only 503(b)(9) Claims and note accrued and unpaid professional fees and other fees associated with exit. Priority tax claims are approximately $5,000. This analysis assumes Administrative and Priority Claims would receive 100% recovery in liquidation.

## SECURED CLAIMS

Secured Claims include only those arising under the Amended and Restated Credit Agreement, dated as of May 9, 2007, totaling $204,850,000 in outstanding principal amount.  This analysis assumes Secured Claims would receive between 26% and 47% recovery in liquidation.

*$ in thousands*

| Secured Claims | |
|---|---|
| Revolver | $ 28,000 |
| Term Loan A | 3,286 |
| Term Loan B | 173,565 |
| **Total Secured Claims** | **$ 204,850** |

## UNSECURED CLAIMS

Unsecured Claims include primarily trade payables and principal and accrued and unpaid interest due under both the 9.5% Merisant Company Unsecured Notes due 2013 and the 12.25% Merisant Worldwide Subordinated Notes due 2014.  This analysis assumes Unsecured Claims would receive no recovery in liquidation.

**EXHIBIT F**

Principal Terms and Conditions of the New Credit Facility

## KEY TERMS OF NEW CREDIT FACILITY

| | |
|---|---|
| Agents | Administrative Agent and Collateral Agent: Wilmington Trust FSB |
| Borrower | Reorganized Merisant |
| Guarantors | The Reorganized Debtor(s) other than Reorganized Merisant |
| Aggregate Principal Amount of New Bank Notes | An aggregate principal amount up to $150 million (less Excess Cash) plus accrued and unpaid interest, fees and expenses payable with respect to the Prepetition Credit Facility |
| Currency | US Dollars, with loans drawn under the Prepetition Credit Facility in Euro to be converted to US Dollar loans so that the New Bank Notes will evidence just one tranche consisting of a fully drawn term loan |
| Maturity Date | 4.5 years from Effective Date |
| Interest | Per annum interest rate of LIBOR (subject to a 200 basis point floor for the first three years following the Effective Date) plus 350 basis points payable monthly in arrears in cash |
| Fees | None payable other than administration fees payable to the Agents in an amount to be agreed in a separate fee letter |
| Consolidated EBITDA | Definition of "Consolidated EBITDA" to be adjusted to reflect "fresh start" accounting, provide for add back of restructuring expenses and eliminate historical add backs to the extent no longer relevant |
| Collateral | First priority lien in and upon substantially all assets of the Reorganized Debtors; a first priority pledge of 100% of the equity held by Reorganized Merisant in each of the Reorganized Debtors and a 65% first priority pledge of the equity of any first tier foreign subsidiary of any Reorganized Debtor |
| | Carveouts for permitted liens substantially consistent with Prepetition Credit Facility but including carveouts permitting (i) cash collateral to secure reimbursement obligations under letters of credit issued for the benefit of the Reorganized Debtors (the "Domestic Letters of Credit") in an amount of up to $10 million (reduced by the aggregate amount outstanding under the Permitted Revolving |

| | |
|---|---|
| | Facility (as defined below) and the aggregate face amount of any outstanding New Facility Letters of Credit (as defined below)) and (ii) liens in favor of lenders under a secured revolving credit facility pari passu with New Bank Notes (the "Permitted Revolving Facility") securing amounts outstanding of up to $10 million (reduced by the aggregate face amount of any outstanding Domestic Letters of Credit and New Facility Letters of Credit), subject to execution of an intercreditor agreement reasonably satisfactory to lenders holding a majority of the loans.<br><br>The Collateral will also secure hedging obligations owing to lenders and affiliates of lenders and letters of credit (if any) issued by one or more lenders in the New Credit Facility (the "New Facility Letters of Credit") in an aggregate face amount of up to $10 million (reduced by the aggregate face amount of any outstanding Domestic Letters of Credit and the aggregate amount outstanding under the Permitted Revolving Facility).  In the event that a New Facility Letter of Credit is drawn upon and the applicable Reorganized Debtor fails to reimburse the issuing lender, such issuing lender will have no recourse to the Agents or the other lenders for reimbursement or any other compensation and will have recourse solely to the Collateral. |
| Amortization | New Bank Notes will be payable in equal quarterly installments on the last business day of each calendar quarter following the Effective Date in an amount equal to 0.25% of the Aggregate Principal Amount of New Bank Notes with a final payment of the unpaid principal balance of the Aggregate Principal Amount of New Bank Notes on the Maturity Date |
| Conditions Precedent to Closing | (1) Execution and delivery of definitive loan documentation<br>(2) Perfection of security interest in Collateral by Collateral Agent<br>(3) Receipt by Administrative Agent of legal opinions customary for a secured financing |

|  | transaction<br>(4) No unmatured or existing "Event of Default" (as defined below)<br>(5) Accuracy of representation and warranties made by Reorganized Debtors in definitive loan documentation<br>(6) Evidence that liens securing obligations under the Prepetition Credit Facility will be released substantially concurrently with the Effective Date<br>(7) Payment of fees and expenses |
|---|---|
| Optional Prepayments | May be made at any time without penalty |
| Mandatory Prepayments | Proceeds of asset sales, equity issuances, debt issuances and insurance and condemnation claims to be handled in manner substantially consistent with Prepetition Credit Facility, which would require mandatory prepayment of (i) 100% of net cash proceeds of debt issuances except for any debt issuances expressly permitted as an exception to the negative covenant restricting indebtedness, (ii) subject to the right of the Reorganized Debtors to reinvest in assets of the same type or equipment or real property of up to $20 million in any fiscal year and as otherwise provided in the Prepetition Credit Facility, 100% of net cash proceeds of asset sales and insurance and condemnation claims proceeds, and (iii) 50% of net cash proceeds of equity issuances<br><br>Excess cash flow sweep substantially consistent with Prepetition Credit Facility (except that sweep will begin after fiscal year 2011), which would require mandatory prepayment of 50% of excess cash flow if net leverage is at least 5.00x, with step down to 25% if net leverage is between 4.00x and 5.00x, and no sweep if net leverage is less than 4.00x. |
| Representations and Warranties | Substantially consistent with Prepetition Credit Facility but not to include absence of material adverse change or material adverse effect and modified to reflect reorganized corporate structure contemplated by the Plan |
| Affirmative Covenants | Substantially consistent with Prepetition Credit Facility but modified to reflect reorganized |

| | |
|---|---|
| | corporate structure contemplated by the Plan, to eliminate historical items to the extent no longer relevant and as follows: (1) No requirement to obtain debt ratings and (2) Due to "fresh start" accounting, annual audited financial statements not to be required for fiscal year 2009 and comparative financial reporting to begin in 2011 |
| Negative Covenants | Substantially consistent with Prepetition Credit Facility but modified to permit the reorganization contemplated by the Plan, to eliminate historical items to the extent no longer relevant and as follows: (1) Financial covenants (net leverage and interest coverage) set at 50% cushion over the projections attached as Exhibit D to the Disclosure Statement for first 3 years, and 25% for remaining term, with covenant testing to begin on March 31, 2011; (2) Capital expenditures to be set substantially consistent with Prepetition Credit Facility which would permit $12 million in any fiscal year subject to carryover of unused portion to next year of up to $2.5 million plus an additional aggregate basket for the term of the New Credit Facility of $12 million; (3) Restrictions on liens and indebtedness to have additional carveouts permitting (i) cash collateral for Domestic Letters of Credit, (ii) the Permitted Revolving Facility and (iii) New Facility Letters of Credit, in each case, to the extent set forth above, and letters of credit issued for the benefit of certain foreign subsidiaries; (4) Existing carveouts for the "Sweet Simplicity JV" (as defined in the Prepetition Credit Facility) to be expanded to include all low or zero-calorie sweeteners or sweetened edible consumer products; (5) Carveout for the "SwissCo 2 Revolving Note" (as defined in the DIP Facility) in restrictions on indebtedness to be expanded to permit additional principal amounts of $50 million in each of 2010, 2011 and 2012 and $60 million in each of 2013 and 2014; (6) Restrictions on indebtedness shall not |

| | |
|---|---|
| | permit "Permitted Additional Secured Indebtedness", "Permitted Junior Lien PIK Notes", "Permitted PIK Notes" and "Permitted Unsecured PIK Notes" (as defined in the Prepetition Credit Facility); <br> (7) Restrictions on fundamental changes, lines of business, dispositions and transactions with affiliates to permit the tax restructuring of Reorganized Merisant's foreign subsidiaries; <br> (8) Restrictions on lines of business to permit expansion into edible consumer products; <br> (9) Restrictions on dispositions and restricted payments to have additional carveouts to permit new management incentive plan; and <br> (10) Restrictions on dispositions to have additional carveouts to permit additional intellectual property licensing |
| Events of Default | Substantially consistent with Prepetition Credit Facility with change of control event of default modified to reflect new capital structure of Reorganized Debtors and to be triggered by a new investor or group of investors acquiring more than a majority of the equity interests of Reorganized Merisant |
| Equity Cure | Unlimited equity cure with cash equity contribution to be added back to Consolidated EBITDA |
| Reporting | Reporting shall be based on a fiscal year commencing on January 1 |
| Amendments and Waivers | Substantially consistent with Prepetition Credit Facility |
| Assignments and Participations | Substantially consistent with Prepetition Credit Facility |
| Reimbursement of Costs and Expenses; Indemnity | Substantially consistent with Prepetition Credit Facility |
| Governing Law | New York |

# EXHIBIT G-1

Class 3 Subscription Form

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MERISANT WORLDWIDE, INC., et al.,[1] | Case No. 09-10059 (PJW) |
| Debtors. | Jointly Administered |

**INSTRUCTIONS TO SUBSCRIPTION FORM FOR HOLDERS OF ELIGIBLE CLASS 3
CLAIMS FOR RIGHTS OFFERING AND PRIVATE INVESTMENT IN CONNECTION
WITH THE DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION**

> **The Subscription Expiration Time is 4:00 p.m.**
> **New York City time on December 4, 2009.**

On October 20, 2009, Merisant Worldwide, Inc. and its affiliated debtors, each as debtor and debtor-in-possession (collectively, the "Debtors") in the above-captioned cases filed the Debtors' Second Amended Joint Plan of Reorganization (as it may be further amended, the "Plan") and the Disclosure Statement in connection therewith (as it may be amended, the "Disclosure Statement"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. Pursuant to the Plan, each holder of an Eligible Class 3 Claim as of the Rights Offering Record Date has the Right to participate in the Rights Offering and purchase its pro rata share of 50,000 shares of Series A-2 Convertible Preferred Stock of Reorganized Merisant (the "Rights Offering Shares"), on the terms and subject to the conditions set forth in this Subscription Form and Section 5.10 of the Plan (the "Rights Offering").[2] In addition, holders of Class 3 Claims (and Class 5 Claims) that are "Accredited Investors" as that term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended (the "Class 3 Private Investors" and "Class 5 Private Investors"), will have the opportunity to participate in a private placement offering for the number of shares of Series A-2 Convertible Preferred Stock equal to the number of Rights Offering Shares that are not properly subscribed for pursuant to the Rights Offering (the "Private Investment Shares"), on the terms and subject to the conditions set forth in this Subscription Form and Section 5.11 of the Plan (the "Private Investment"). Class 3 Private Investors will be able to purchase the number of Private Investment Shares that have not been properly subscribed to by Class 5 Private Investors as of the Subscription Expiration Time (the "Class 3 Private Investment Shares").

---

[1] The Debtors are: Merisant Worldwide, Inc., (Tax ID No. XX-XXX9000), Merisant Company (Tax ID No. XX-XXX8321), Merisant Foreign Holdings I, Inc., (Tax ID No. XX-XXX6579), Merisant US, Inc. (Tax ID No. XX-XXX7233), Whole Earth Sweetener Company, LLC, (Tax ID No. XX-XXX3024), and Whole Earth Foreign Holdings, LLC, (Tax ID No. XX-XXXXYYYY). The mailing address for Merisant Worldwide, Inc., is 33 North Dearborn, Suite 200, Chicago, Illinois 60602.

[2] See Section 5.10 of the Plan and Section II.E. of the Disclosure Statement for a complete description of the Rights Offering.

An "Eligible" Class 3 Claim shall mean: (I) an Allowed Claim, as of the Rights Offering Record Date, in Class 3; and (II) any Claim in Class 3 for which a Proof of Claim has been filed as non-contingent, undisputed, and liquidated and (a) if an objection to such Proof of Claim has already been filed, then such Claim shall only be "Eligible" to the extent of any undisputed portion thereof, or (b) if an objection to such Proof of Claim has not been filed and no amount is reflected in the Debtors' schedules of assets and liabilities (the "Schedules"), but the Debtors, in their sole discretion, do not dispute all or a portion of the amount asserted in the Proof of Claim, then such Claim shall only be "Eligible" to the extent of any undisputed portion thereof, or (c) if an objection to such Proof of Claim has not been filed and the corresponding Claim listed in the Schedules is different than the amount asserted in the Proof of Claim and the Bankruptcy Court has not entered an order to the contrary, then such Claim shall only be "Eligible" to the extent of the lesser of the amount listed on the Schedules and the amount of the Proof of Claim, unless the Debtors, in their sole discretion, do not dispute all or a portion of the amount asserted in the Proof of Claim, in which case the undisputed portion shall be the amount of the "Eligible" Claim for purposes of participation in the Rights Offering.

You have received the attached Subscription Form because you are the holder of record, as of October 23, 2009 (the "Rights Offering Record Date"), of an Eligible Class 3 Claim. Please utilize the attached Subscription Form to exercise your Right. In order to participate in the Rights Offering, you must complete and return the attached Subscription Form and remit payment for the total number of Rights Offering Shares for which you choose to subscribe (the "Rights Offering Subscription Price") to Epiq Bankruptcy Solutions, LLC (the "Subscription Agent") on or before the Subscription Expiration Time set forth above.

You also may be a Class 3 Private Investor as of the Rights Offering Record Date and have the opportunity to subscribe for the Class 3 Private Investment Shares. If you are a Class 3 Private Investor, in order to participate in the Private Investment please utilize the attached Subscription Form to indicate how many, if any, Private Investment Shares you are willing to purchase (the corresponding maximum dollar amount is the "Maximum Private Investment Subscription Price"). Within five (5) Business Days after the Subscription Expiration Time set forth above, you will receive notice ("Class 3 Notice") of the number of Private Investment Shares allocated to you pursuant to the Private Investment (which number of Private Investment Shares will not be greater than the number of Private Investment Shares that you subscribe for in this Subscription Form) and the aggregate purchase price for the total number of such shares ("Private Investment Subscription Price") (which Private Investment Subscription Price will not be greater than the Maximum Private Investment Subscription Price indicated on this Subscription Form). You must then remit payment of the Private Investment Subscription Price to the Subscription Agent within five (5) Business Days after receipt of your Class 3 Notice.

**RIGHTS OFFERING**

To subscribe for shares of New Merisant Convertible Preferred Stock pursuant to the Rights Offering:

   1. **Insert** the principal amount of Class 3 Merisant Company Notes you hold in Item 1 of the Subscription Form. If you have any questions about the amount of Class 3 Merisant Company Notes held by you, please contact your bank, broker or other nominee (each of the foregoing, a "Nominee").

2. **Calculate** your Share Quantity of Rights Offering Shares in Item 3.

3. **Complete** Item 4 to determine the Rights Offering Subscription Price.

4. **Read and Complete** the certification in Item 6.

5. **Nominee Certification.** Your ***Nominee*** must complete the Nominee Certification in Item 8 of the Subscription Form.

6. **Return the Subscription Form and Payment (If Not By Wire Transfer)** in the pre-addressed envelope so that it is received by the Subscription Agent on or before the Subscription Expiration Time. ***Do not fax Subscription Forms.*** If payment is to be made by wire transfer, call the Subscription Agent at (646) 282-2400 to confirm receipt of payment.

**PRIVATE INVESTMENT**

To subscribe for shares of New Merisant Convertible Preferred Stock pursuant to the Private Investment:

1. **Insert** amount of Private Investment Shares for which you wish to subscribe in Item 5.

2. **Complete** Item 5 to determine the Maximum Private Investment Subscription Price.

3. **Read and Complete** the Class 3 Private Investor certification in Item 7a and supplemental certification in 7b.

4. **Nominee Certification.** Your ***Nominee*** must complete the Nominee Certification in Item 8 of the Subscription Form.

5. **Return the Subscription Form** in the pre-addressed envelope so that it is received by the Subscription Agent on or before the Subscription Expiration Time. ***Do not fax Subscription Forms.***

6. **Make Payment for Private Investment Shares Upon Receipt of the Class 3 Notice** to the Subscription Agent by wire transfer or by bank or cashier's check delivered to the Subscription Agent. If payment is to be made by wire transfer, call the Subscription Agent at (646) 282-2400 to confirm receipt of payment.

Payments made in accordance with the Rights Offering (the "Rights Offering Proceeds") and Private Investment (the "Private Investment Proceeds") will be deposited and held by the Subscription Agent in a trust account maintained by the Subscription Agent for the sole purpose

of holding the Rights Offering Proceeds and Private Investment Proceeds until the Effective Date or such other later date, at the option of the Reorganized Debtors, on which the Rights Offering Shares and Private Investment Shares will be distributed.  The Subscription Agent will not use such funds for any other purpose prior to such date, and shall not encumber or permit such funds to be encumbered with any Lien or similar encumbrance.

In the event that the Debtors revoke, withdraw or fail to consummate the Plan, the Subscription Agent or the Debtors or Reorganized Debtors, as the case may be, shall, within five (5) Business Days of such event or failure to consummate the Plan, return the Rights Offering Proceeds and Private Investment Proceeds, without interest.

The Debtors and the Subscription Agent will use commercially reasonable efforts to give notice to any holder of Rights or Class 3 Private Investor regarding any defect or irregularity in connection with any purported exercise of Rights or subscription for Private Investment Shares by such holder and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors nor the Subscription Agent will incur any liability for failure to give such notification.

Please review the Disclosure Statement (Sections II.E. and II.F.) and the Plan (Sections 5.10 and 5.11) for further information.  Copies of the Plan and Disclosure Statement are available through the Subscription Agent at www.epiqbankruptcysolutions.com or by contacting the Subscription Agent by first class mail, personal delivery, or overnight courier at Merisant Ballot Processing Center, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017.

**Questions.**  If you have any questions about this Subscription Form, or the subscription procedures described herein, please contact the Subscription Agent at (646) 282-2400.

*You should review the Disclosure Statement and the Plan before you exercise your Rights or subscribe for Private Investment Shares.  You may wish to seek legal advice concerning the Rights Offering and Private Investment.*

**If your Subscription Form and your Rights Offering Subscription Price are not received by the Subscription Agent by the Subscription Expiration Time, your Right to participate in the Rights Offering will terminate and be cancelled.**

**If your Subscription Form is not received by the Subscription Agent by the Subscription Expiration Time and your Private Investment Subscription Price is not received within five (5) Business Days after your receipt of the Class 3 Notice, your ability to participate in the Private Investment will terminate and be cancelled.**

**SUBSCRIPTION FORM FOR HOLDERS OF ELIGIBLE CLASS 3 CLAIMS FOR RIGHTS OFFERING AND FOR CLASS 3 PRIVATE INVESTORS FOR PRIVATE INVESTMENT IN CONNECTION WITH THE DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION**

---

**The Subscription Expiration Time is 4:00 p.m. New York City time on December 4, 2009, unless extended by the Debtors in writing.**

---

**Please consult the Plan and the accompanying Disclosure Statement for additional information with respect to this Subscription Form.**

---

**Item 1.  Amount of Eligible Class 3 Claims.**  I certify that, as of the Rights Offering Record Date, October 23, 2009, I held Class 3 Merisant Company Notes in the following principal amount (insert amount below) or that I am the authorized signatory of that beneficial owner. This amount must match the amount in Item 8 that has been certified by your Nominee as the amount held by your account as of the Rights Offering Record Date (the "Certified Principal Amount").

$_____
Certified Principal Amount

**Item 2.  Rights.**  Each holder of an Eligible Class 3 Claim is entitled to participate in the Rights Offering for up to such holder's pro rata share of the Rights Offering Shares.  To exercise your Right, fill out Item 3 below and read and complete Item 4 below.

**Item 3.  Calculation of Rights Offering Shares Quantity.**  By completing the following blanks, you are agreeing to purchase the number of Rights Offering Shares specified below (specify a whole number of Rights Offering Shares), at a price of $100.00 per share, on the terms of and subject to the conditions set forth in the Plan.  To calculate the Rights Offering Shares Quantity for which you are subscribing pursuant to the Rights Offering, complete the following:

_____  x  [_____]  =  _____
Certified Principal Amount        Pro Rata                Rights Offering Shares
                                  Multiplier[1]           Quantity
                                                          (Round Down to Nearest
                                                          Whole Number)

---

[1] Your Pro Rata Multiplier was determined by dividing your Certified Principal Amount described in Item 1 by $235,331,250, which is the aggregate Certified Principal Amounts for all holders of Eligible Class 3 Claims.

In order to exercise the Rights, each holder of an Eligible Class 3 Claim must: (i) return this duly completed Subscription Form to the Subscription Agent so that such form is actually received by the Subscription Agent; and (ii) pay or arrange for payment to the Subscription Agent (on behalf of Reorganized Merisant) on or before the Subscription Expiration Time in accordance with the wire instructions set forth below or by bank or cashier's check delivered to the Subscription Agent.

**Item 4. Rights Offering Subscription Price.** To calculate your Rights Offering Subscription Price, complete the following:

_____    x    $[\_\_\_\_\_] per share    =    _____

Rights Offering Shares
Quantity (Number That
You Elect to Purchase)

Rights Offering
Subscription Price

**Item 5. Maximum Private Investment Subscription Price.** By completing the following blanks, you are agreeing to purchase the number of Private Investment Shares specified below on the terms of and subject to the conditions set forth in the Plan. Please specify a whole number of Private Investment Shares, up to 50,000 shares, at a price of $100.00 per share. The number of shares that you specify may be subject to proration based on the aggregate number of Private Investment Shares subscribed to by Class 3 Private Investors if the aggregate number of shares subscribed for by Class 3 Private Investors is greater than the number of Class 3 Private Investment Shares available. Your Class 3 Notice will describe the number of Private Investment Shares that you will be required to purchase pursuant to the Private Investment and the Private Investment Subscription Price for such shares. To calculate your Maximum Private Investment Subscription Price, complete the following:

_____    X    $[\_\_\_\_\_] per share    =    _____

Maximum Number of
Private Investment Shares
You Agree to Purchase
(Up to 50,000)

Maximum Private
Investment Subscription
Price

**Wire Instructions:**

    Wire to:

    ABA#:

    Credit to:

*Include the Fed. Ref. number on your Subscription Form.*

**Check Instructions:**

    Make <u>Bank Check</u> or <u>Cashier's Check</u> payable to Merisant Company.

Send your check and Subscription Form in the pre-addressed envelope provided OR by mail, courier or hand delivery to the Subscription Agent at the following address: Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, Attn: Merisant Subscription Agent.

If, on or prior to the Subscription Expiration Time, or with respect to payment for Private Investment Shares, within five (5) Business Days after your receipt of the Class 3 Notice, the Subscription Agent for any reason has not received both your duly completed Subscription Form and your payment in immediately available funds in an amount equal to your Rights Offering Subscription Price (as set forth in Item 4 above) or Private Investment Subscription Price (as set forth in your Class 3 Notice), as applicable, you will be deemed to have relinquished and waived your Right to participate in the Rights Offering and ability to subscribe for Private Investment Shares.

**Item 6. Subscription Certifications.** I certify that (i) I am the holder, or the authorized signatory of the holder, of an Eligible Class 3 Claim, and (ii) I am, or such holder is, entitled to participate in the Rights Offering to the extent of my, or such holder's, Eligible Class 3 Claim Amount indicated under Item 1 above.

**Item 7a. Class 3 Private Investor Certification.** I certify that I am an "Accredited Investor" as that term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended.

**Item 7b. Subscription Certifications for Persons who Qualify as Accredited Investors.**

(a) <u>No Intention to Sell</u>. I certify that I am, or such holder is, acquiring the Private Investment Shares for my, or such holder's, account with the present intention of holding such shares for purposes of investment, and I have, or such holder has, no intention of selling such shares in a public distribution in violation of the federal securities laws or any applicable state securities laws.

(b) <u>Securities Laws Compliance</u>. I understand, or such holder understands, that the Private Investment Shares have not been and will not be registered under the Securities Act or applicable state securities laws and are being issued in reliance on exemptions for private offerings contained in Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act") and the provisions of Regulation D promulgated thereunder. The Private Investment Shares will not be offered for sale, sold or otherwise transferred by me, or such holder, except pursuant to a registration statement or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

(c) <u>Sophistication</u>. I have, or such holder has, such knowledge and experience in financial and business matters that I am, or such holder is, capable of evaluating the merits and risks of investing in the Private Investment Shares being acquired hereunder. I am, or such holder is, an "Accredited Investor" within the meaning of Rule 501(a) under the Securities Act. I understand and am, or such holder understands and is, able to bear any

economic risks associated with such investment (including, without limitation, the necessity of holding the Private Investment Shares for an indefinite period of time).

(d) <u>Information</u>. I acknowledge that I have been, or such holder has been, afforded the opportunity to ask questions and receive answers concerning the Debtors and their non-Debtor affiliates and to obtain additional information that I have, or such holder has, requested to verify the accuracy of the information contained herein. I further acknowledge that I have, or such holder has, received a copy of the Plan and the Disclosure Statement.

Date: _____

Name of Holder: _____

Signature: _____

Name of Person Signing: _____

Title (if corporation, partnership or LLC: _____

Street Address: _____

_____

City, State, Zip Code: _____

_____

Telephone Number: _____

**Item 8.  Nominee Certification.**  Your ownership of Class 3 Merisant Company Notes must be confirmed by your Nominee.  The Nominee holding your Class 3 Merisant Company Notes as of the Rights Offering Record Date, October 23, 2009, must complete the box below on your behalf.

| <u>For Use Only by the Nominee</u> | |
|---|---|
| DTC Participant Name:<br><br>_____<br><br>DTC Participant Number: _____<br><br>Principal Amount of Class 3 Merisant Company Notes (CUSIP _____) held by Nominee for this account as of the Rights Offering Record Date, October 23, 2009:<br><br>$_____ principal amount<br><br>_____<br>Nominee Contact Name<br><br>(_____) _____-_____<br>Nominee Contact Telephone Number | Nominee's Medallion Guarantee: |

**PLEASE NOTE: NO RIGHT WILL BE VALIDLY EXERCISED UNLESS, ON OR BEFORE THE SUBSCRIPTION EXPIRATION TIME, THE SUBSCRIPTION AGENT RECEIVES (i) A PROPERLY COMPLETED AND SIGNED SUBSCRIPTION ACCEPTANCE FORM AND (ii) PAYMENT OF YOUR RIGHTS OFFERING SUBSCRIPTION PRICE.**

**PLEASE NOTE: NO PRIVATE INVESTMENT SUBSCRIPTION WILL BE VALIDLY EXERCISED UNLESS, (i) ON OR BEFORE THE SUBSCRIPTION EXPIRATION TIME, THE SUBSCRIPTION AGENT RECEIVES A PROPERLY COMPLETED AND SIGNED SUBSCRIPTION ACCEPTANCE FORM AND (ii) WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT OF YOUR CLASS 3 NOTICE, THE SUBSCRIPTION AGENT RECEIVES PAYMENT OF YOUR PRIVATE INVESTMENT SUBSCRIPTION PRICE.**

**THIS FORM SHOULD BE RETURNED ONLY TO THE SUBSCRIPTION AGENT.**

# EXHIBIT G-2

Class 5 Subscription Forms

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MERISANT WORLDWIDE, INC., et al.,[1] | Case No. 09-10059 (PJW) |
| Debtors. | Jointly Administered |

**INSTRUCTIONS TO SUBSCRIPTION FORM FOR HOLDERS OF CLASS 5
NOTEHOLDER CLAIMS FOR THE PRIVATE INVESTMENT IN CONNECTION
WITH THE DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION**

> **The Subscription Expiration Time is 4:00 p.m.
> New York City time on December 4, 2009.**

On October 20, 2009, Merisant Worldwide, Inc. and its affiliated debtors, each as debtor and debtor-in-possession (collectively, the "Debtors") in the above-captioned cases filed the Debtors' Second Amended Joint Plan of Reorganization (as it may be further amended, the "Plan") and the Disclosure Statement in connection therewith (as it may be amended, the "Disclosure Statement"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. Pursuant to the Plan, each holder of an Eligible Class 3 Claim as of the Rights Offering Record Date has the Right to participate in the Rights Offering and purchase its pro rata share of 50,000 shares of Series A-2 Convertible Preferred Stock of Reorganized Merisant (the "Rights Offering Shares"), on the terms and subject to the conditions set forth in Section 5.10 of the Plan (the "Rights Offering").[2] In addition, holders of Class 5 Claims (and Class 3 Claims) that are "Accredited Investors" as that term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended (the "Class 5 Private Investors" and "Class 3 Private Investors"), will have the opportunity to participate in a private placement offering for the number of shares of Series A-2 Convertible Preferred Stock equal to the number of Rights Offering Shares that are not properly subscribed for pursuant to the Rights Offering (the "Private Investment Shares"), on the terms and subject to the conditions set forth in this Subscription Form and Section 5.11 of the Plan (the "Private Investment"). Class 5 Private Investors will be able to purchase up to the entire number of Private Investment Shares.

You have received the attached Subscription Form because you are the holder of record, as of October 23, 2009 (the "Private Investment Record Date"), of a Class 5 Claim and may be a

---

[1] The Debtors are: Merisant Worldwide, Inc., (Tax ID No. XX-XXX9000), Merisant Company (Tax ID No. XX-XXX8321), Merisant Foreign Holdings I, Inc., (Tax ID No. XX-XXX6579), Merisant US, Inc. (Tax ID No. XX-XXX7233), Whole Earth Sweetener Company, LLC, (Tax ID No. XX-XXX3024), and Whole Earth Foreign Holdings, LLC, (Tax ID No. XX-XXXYYYY). The mailing address for Merisant Worldwide, Inc., is 33 North Dearborn, Suite 200, Chicago, Illinois 60602.

[2] See Section 5.10 of the Plan and Section II.E. of the Disclosure Statement for a complete description of the Rights Offering.

Class 5 Private Investor and have the opportunity pursuant to the Plan to subscribe for the Class 5 Private Investment Shares. If you are a Class 5 Private Investor and wish to participate in the Private Investment, please utilize the attached Subscription Form to indicate how many, if any, Private Investment Shares you are willing to purchase (the corresponding maximum dollar amount is the "Maximum Private Investment Subscription Price"). Within five (5) Business Days after the Subscription Expiration Time set forth above, you will receive notice ("Class 5 Notice") of the number of Private Investment Shares allocated to you pursuant to the Private Investment (which number of Private Investment Shares will not be greater than the number of Private Investment Shares that you subscribe for in this Subscription Form) and the aggregate purchase price for the total number of such shares ("Private Investment Subscription Price") (which Private Investment Subscription Price will not be greater than the Maximum Private Investment Subscription Price indicated on this Subscription Form). You must then remit payment of the Private Investment Subscription Price to Epiq Bankruptcy Solutions, LLC (the "Subscription Agent") within five (5) Business Days after receipt of your Class 5 Notice.

To subscribe for shares of New Merisant Convertible Preferred Stock pursuant to the Private Investment:

1. **Insert** amount of Private Investment Shares that you wish to subscribe for in Item 1.

2. **Complete** Item 1 to determine the Maximum Private Investment Subscription Price.

3. **Read and Complete** the Class 5 Private Investor certification in Item 2a and supplemental certification in 2b.

4. **Nominee Certification.** Your *Nominee* must complete the Nominee Certification in Item 3 of the Subscription Form.

5. **Return the Subscription Form** in the pre-addressed envelope so that it is received by the Subscription Agent on or before the Subscription Expiration Time. *Do not fax Subscription Forms.*

6. **Make Payment Upon Receipt of the Class 5 Notice** to the Subscription Agent by wire transfer or by bank or cashier's check delivered to the Subscription Agent. If payment is to be made by wire transfer, call the Subscription Agent at (646) 282-2400 to confirm receipt of payment.

Payments made in accordance with the Private Investment (the "Private Investment Proceeds") will be deposited and held by the Subscription Agent in a trust account maintained by the Subscription Agent for the sole purpose of holding the Private Investment Proceeds until the Effective Date or such other later date, at the option of the Reorganized Debtors, on which the Private Investment Shares will be distributed. The Subscription Agent will not use such funds for any other purpose prior to such date, and shall not encumber or permit such funds to be encumbered with any Lien or similar encumbrance.

In the event that the Debtors revoke, withdraw or fail to consummate the Plan, the Subscription Agent or the Debtors or Reorganized Debtors, as the case may be, shall, within five

(5) Business Days of such event or failure to consummate the Plan, return the Private Investment Proceeds, without interest.

The Debtors and the Subscription Agent will use commercially reasonable efforts to give notice to any Class 5 Private Investor regarding any defect or irregularity in connection with any purported subscription for Private Investment Shares by such Class 5 Private Investor and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors nor the Subscription Agent will incur any liability for failure to give such notification.

Please review the Disclosure Statement (Section II.F.) and the Plan (Section 5.11) for further information. Copies of the Plan and Disclosure Statement are available through the Subscription Agent at www.epiqbankruptcysolutions.com, or by contacting the Subscription Agent by first class mail, personal delivery, or overnight courier at Merisant Ballot Processing Center, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017.

**Questions.** If you have any questions about this Subscription Form, or the subscription procedures described herein, please contact the Subscription Agent at (646) 282-2400.

*You should review the Disclosure Statement and the Plan before you subscribe for Private Investment Shares. You may wish to seek legal advice concerning the Private Investment.*

**If your Subscription Form is not received by the Subscription Agent by the Subscription Expiration Time and your Private Investment Subscription Price is not received within five (5) Business Days after your receipt of the Class 5 Notice, your ability to participate in the Private Investment will terminate and be cancelled.**

**SUBSCRIPTION FORM FOR HOLDERS OF CLASS 5 NOTEHOLDER CLAIMS FOR THE PRIVATE INVESTMENT IN CONNECTION WITH THE DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION**

---

**The Subscription Expiration Time is 4:00 p.m. New York City time on December 4, 2009, unless extended by the Debtors in writing.**

---

**Please consult the Plan and the accompanying Disclosure Statement for additional information with respect to this Subscription Form.**

---

**Item 1.  Maximum Private Investment Subscription Price.**  By completing the following blanks, you are agreeing to purchase the number of Private Investment Shares specified below on the terms of and subject to the conditions set forth in the Plan.  Please specify a whole number of Private Investment Shares, up to 50,000 shares, at a price of $100.00 per share.  The number of shares that you specify may be subject to proration based on the aggregate number of Private Investment Shares subscribed to by Class 5 Private Investors if the aggregate number of shares subscribed for by Class 5 Private Investors is greater than the number of Private Investment Shares available.  Your Class 5 Notice will describe the number of Private Investment Shares that you will be required to purchase pursuant to the Private Investment and the Private Investment Subscription Price for such shares.  To calculate your Maximum Private Investment Subscription Price, complete the following:

|  | X | $[_____] per share | = |  |
|---|---|---|---|---|
| Maximum Number of Private Investment Shares You Agree to Purchase (Up to 50,000) |  |  |  | Maximum Private Investment Subscription Price |

**Wire Instructions:**

Wire to:

ABA#:

Credit to:

*Include the Fed. Ref. number on your Subscription Form.*

**Check Instructions:**

Make Bank Check or Cashier's Check payable to Merisant Company.

Send your check and Subscription Form in the pre-addressed envelope provided OR by mail, courier or hand delivery to the Subscription Agent at the following address: Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, Attn: Merisant Subscription Agent.

If, on or prior to the Subscription Expiration Time, the Subscription Agent for any reason has not received your duly completed Subscription Form and/or has not received payment in immediately available funds in an amount equal to your Private Investment Subscription Price (as set forth in your Class 5 Notice) for your Private Investment Shares within five (5) Business Days after your receipt of the Class 5 Notice, you will be deemed to have relinquished and waived your ability to subscribe for Private Investment Shares.

**Item 2a.  Class 5 Private Investor Certification.**  I certify that I am an "Accredited Investor" as that term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended.

**Item 2b.  Subscription Certifications for Persons who Qualify as Accredited Investors.**

(a) <u>No Intention to Sell</u>.  I certify that I am, or such holder is, acquiring the Private Investment Shares for my, or such holder's, account with the present intention of holding such shares for purposes of investment, and I have, or such holder has, no intention of selling such shares in a public distribution in violation of the federal securities laws or any applicable state securities laws.

(b) <u>Securities Laws Compliance</u>.  I understand, or such holder understands, that the Private Investment Shares have not been and will not be registered under the Securities Act or applicable state securities laws and are being issued in reliance on exemptions for private offerings contained in Section 4(2) of the Securities Act of 1933, as amended (the "<u>Securities Act</u>") and the provisions of Regulation D promulgated thereunder.  The Private Investment Shares will not be offered for sale, sold or otherwise transferred by me, or such holder, except pursuant to a registration statement or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

(c) <u>Sophistication</u>.  I have, or such holder has, such knowledge and experience in financial and business matters that I am, or such holder is, capable of evaluating the merits and risks of investing in the Private Investment Shares being acquired hereunder.  I am, or such holder is, an "accredited investor" within the meaning of Rule 501(a) under the Securities Act.  I understand and am, or such holder understands and is, able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding the Private Investment Shares for an indefinite period of time).

(d) <u>Information</u>.  I acknowledge that I have been, or such holder acknowledges that it has been, afforded the opportunity to ask questions and receive answers concerning the Debtors and their non-Debtor affiliates and to obtain additional information that I have, or it has, requested to verify the accuracy of the information contained herein.  I further

acknowledge that I have, or such holder has, received a copy of the Plan and the Disclosure Statement.

Date: _____

Name of Holder: _____

Signature: _____

Name of Person Signing: _____

Title (if corporation,
partnership or LLC: _____

Street Address: _____

_____

City, State, Zip Code: _____

_____

Telephone Number: _____

**Item 8.  Nominee Certification.**  Your ownership of Class 5 Merisant Company Notes must be confirmed by your Nominee.  The Nominee holding your Class 5 Merisant Company Notes as of the Private Investment Record Date, October 23, 2009, must complete the box below on your behalf.

| For Use Only by the Nominee | |
|---|---|
| DTC Participant Name:<br><br>_____<br><br>DTC Participant Number: _____<br><br>Principal Amount of Class 5 Merisant Company Notes (CUSIP _____) held by Nominee for this account as of the Private Investment Record Date, October 23, 2009:<br><br>$_____ principal amount<br><br>_____<br>Nominee Contact Name<br><br>(_____) _____-_____<br>Nominee Contact Telephone Number | Nominee's Medallion Guarantee: |

**PLEASE NOTE: NO PRIVATE INVESTMENT SUBSCRIPTION WILL BE VALIDLY EXERCISED UNLESS, (i) ON OR BEFORE THE SUBSCRIPTION EXPIRATION TIME, THE SUBSCRIPTION AGENT RECEIVES A PROPERLY COMPLETED AND SIGNED SUBSCRIPTION ACCEPTANCE FORM AND (ii) WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT OF YOUR CLASS 5 NOTICE, THE SUBSCRIPTION AGENT RECEIVES PAYMENT OF YOUR PRIVATE INVESTMENT SUBSCRIPTION PRICE.**

**THIS FORM SHOULD BE RETURNED ONLY TO THE SUBSCRIPTION AGENT.**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MERISANT WORLDWIDE, INC., et al.,[1] | Case No. 09-10059 (PJW) |
| Debtors. | Jointly Administered |

**INSTRUCTIONS TO SUBSCRIPTION FORM FOR HOLDERS OF CLASS 5 CLAIMS
FOR THE PRIVATE INVESTMENT IN CONNECTION WITH THE
DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION**

> **The Subscription Expiration Time is 4:00 p.m.
> New York City time on December 4, 2009.**

On October 20, 2009, Merisant Worldwide, Inc. and its affiliated debtors, each as debtor and debtor-in-possession (collectively, the "Debtors") in the above-captioned cases filed the Debtors' Second Amended Joint Plan of Reorganization (as it may be further amended, the "Plan") and the Disclosure Statement in connection therewith (as it may be amended, the "Disclosure Statement"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. Pursuant to the Plan, each holder of an Eligible Class 3 Claim as of the Rights Offering Record Date has the Right to participate in the Rights Offering and purchase its pro rata share of 50,000 shares of Series A-2 Convertible Preferred Stock of Reorganized Merisant (the "Rights Offering Shares"), on the terms and subject to the conditions set forth in Section 5.10 of the Plan (the "Rights Offering").[2]  In addition, holders of Class 5 Claims (and Class 3 Claims) that are "Accredited Investors" as that term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended (the "Class 5 Private Investors" and "Class 3 Private Investors"), will have the opportunity to participate in a private placement offering for the number of shares of Series A-2 Convertible Preferred Stock equal to the number of Rights Offering Shares that are not properly subscribed for pursuant to the Rights Offering (the "Private Investment Shares"), on the terms and subject to the conditions set forth in this Subscription Form and Section 5.11 of the Plan (the "Private Investment").  Class 5 Private Investors will be able to purchase up to the entire number of Private Investment Shares.

You have received the attached Subscription Form because you are the holder of record, as of October 23, 2009 (the "Private Investment Record Date"), of a Class 5 Claim and may be a

---

[1] The Debtors are: Merisant Worldwide, Inc., (Tax ID No. XX-XXX9000), Merisant Company (Tax ID No. XX-XXX8321), Merisant Foreign Holdings I, Inc., (Tax ID No. XX-XXX6579), Merisant US, Inc. (Tax ID No. XX-XXX7233), Whole Earth Sweetener Company, LLC, (Tax ID No. XX-XXX3024), and Whole Earth Foreign Holdings, LLC, (Tax ID No. XX-XXXYYYY).  The mailing address for Merisant Worldwide, Inc., is 33 North Dearborn, Suite 200, Chicago, Illinois 60602.

[2] See Section 5.10 of the Plan and Section II.E. of the Disclosure Statement for a complete description of the Rights Offering.

Class 5 Private Investor and have the opportunity pursuant to the Plan to subscribe for the Class 5 Private Investment Shares. If you are a Class 5 Private Investor and wish to participate in the Private Investment, please utilize the attached Subscription Form to indicate how many, if any, Private Investment Shares you are willing to purchase (the corresponding maximum dollar amount is the "Maximum Private Investment Subscription Price"). Within five (5) Business Days after the Subscription Expiration Time set forth above, you will receive notice ("Class 5 Notice") of the number of Private Investment Shares allocated to you pursuant to the Private Investment (which number of Private Investment Shares will not be greater than the number of Private Investment Shares that you subscribe for in this Subscription Form) and the aggregate purchase price for the total number of such shares ("Private Investment Subscription Price") (which Private Investment Subscription Price will not be greater than you pursuant to the Maximum Private Investment Subscription Price indicated on this Subscription Form). You must then remit payment of the Private Investment Subscription Price to Epiq Bankruptcy Solutions, LLC (the "Subscription Agent") within five (5) Business Days after receipt of your Class 5 Notice.

To subscribe for shares of New Merisant Convertible Preferred Stock pursuant to the Private Investment:

1. **Insert** amount of Private Investment Shares that you wish to subscribe for in Item 1.

2. **Complete** Item 1 to determine the Maximum Private Investment Subscription Price.

3. **Read and Complete** the Class 5 Private Investor certification in Item 2a and supplemental certification in 2b.

4. **Return the Subscription Form** in the pre-addressed envelope so that it is received by the Subscription Agent on or before the Subscription Expiration Time. *Do not fax Subscription Forms.*

5. **Make Payment Upon Receipt of the Class 5 Notice** to the Subscription Agent by wire transfer or by bank or cashier's check delivered to the Subscription Agent. If payment is to be made by wire transfer, call the Subscription Agent at (646) 282-2400 to confirm receipt of payment.

Payments made in accordance with the Private Investment (the "Private Investment Proceeds") will be deposited and held by the Subscription Agent in a trust account maintained by the Subscription Agent for the sole purpose of holding the Private Investment Proceeds until the Effective Date or such other later date, at the option of the Reorganized Debtors, on which the Private Investment Shares will be distributed. The Subscription Agent will not use such funds for any other purpose prior to such date, and shall not encumber or permit such funds to be encumbered with any Lien or similar encumbrance.

In the event that the Debtors revoke, withdraw or fail to consummate the Plan, the Subscription Agent or the Debtors or Reorganized Debtors, as the case may be, shall, within five (5) Business Days of such event or failure to consummate the Plan, return the Private Investment Proceeds, without interest.

The Debtors and the Subscription Agent will use commercially reasonable efforts to give notice to any Class 5 Private Investor regarding any defect or irregularity in connection with any purported subscription for Private Investment Shares by such Class 5 Private Investor and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors nor the Subscription Agent will incur any liability for failure to give such notification.

Please review the Disclosure Statement (Section II.F.) and the Plan (Section 5.11) for further information.  Copies of the Plan and Disclosure Statement are available through the Subscription Agent at www.epiqbankruptcysolutions.com or by contacting the Subscription Agent by first class mail, personal delivery, or overnight courier at Merisant Ballot Processing Center, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017.

**Questions.**  If you have any questions about this Subscription Form, or the subscription procedures described herein, please contact the Subscription Agent at (646) 282-2400.

*You should review the Disclosure Statement and the Plan before you subscribe for Private Investment Shares.  You may wish to seek legal advice concerning the Private Investment.*

**If your Subscription Form is not received by the Subscription Agent by the Subscription Expiration Time and your Private Investment Subscription Price is not received within five (5) Business Days after your receipt of the Class 5 Notice, your ability to participate in the Private Investment will terminate and be cancelled.**

**SUBSCRIPTION FORM FOR HOLDERS OF CLASS 5 CLAIMS FOR THE PRIVATE
INVESTMENT IN CONNECTION WITH THE
<u>DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION</u>**

---

**The Subscription Expiration Time is 4:00 p.m. New York City time on
December 4, 2009, unless extended by the Debtors in writing.**

---

**Please consult the Plan and the accompanying Disclosure Statement
for additional information with respect to this Subscription Form.**

---

**Item 1.  Maximum Private Investment Subscription Price.**  By completing the following
blanks, you are agreeing to purchase the number of Private Investment Shares specified below on
the terms of and subject to the conditions set forth in the Plan.  Please specify a whole number of
Private Investment Shares, up to 50,000 shares, at a price of $100.00 per share.  The number of
shares that you specify may be subject to proration based on the aggregate number of Private
Investment Shares subscribed to by Class 5 Private Investors if the aggregate number of shares
subscribed for by Class 5 Private Investors is greater than the number of Private Investment
Shares available.  Your Class 5 Notice will describe the number of Private Investment Shares
that you will be required to purchase pursuant to the Private Investment and the Private
Investment Subscription Price for such shares.  To calculate your Maximum Private Investment
Subscription Price, complete the following:

X      $[     ] per share      =

| Maximum Number of | | Maximum Private |
| Private Investment Shares | | Investment Subscription |
| You Agree to Purchase | | Price |
| (Up to 50,000) | | |

**<u>Wire Instructions:</u>**

    Wire to:

    ABA#:

    Credit to:

*Include the Fed. Ref. number on your Subscription Form.*

**<u>Check Instructions:</u>**

    Make <u>Bank Check</u> or <u>Cashier's Check</u> payable to Merisant Company.

Send your check and Subscription Form in the pre-addressed envelope provided OR by mail, courier or hand delivery to the Subscription Agent at the following address: Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, Attn: Merisant Subscription Agent.

If, on or prior to the Subscription Expiration Time, the Subscription Agent for any reason has not received your duly completed Subscription Form and/or has not received payment in immediately available funds in an amount equal to your Private Investment Subscription Price (as set forth in your Class 5 Notice) for your Private Investment Shares within five (5) Business Days after your receipt of the Class 5 Notice, you will be deemed to have relinquished and waived your ability to subscribe for Private Investment Shares.

**Item 2a.  Class 5 Private Investor Certification.**  I certify that (i) I am an "Accredited Investor" as that term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended.

**Item 2b.  Subscription Certifications for Persons who Qualify as Accredited Investors.**

(a) <u>No Intention to Sell</u>.  I certify that I am, or such holder is, acquiring the Private Investment Shares for my, or such holder's, account with the present intention of holding such shares for purposes of investment, and I have, or such holder has, no intention of selling such shares in a public distribution in violation of the federal securities laws or any applicable state securities laws.

(b) <u>Securities Laws Compliance</u>.  I understand, or such holder understands, that the Private Investment Shares have not been and will not be registered under the Securities Act or applicable state securities laws and are being issued in reliance on exemptions for private offerings contained in Section 4(2) of the Securities Act of 1933, as amended (the "<u>Securities Act</u>") and the provisions of Regulation D promulgated thereunder.  The Private Investment Shares will not be offered for sale, sold or otherwise transferred by me, or such holder, except pursuant to a registration statement or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

(c) <u>Sophistication</u>.  I have, or such holder has, such knowledge and experience in financial and business matters that I am, or such holder is, capable of evaluating the merits and risks of investing in the Private Investment Shares being acquired hereunder.  I am, or such holder is, an "accredited investor" within the meaning of Rule 501(a) under the Securities Act.  I understand and am, or such holder understands and is, able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding the Private Investment Shares for an indefinite period of time).

(d) <u>Information</u>.  I acknowledge that I have been, or such holder acknowledges that it has been, afforded the opportunity to ask questions and receive answers concerning the Debtors and their non-Debtor affiliates and to obtain additional information that I have, or it has, requested to verify the accuracy of the information contained herein.  I further

acknowledge that I have, or such holder has, received a copy of the Plan and the Disclosure Statement.

Date: _____

Name of Holder: _____

Signature: _____

Name of Person Signing: _____

Title (if corporation, partnership or LLC: _____

Street Address: _____

_____

City, State, Zip Code: _____

_____

Telephone Number: _____


**PLEASE NOTE: NO PRIVATE INVESTMENT SUBSCRIPTION WILL BE VALIDLY EXERCISED UNLESS, (i) ON OR BEFORE THE SUBSCRIPTION EXPIRATION TIME, THE SUBSCRIPTION AGENT RECEIVES A PROPERLY COMPLETED AND SIGNED SUBSCRIPTION ACCEPTANCE FORM AND (ii) WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT OF YOUR CLASS 5 NOTICE, THE SUBSCRIPTION AGENT RECEIVES PAYMENT OF YOUR PRIVATE INVESTMENT SUBSCRIPTION PRICE.**

**THIS FORM SHOULD BE RETURNED ONLY TO THE SUBSCRIPTION AGENT.**